**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq. (KR 4963)
S. Jason Teele, Esq. (SJT 7390)
Thomas A. Pitta, Esq. (TP 3018)
Timothy R. Wheeler, Esq. (TW 3466)
Wojciech F. Jung, Esq. (WJ 2047)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400
*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>EPV SOLAR, INC.,<br><br>               Debtor. | Chapter 11<br><br>Case No. 10-15173 (   ) |

**CERTIFICATION IN SUPPORT OF DEBTOR'S PETITION AND FIRST DAY
MOTIONS**

Tom Werthan, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am the President, Chief Executive Officer, Chief Financial Officer and a Director of EPV Solar, Inc. ("EPV" or the "Debtor").  Although I was originally employed as EPV's Chief Financial Officer in February 2007, following the resignation of Scott T. Massie in August 2009 I became EPV's Chief Executive Officer and a Director.

2.      In my capacity as an Officer and Director, I have detailed knowledge of and experience with the business and financial affairs of EPV, a corporation organized under and existing pursuant to the laws of the State of New Jersey.

3.      Simultaneously herewith, the Debtor filed its voluntary petition (the "Petition") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code").

4.      The Debtor intends to operate its business as a debtor in possession under

sections 1107(a) and 1108 of the Bankruptcy Code.  I am advised by counsel that this Court has jurisdiction over the Debtor's chapter 11 case pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the District of New Jersey pursuant to 28 U.S.C. §§ 1408 and 1409.

5.    This Certification is being submitted in support of the Petition and the relief requested in the First Day Motions (defined below).  Except as otherwise indicated herein, all facts set forth in this Certification are based upon my personal knowledge of the Debtor's operations and finances and information gathered from a review of relevant documents, or provided to me by other members of the Debtor's management or professionals.  I am authorized to submit this Certification on behalf of the Debtor.  If called upon to testify, I could and would testify competently to the facts set forth herein.

A.    **Company Organization and Structure.**

6.    EPV is a solar energy company that designs, develops, manufactures, and markets low-cost amorphous silicon ("a-Si") thin-film photovoltaic ("PV") solar modules and develops and supplies turn-key production lines, capital equipment and technology to manufacture a-Si thin-film PV for the growing international renewable energy market.  In the past, EPV's researchers designed several thin-film PV manufacturing facilities around the world that utilized the Debtor's proprietary manufacturing equipment and technology.

7.    As of the date hereof, the Debtor employs twenty-two (22) full-time and two (2) part-time employees at its Robbinsville, New Jersey headquarters.

B.    **History and Nature of the Debtor's Business.**

8.    Located near Trenton, New Jersey, EPV is a privately owned company that has been at the forefront of research, development, and commercialization of thin-film PV technologies since 1991 when it was founded by pioneers in the solar industry.  EPV produces solar modules using proprietary manufacturing equipment - the EPV Integrated Manufacturing System ("IMS"), which is based on EPV's commercially proven batch manufacturing process. EPV plans joint ventures based on the IMS capability to expand capacity at manufacturing

locations throughout the world.

9.     During 2007, EPV implemented a plan to expand production capacity to facilitate the manufacture and sale of larger quantities of modules and began to design, manufacture and sell high-performance, low-cost a-Si thin-film PV modules to customers in a variety of end markets, particularly customers building large solar fields.

10.     In connection with this new business focus, EPV's board of directors brought in a new management team and tasked it with raising financing for the expansion of EPV's manufacturing operations.  As a result of EPV's fund-raising activities, on June 24, 2007, the Debtor issued $77.5 million in face amount of senior secured convertible notes, maturing in June 2010 (the "2007 Notes").  The proceeds of the 2007 Notes were used primarily to finance the construction of manufacturing facilities in Robbinsville, New Jersey and Senftenberg, Germany.  Following the issuance of the 2007 Notes, the Debtor focused on growing its business and securing customers to support the increased production capabilities created by the new manufacturing facilities.  These efforts led to EPV entering into long-term supply contracts with numerous customers for sales anticipated to exceed $1 billion over the terms of the contracts (generally five to six years).

11.     However, the Debtor's operations and finances were severely impacted by the collapse in the world debt and equity markets commencing in September 2008.  The Debtor's long-term contracts were for the supply of solar modules to be used in the construction of large solar farms, which are commonly funded primarily through debt financing.  As this financing became unavailable to EPV's customers, their orders to EPV were discontinued.  In accordance with industry practice, EPV's contracts generally did not contain minimum order volumes or cancellation penalties so EPV's expected revenue never materialized.

12.     In addition to the impact upon EPV's customers from the downturn in the markets, the Debtor's financial problems exacerbated its sales decline.  The cost of the modules makes up approximately 50% of the cost of constructing a solar farm, and it is critical to the lending banks and the customers that the module supplier will be able to stand behind the 25-

year warranty provided with the modules.  With the balance sheet being significantly impaired by the 2007 Notes, EPV was unable to satisfy potential customers that it would be able to do so.

13.     In order to improve the balance sheet, on June 4, 2009, EPV consummated a balance sheet restructuring, pursuant to which approximately 50% of the 2007 Notes were exchanged for equity in EPV, warrants for additional equity and $50 million in face amount of new notes (the "2009 Notes").  However, the Debtor's sales continued to decline and it was unable to continue meeting operating costs.   In mid-2009, EPV completely ceased its manufacturing operations.  As a result of its inability to fund operations, beginning in November 2008 and continuing through May 2009, the Debtor was forced to terminate (through reductions in force and furloughs) approximately 350 of its employees.

14.     In November 2009, the Debtor entered into a senior secured term loan (the "Patriarch Loan") with Patriarch Partners Agency Services, LLC ("Patriarch").  The Patriarch Loan was intended as bridge financing to allow the Debtor sufficient time to market its business and assets for sale, including the contemplated Akart Asset Sale (defined below).  As of the date hereof, the Debtor's liability to Patriarch totals approximately $3.6 million, exclusive of the last interest payment due on February 18, 2010 (the "Maturity Date").  The Debtor was unable to repay its obligations to Patriarch by the Maturity Date and, on the Maturity Date, Patriarch provided the Debtor with a Notice of an Event of Default.  Subsequently, on February 22, 2010, Patriarch provided the Debtor with a Notice of Disposition of Collateral, with an auction scheduled for March 5, 2010.

15.     Since EPV ceased manufacturing operations, it has focused on selling its remaining inventory and preserving the value of the enterprise for a sale.  Simultaneously, EPV solicited interest from potential buyers in acquiring the business.  As a result of these efforts, on September 24, 2009, the Debtor entered into a letter of intent with Akart Anerji Yatirimlari A.S. ("Akart") to sell substantially all of EPV's assets for the aggregate purchase price of $52.5 million (the "Akart Asset Sale").  Subsequently, on December 7, 2009, the parties entered into definitive sale agreements with the Akart Asset Sale scheduled to close by January 15, 2010.

However, Akart was unable to secure adequate financing to consummate the Akart Asset Sale. As a result of the failure to consummate the Akart Asset Sale and the continuing pressure of the Debtor's leverage position, the Debtor took the unavoidable step of commencing this chapter 11 case to preserve the value of its assets, explore a sale of its a-Si PV manufacturing assets and reorganize around its core equipment business. Most of all, given the Debtor's default under the Patriarch Loan, this chapter 11 filing will provide the Debtor with adequate breathing room to further explore the sale and maximize value of its manufacturing assets for the benefit of <u>all</u> of its creditor constituents and stakeholders.

**C.    The Debtor's Corporate Structure.**

16.    In addition to its United States based business, the Debtor conducts business abroad through three non-debtor subsidiaries. The Debtor is the direct parent, and owns 100% of the capital stock, of EPV Solar Europe Limited ("<u>EPV</u> <u>Europe</u>"), a non-resident Irish company domiciled in Bermuda. EPV Europe owns the capital stock of EPV Solar Ireland Limited ("<u>EPV</u> <u>Ireland</u>"), an Irish company. EPV Ireland owns 100% of the capital stock of EPV Solar Germany GmbH ("<u>EPV</u> <u>Germany</u>", and together with EPV Europe and EPV Ireland, the "<u>Non-Debtor</u> <u>Subsidiaries</u>"), a German company that owns the thin-film solar module facility in Senftenberg, Germany. The Non-Debtor Subsidiaries are not debtors in this or any insolvency proceeding.

**D.    The Debtor's Prepetition Debt Structure.**

**i.    Secured Debt**

17.    As of the Petition Date, the Debtor is indebted to Patriarch in the amount of approximately $3.6 million, plus last interest payment that was due on the Maturity Date. In addition, approximately $55.5 million of the 2009 Notes remain outstanding.[1]

---

[1]    Other than the stipulations the Debtor is making with respect to the cash collateral orders and related documentation, nothing contained herein constitutes an admission or acknowledgment that any claims described and identified in this Certification are valid, enforceable, allowable, or not subject to disputes, counterclaims, or offsets.

### ii.    Affiliate Funding

18.    Historically, the Debtor and the Non-Debtor Subsidiaries have funded their own operational and other expenses.  However, EPV Germany is obligated to EPV in the approximate amount of $24.5 million.  On account of this obligation, EPV Germany has historically made various payments to the Debtor from available cash flow.  In the months preceding the Petition Date, EPV Germany has not had sufficient sales to meet its operating cash needs and EPV has been required to fund certain expenses of the Non-Debtor Subsidiaries.  EPV Germany currently possesses adequate working capital to support and maintain normal operations through approximately May 15, 2010.  However, to the extent the need arises, the Debtor requests authority, in the Cash Management Motion (defined below), to provide supplemental operating capital to the Non-Debtor Subsidiaries, only to the extent necessary to preserve the value of these valuable estate assets, consistent with prepetition practices.

### iii.    Unsecured Debt

19.    As of the Petition Date, the Debtor had aggregate unsecured debt totaling approximately $10.7 million.  This debt includes, but is not limited to, trade payables.

### iv.    Shareholder Equity

20.    On the Petition Date, EPV has approximately four hundred eighty (480) shareholders of record of its common shares of voting stock.  In addition to the common shares, the Debtor has also issued warrants for the purchase of common stock to the holders of the 2009 Notes in connection with the June, 2009 restructuring transactions.  Moreover, certain of the Debtor's Employees hold stock options for EPV's common stock.

### FACTS IN SUPPORT OF FIRST DAY MOTIONS

21.    Concurrent with the filing of its Chapter 11 petition, the Debtor has filed the First Day Motions.  The Debtor requests that each of the First Day Motions described below be granted, as each constitutes a critical element in achieving a successful result in the Debtor's Chapter 11 case for the benefit of all parties in interest.

22.    For a more detailed description of these motions, the Debtor respectfully refers the Court to the respective First Day Motions.  To the extent that this Certification and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.

**A.    Debtor's Motion for Interim and Final Orders Under Section 105, 361, 362 and 363 of the Bankruptcy Code Approving the Use of Cash Collateral, Providing Adequate Protection and Setting a Final Hearing Pursuant to Bankruptcy Rule 4001**

23.    By this motion (the "Cash Collateral Motion"), the Debtor requests an order:

(a)    authorizing the use of the Prepetition Secured Lenders' (defined below) cash collateral and granting adequate protection therefore to the Senior Lenders;

(b)    granting the Senior Lenders replacement liens pursuant to section 361, 363(c) and (e), and solely to the extent of  any diminution in value of their collateral; and

(c)    giving notice of and scheduling an interim and final hearing pursuant to Bankruptcy Rule 4001.

24.    Without the immediate use of the Prepetition Secured Lenders' cash collateral, the Debtor will be unable to pay its ordinary and necessary business expenses including, but not limited to, payroll and related obligations, rent, taxes, utilities, amounts owed to vendors and other supplies of goods and services, insurance, and other costs of administering its estate.  Use of the Prepetition Secured Lenders' cash collateral is therefore critical to preserving the value of the Debtor's estate for all parties-in-interest.

25.    As of the Petition Date, the Debtor was indebted, on a secured basis, under a credit agreement, dated as of November 18, 2009 (as amended, restated, supplemented or otherwise modified from time to time (the "Prepetition Term Loan Agreement") with Patriarch Partners Agency Services, LLC (the "Senior Agent"), and the lenders party thereto (collectively, with the Senior Agent, the "Senior Lenders").  In connection with the Prepetition Term Loan Agreement, the Debtor and Senior Lenders are also parties to a security agreement (the

"Prepetition Term Security Agreement"), dated as of November 18, 2009 (as amended, restated, supplemented or otherwise modified from time to time), which, *inter alia*, grants the Senior Lenders, liens on substantially all of the Debtor's assets.

26.    As of the Petition Date, the Debtor's obligations under the Prepetition Term Loan Agreement totaled approximately $3.6 million, exclusive of the last interest payment.

27.    The Debtor is also a party to an indenture (the "Indenture"), dated as of June 4, 2009 (as amended, restated, supplemented or otherwise modified from time to time) with The Bank of New York Mellon, as trustee (the "Subordinated Notes Trustee"), governing the 1% Convertible Senior Secured PIK Notes Due 2016 (the "Subordinated Notes", and the holders of the Subordinated Notes being the "Subordinated Noteholders", and together with the Senior Lenders, collectively, the "Prepetition Secured Lenders").  The Debtor's obligations under the Indenture are secured as set forth in a security agreement (the "Notes Security Agreement"), dated as of June 4, 2009, (as amended, restated, supplemented or otherwise modified from time to time) with The Bank of New York Mellon as the collateral agent for the benefit of the Subordinated Noteholders.

28.    The Subordinated Noteholders' liens upon and security interest in the Debtor's assets are subordinated to the liens and security interests of the Senior Lenders pursuant to a subordination agreement dated as of November 18, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Subordination Agreement" and, together with the Prepetition Term Loan Agreement, the Prepetition Term Security Agreement, the Indenture and the Notes Security Agreement and all other documents, agreements or instruments in connection therewith or related thereto, collectively, the "Prepetition Loan Documents"), among the Debtor, the Senior Agent as administrative agent for the Senior Lenders, and the Subordinated Notes Trustee in its capacity as trustee and collateral agent to the Subordinated Noteholders.

29.    As of the Petition Date, the Debtor's obligations under the Subordinated Notes totaled approximately $55.5 million.

30.    The Debtor's obligations under the Prepetition Loan Documents are further secured by certain pledges of collateral by the Non-Debtor Subsidiaries.

31.    Pursuant to section 363(c) of the Bankruptcy Code, a debtor-in-possession may not use cash collateral without the consent of the secured party or Court approval.  While the Debtor remains hopeful that the Senior Lenders will consent, they have not done so as of this time.  By virtue of the Subordination Agreement, the Subordinated Notes Trustee and the Subordinated Noteholders are deemed to have consented to the Debtor's use of cash collateral.

32.    As set forth in the Cash Collateral Motion, the Debtor proposes to provide the Senior Lenders with adequate protection in the form of replacement liens, in all respects subject to the Subordination Agreement.  The Debtor also proposes to fully repay the Senior Lenders from the proceeds of a sale of the Debtor's module manufacturing assets and a-Si inventory.

33.    Through the use of the Prepetition Secured Lenders' cash collateral, the Debtor will be able to maintain the value and any equity cushion associated with its assets for the benefit of the Prepetition Secured Lenders and other creditors junior to the Prepetition Secured Lenders.  Moreover, the use of cash collateral will prevent the abrupt discontinuation of the Debtor's operations, which may adversely affect the Debtor's ability to market and sell its module manufacturing assets and reorganize its core equipment business.  Thus, the best way to ensure that the Prepetition Secured Lenders' security interests are not jeopardized is through the use of the Prepetition Secured Lenders' cash collateral.  The Debtor respectfully submits that the protections proposed in the Cash Collateral Motion are appropriate to adequately protect the Prepetition Secured Lenders' interests.  As discussed above, the value of the Debtor's assets exceeds its obligations to the Senior Lenders.

34.    The Debtor submits that the Subordinated Noteholders are not entitled to any form of adequate protection absent the consent of the Senior Lenders.  The Collateral Agent and the Subordinated Noteholders waived their adequate protection rights in the Subordination Agreement.  However, and only after the Debtor's debt to the Senior Lenders under the

Prepetition Term Loan Agreement is repaid in full, the Subordinated Notes Trustee, on behalf of the Subordinated Noteholders, will be granted replacement perfected security interests under Section 361(2) of the Bankruptcy Code to the extent the Subordinated Noteholders' collateral is used by the Debtor, and only to the extent of any diminution in value of the Subordinated Noteholders' collateral.

35.    Absent the immediate entry of the proposed interim order, the Debtor will be unable to operate in chapter 11, seek a sale of its module manufacturing assets, or reorganize around its core equipment business.  Thus, the Debtor respectfully submits that cause has been shown for the entry of the proposed interim order submitted with the Cash Collateral Motion.

36.    Accordingly the Court should authorize the Debtor's use the cash collateral in accordance with the budget annexed to the Cash Collateral Motion.

**B.    Debtor's Motion For Order Pursuant to 11 U.S.C. §§ 105(a), 507(a)(4) And 507(a)(5) (A) Authorizing the Debtor to Pay Pre-petition Wages and Salaries, and Honor Certain Employee Benefits, (B) Directing All Banks to Honor Pre-petition Checks for Payment of Pre-petition Employee Obligations, and (C) Authorizing the Debtor to Honor Workers' Compensation Obligations**

37.    By this motion (the "Wage Motion"), the Debtor seeks the authority, but not the obligation, to: (i) pay all pre-petition Employee claims for wages, salaries, contractual compensation, sick pay, personal pay, holiday pay and other accrued compensation; (ii) make all payments for which Employee payroll deductions were made pre-petition; (iii) reimburse all pre-petition Employee business expenses; (iv) make pre-petition contributions and pay benefits under certain Employee benefit plans; (v) honor workers' compensation programs; (vi) pay other miscellaneous Employee-related costs including but not limited to processing costs and fees; and (vii) continue Employee programs with respect to vacation, sick, personal and holiday leave and continue certain health, welfare, savings and other benefit programs as described more fully below.

38.    Additionally, the Debtor (i) requests that the Court authorize and direct applicable banks and other financial institutions to receive, process, honor and pay all pre-

petition checks and transfers drawn on the Debtor's accounts and to make the foregoing payments, and (ii) seeks authority to pay all processing costs and administrative expenses related to the foregoing payments.

39.     The average weekly payroll for the Debtor's salaried and hourly Employees is approximately $60,000 (inclusive of all related taxes).  The Employees are paid on a weekly basis.    The Debtor uses Automatic Data Processing, Inc. ("ADP") to process Employees' paychecks and direct deposits and pay all related taxes.  The Debtor provides payroll information to ADP on Tuesday of each calendar week, and payroll funds are transferred from the Debtor's payroll account to ADP in advance for each payroll period.  Payroll for the Debtor's Employees for the week ending February 19, 2010 has been paid.  The Debtor's Employees have accrued wages for the week ending February 26, 2010.  By this Wage Motion, the Debtor seeks authority to pay all outstanding wages, salaries and other compensation owed to its Employees as of the Petition Date, aggregating approximately $36,000.

40.     The Debtor maintains a paid time off ("PTO") policy (the "PTO Policy") applicable to all full-time employees, other than executive employees, with at least ninety (90) days of service that includes all paid time for vacation, sick leave, holidays and personal time. Under the PTO Policy, full-time Employees are eligible for up to 232 hours of PTO annually, depending on the number of years of credited service.  The Debtor's PTO Policy typically does not permit Employees to carry over PTO from one year to the next or compensate Employees for any accrued but unused PTO, except in the case of termination or where prohibited by applicable law.  The Debtor anticipates that its Employees will utilize any accrued PTO in the ordinary course.

41.     In the ordinary course of the Debtor's business, Employees may incur a variety of business expenses that are typically reimbursed by the Debtor pursuant to its normal business practices.  The reimbursable business expenses incurred by the Employees include business travel, business meals, car rentals, delivery expenses and miscellaneous related expenses (collectively, the "Reimbursable Business Expenses").  All Reimbursable Business

Expenses were incurred with the understanding that they would be reimbursed by the Debtor.  As of the Petition Date, the Debtor estimates that there are no, or *de minimis* (*i.e.*, under $1,000) unreimbursed Reimbursable Business Expenses.

42.     In the ordinary course of its business, the Debtor provides medical, dental, prescription, supplemental medical and vision insurance to its eligible full-time Employees through group plans offered by Horizon Blue Cross/Blue Shield of New Jersey, Delta Dental of New Jersey, Express Scripts, TransAmerica and Spectera (collectively, the "Health Benefits"). Eligible Employees are also entitled to participate in the Debtor's life and long term disability insurance programs offered by Unum Life Insurance Company of America (the "Life Insurance", collectively with the Health Benefits, the "Insurance Benefits").

43.     The Debtor provides its full-time Employees with the Health Benefits at a substantially reduced cost.  Full-time Employees, who have been employed for ninety (90) calendar days are eligible to receive the Health Benefits on the first day of the next succeeding month.   The Debtor's current total monthly cost for providing the Health Benefits is approximately $76,000, with approximately $41,000 of that amount attributable to fifty-two (52) former employees receiving Health Benefits through COBRA.[2]  As of the Petition Date, the Debtor was current with its obligations on account of the Health Benefits.

44.     The Debtor provides its eligible full-time Employees certain Life Insurance coverage at no cost to the Employees.  Full-time Employees who have been employed for ninety (90) calendar days are eligible to receive the Life Insurance on the first day of the next succeeding month.   As of the Petition Date, the Debtor was current with its obligations on account of the Life Insurance.

45.     The Debtor maintains a defined savings plan for its Employees, which is qualified under section 401(k) of the Internal Revenue Code (the "Savings Plan").  The Savings Plan is administered by EPV Solar, Inc. with Fidelity Management Trust Company as plan

---

[2]     COBRA benefits for all but one former employee will expire on or about December 31, 2010.  All COBRA benefits will expire on or about May 31, 2011.

trustee. Full-time Employees who have been employed for ninety (90) calendar days are eligible to participate in the Savings Plan on the first day of the next succeeding month. Pursuant to the Savings Plan, the Debtor deducts the appropriate amounts from each participating Employee's payroll check and transfers the withheld funds to the plan trustee. The Debtor is current in its obligations under the Savings Plan.

46. The Debtor is required under applicable law to maintain workers' compensation insurance policies and programs to provide Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtor.

47. The Debtor currently insures its workers' compensation liabilities pursuant to a policy with Travelers Insurance Company. As of the Petition Date, the Debtor was current with its workers' compensation obligations.

48. In addition, the Debtor maintains insurance coverage for its directors and officers and the Debtor is current with its premium obligations in connection therewith.

49. Through the Wage Motion, the Debtor also requests that all applicable banks and other financial institutions be authorized to receive, process, honor and pay any and all check and transfers drawn on the Debtor's dedicated payroll accounts, whether such checks were presented before, on, or after the Petition Date. Accordingly, by this Motion, the Debtor seeks (i) authorization for, and/or ratification of, its banks' honoring of pre-petition payroll checks and transfers on or after the Petition Date, (ii) authorization for the banks to process and honor all other checks issued for payments approved by this Motion, and (iii) authorization to reissue checks for payments approved by this Motion whenever a check therefore is dishonored post-petition.

50. Any delay in paying the Employee-related compensation, deductions, reimbursement, benefit plans, workers compensation obligations and/or any other payment requested in the Wage Motion (collectively, the "Employee Obligations") would severely disrupt the Debtor's relationship with its Employees and irreparably impair the Employees' morale at the very time that their dedication, confidence and cooperation are most critical. The Debtor

faces the risk that its operations may be severely impaired if it is not granted authority to pay the Employee Obligations.  At this critical stage, the Debtor simply cannot risk the substantial disruption of its business operations that would attend any decline in workforce morale attributable to the Debtor's failure to pay the Employee Obligations in the ordinary course of business.

51.    I submit that the relief requested in this Motion is warranted under sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code provides that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Further, section 105(a) provides, in pertinent part, that the "Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

52.    No Employee will receive payments in excess of the $10,950 limit established pursuant to sections 507(a)(4) and (5) of the Bankruptcy Code for accrued but unpaid Employee Obligations.  I believe that the payment of the Employee Obligations is critical, especially in light of the need to maintain the morale of the Debtor's Employees and during the pendency of this chapter 11 case.

**C.    Motion for Entry of a Bridge Order and a Final Order (I) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service on Account of Pre-Petition Invoices, (II) Deeming Utility Companies to Have Adequate Assurance of Future Payment and (III) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to Bankruptcy Code §§ 105(a) and 366**

53.    By this motion (the "Utilities Motion"), the Debtor requests entry of interim and final orders (i) prohibiting utility companies from discontinuing, altering or refusing service on account of prepetition invoices, (ii) deeming utility companies to have adequate assurance of future payment, and (iii) establishing procedures for resolving requests for additional assurance pursuant to 11 U.S.C. §§ 105(a) and 366.

54.    In the ordinary course of its business, the Debtor incurs liabilities to various utility companies (each a "Utility Company" and, collectively, the "Utility Companies")

for electricity, gas, telephone service, internet service and data services through the operation of its corporate offices.[3]

55.     Uninterrupted utility services are essential to the continuation of Debtor's ongoing operations, its efforts to maximize the value of the estate and its ability to prosecute this chapter 11 case.  The Debtor's operations will be severely impacted if one or more of the Utility Companies refuse or discontinue utility services for even a brief period of time.  Any interruption of utility services, to the extent that such interruption limits the Debtor's operations, will damage the Debtor's revenues and ability to maximize the value of its assets.  In addition, interruption of utility services may harm the Debtor's relationships with its customers, vendors and employees and will be detrimental to the Debtor's estate, creditors and employees.  Any disruption to Debtor's operations as a result of termination of utility services will frustrate the Debtor's efforts in this case.  Thus, it is critical that utility services provided to the Debtor continue uninterrupted.

56.     As of the Petition Date, the Debtor was current with some of the Utility Companies and had unpaid balances with others.  The Debtor intends to remain current on all of its post-petition obligations to Utility Companies.

57.     Section 366 of the Bankruptcy Code prohibits a utility company from altering, refusing or discontinuing service to a chapter 11 debtor within the first thirty (30) days of the bankruptcy filing (the "Utilities Stay Period").  Upon expiration of the Utilities Stay Period, section 366(b) of the Bankruptcy Code provides that a utility company may terminate services if the utility company has not received adequate assurance of payment from the chapter 11 debtor.

58.     Adequate assurance of payment as defined within section 366(c)(1)(A) of

---

[3]     While the Debtor believes that all of its Utility Companies are listed in Exhibit C to the Utilities Motion, it is possible that certain Utility Companies may have been inadvertently omitted from this list.  Accordingly, the Debtor reserves the right to amend Exhibit C to add any omitted Utility Company and to request that the relief set forth in the Utilities Motion apply to such entities.  In addition, the Debtor reserves the right to assert that any of the entities now or hereafter listed in Exhibit C are not "utilities" within the meaning of section 366 of the Bankruptcy Code.

the Bankruptcy Code, includes "(i) a cash deposit; (ii) a letter of credit; (iii) a certificate of deposit; (iv) a surety bond; (v) a prepayment of utility consumption; (vi) or another form of security that is mutually agreed on between the utility and the debtor or trustee." 11 U.S.C. § 336(c)(1)(A).

59.     The Debtor proposes to provide each Utility Company with a cash deposit equal to two weeks' estimated average utility consumption (the "Utility Deposit") within five (5) business days after the date of entry of the Final Order granting this Motion as adequate assurance of payment as required by section 366(c)(1)(A) of the Bankruptcy Code.[4]

60.     In addition, the Debtor seeks to establish reasonable procedures by which Utility Companies may request additional assurance of future payment. The Debtor proposes the following procedures:

(a)     Absent a further order of this Court and except as otherwise provided herein, the Utility Companies may not alter, refuse or discontinue service to, or discriminate against, the Debtor on account of the commencement of its chapter 11 case or any unpaid pre-petition charges, or request payment of an additional deposit or receipt of other security in connection with any unpaid pre-petition charges.

(b)     The Debtor will serve the Utilities Motion and the Interim Order, if granted by the Court, via first-class mail, within five (5) business days after the date that the Interim Order is entered by the Court, on each of the Utility Companies identified on Exhibit C attached hereto. In the event that any Utility Company was omitted from Exhibit C, the Debtor shall have the right to supplement Exhibit C and shall promptly provide notice of the Order upon learning of such Utility Company.

(c)     Any Utility Company may request assurance of payment (an "Additional Payment Request") within thirty (30) days

---

[4]     As of the Petition Date, the Debtor had already remitted an aggregate security deposit of $27,000 in connection with its five (5) electric/gas accounts with PSE&G. Because the amount of the aggregate security deposit already in place exceeds the Debtor's projected two weeks' aggregate usage of approximately $11,075.00 for these accounts, the Debtor submits that no additional security deposit is necessary.

after the Petition Date (the "Additional Payment Request Deadline") by submitting the request to counsel to the Debtor, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey 07068, Attention: S. Jason Teele, Esq.

(d)     Any Additional Payment Request must (i) be in writing; (ii) set forth the location for which utility services are provided; (iii) include a summary of the Debtor's payment history relevant to the affected account(s), including any security deposits or other prepayments or assurances previously provided by the Debtor; (iv) describe in sufficient detail the reason(s) why the treatment afforded pursuant to the procedures set forth herein does not constitute satisfactory adequate assurance of payment; and (v) include a proposal for what would constitute adequate assurance from the Debtor, along with an explanation of why such proposal is reasonable.

(e)     If a Utility Company makes a timely Additional Payment Request that the Debtor believes is reasonable, the Debtor shall be authorized in its sole discretion to comply with such request without further order of the Court.

(f)     If the Debtor believes that a Utility Company's Additional Payment Request is unreasonable, the Debtor will schedule a hearing on not less than twenty (20) days notice (a "Determination Hearing") to determine if additional assurance as to payment to such Utility Company is necessary.

(g)     Pending resolution of a Utility Company's Additional Payment Request at a Determination Hearing, such Utility Company shall be prohibited from altering, refusing or discontinuing service to the Debtor.

(h)     If a Utility Company fails to send an Additional Payment Request by the Additional Payment Request Deadline, such Utility Company shall have waived its right to make an Additional Payment Request. (Utility Companies that do not send Additional Payment Requests to the parties set forth above by the Additional Payment Request Deadline shall be collectively referred to herein as the "Consenting Utility Companies").

61.     I respectfully submit that this Court should use its equitable powers under

section 105(a) of the Bankruptcy Code because the relief requested is necessary to ensure normal

operations at the Debtor's facilities.  The Debtor's cash flow will be materially impacted if the Utility Companies are permitted to condition post-petition services on the payment of exorbitantly burdensome deposits or other extreme forms of adequate protection.  The Debtor proposes a two-week cash deposit as adequate assurance of future payment.  The relief sought in the Utilities Motion is thus necessary to the extent it prevents a utility company from conditioning post-petition utility services on unreasonable demands.

62.     As set forth above, if Utility Companies are permitted to terminate utility services on the thirty-first day after the Petition Date, a substantial disruption to the Debtor's operations will occur, and the Debtor's business will be irreparably harmed.  If faced with the imminent termination of utility services, the Debtor may be forced to pay any amount demanded by the Utility Companies to avoid the cessation of essential utility services.

63.     I submit that the procedures set forth in the Utilities Motion provide an orderly process for providing adequate assurance of payment to the Utility Companies, without risking irreparable harm to its estate.  Without the procedures set forth in the Utilities Motion, the Debtor could be forced to address numerous requests by Utility Companies in a haphazard manner at a critical period, while the Debtor is trying to move forward with its chapter 11 case. The Debtor could be forced to capitulate to almost any demands made by its Utility Companies, or face the discontinuation of utility service to its facilities and a potential shutdown of its business.  The orderly process contemplated by the procedures set forth in the Utilities Motion will avert such a potentially disastrous outcome, enabling the Debtor to make a smooth transition into chapter 11, while ensuring a fair process for providing adequate assurance to the Utility Companies to the extent required.

**D.     Motion for an Order (A) Authorizing Debtor to Continue Using Existing Consolidated Cash Management System, Bank Accounts and Business Forms, (B) Granting a Waiver of the Deposit Guidelines Set Forth in Section 345 of the Bankruptcy Code and (C) Granting Related Relief**

64.     By this motion (the "<u>Cash</u> <u>Management</u> <u>Motion</u>"), the Debtor requests an order (i) authorizing the Debtor to continue and maintain its existing cash management system,

bank accounts and business forms, (ii) modifying the investment guidelines set forth in section 345 of the Bankruptcy Code, and (iii) granting related relief.

65.     The Debtor has thirteen (13) accounts (the "Bank Accounts") at seven (7) financial institutions.  A list of the Bank Accounts and their respective account numbers and description of the primary purpose of each account is annexed to the Cash Management Motion as Exhibit A.

66.     In the ordinary course of the Debtor's business, funds received from customers are deposited into the Debtor's operating account with Wachovia Bank.  These funds are transferred to the Debtor's other accounts as needed for (i) payment of employee payroll and related taxes; (ii) various accounts payable to third party vendors, suppliers and outside contractors; and (iii) investment purposes.

67.     The Debtor's operating account at Wachovia Bank is subject to an account control agreement with the Senior Agent, executed in connection with the Prepetition Term Loan and Security Agreements.  The Prepetition Term Loan and Security Agreements require that the Debtor's revenue be deposited directly into the Wachovia account and, under certain circumstances defined in the Prepetition Term Loan and Security Agreements, remitted to the Senior Agent.  Prior to the Petition Date, the Debtor affected the following transactions: (i) $250,000 was transferred from the Wachovia account to the other Bank Accounts to meet current and anticipated operating expenses such as payroll, taxes and utilities; (ii) $350,000 was paid to Lowenstein Sandler PC as a retainer in connection with, *inter alia*, bankruptcy and restructuring services; (iii) revenue realized from one customer - MedSolar - was deposited directly by MedSolar into the Debtor's Dresdner account; and (iv) the Debtor retained certain proceeds realized from the sale of tax net operating losses ($230,000) allegedly due and owing to the Senior Agent.  I believe that these transactions were necessary to stabilize the Debtor's business and facilitate a smooth transition into chapter 11.

68.     The Debtor should be authorized to continue to use its existing Bank Accounts and Cash Management System.  The Debtor will work closely with its banks to ensure

that appropriate procedures are in place so that checks issued prior to the Petition Date, but presented after the Petition Date, will not be honored absent approval from the Court.  The Debtor will also maintain records of all transfers within the Cash Management System, including transfers between the Debtor and its Non-Debtor Affiliates, so that all transfers and transactions will be documented in its books and records to the same extent such information was maintained by the Debtor prior to the Petition Date.

69.    Permitting the Debtor to use its existing Bank Accounts and Cash Management System is in the best interests of the Debtor's estate, its creditors and other interested parties.  It is critical that the Debtor be able to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate its business.  Through the Cash Management System and Bank Accounts, the Debtor is able to effectively and efficiently collect, transfer, and disburse funds as needed, as well as to efficiently monitor and control the movement of cash.

70.    To require the Debtor to use new accounts would be disruptive to its business and would impair its efforts to maximize the value of its estate for the benefit of its creditors and parties in interest.  Requiring the Debtor to adopt new, segmented cash management systems at this critical stage of this case would be expensive, would create unnecessary administrative burdens, and would be much more disruptive than productive.  Moreover, having to open new accounts as of the Petition Date would unnecessarily distract the Debtor's key accounting and financial personnel whose efforts are more appropriately focused on assisting with the Debtor's efforts to reorganize its business.  Furthermore, any delays or disruption in the payment of wages and other employee-related expenses resulting from changing bank accounts would erode employee morale at this critical time, an outcome that would severely hamper the Debtor's efforts to reorganize its business.

71.    Conversely, maintenance of the Debtor's Bank Accounts and Cash Management System would avoid delays in the payment of necessary expenses, such as payroll, and will ensure a smooth transition into chapter 11 without the inconvenience, cost, confusion

and delay associated with transferring cash management operations to new accounts. By allowing the continued use of its existing Bank Accounts and Cash Management System, the Debtor will have the unimpeded cash flow necessary for the interim maintenance of its operations. Accordingly, the Debtor respectfully requests authorization to maintain its Bank Accounts and Cash Management System in the ordinary course of business, provided that no prepetition checks, drafts, wire transfers, or other forms of tender that have not yet cleared as of the Petition Date will be honored unless authorized by separate order of this Court.

72.    The Debtor also requests authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Bank Accounts. The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Bank Accounts. In accordance with existing practices, the Debtor will maintain strict records of all receipts and disbursements from the Bank Accounts during the pendency of this case and will ensure that its records properly distinguish between pre- and post-petition transactions.

73.    I submit that the relief requested in the Cash Management Motion is appropriate and well within this Court's authority. Allowing the Debtor to maintain its prepetition Bank Accounts and Cash Management System will minimize the effect of this chapter 11 case on its business affairs without violating the policies of the Bankruptcy Code. Doing so will enable the Debtor to operate in chapter 11 in a manner that maximizes value for the estate and creditors and is therefore in its best interests.

74.    A waiver of account closing requirements is important in this case. Specifically, subject to a prohibition against honoring pre-petition checks without specific authorization from this Court, the Debtor requests that the Bank Accounts be deemed to be debtor-in-possession accounts, and that their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as those employed during the pre-petition period, be authorized. In sum, the Cash Management System allows the Debtor to effectively and efficiently run its business. The Debtor believes that to maximize the value of its

business, there must be minimal disruption to its administrative affairs, and that the maintenance of its current Cash Management System, as provided in the Cash Management Motion, is essential to limiting disruptions to the Debtor's operations.

75.    I submit that if the relief requested in this Motion is granted, the Debtor will not pay, and its banks will be directed not to pay, any debts incurred before the Petition Date, except as authorized by this Court.

76.    In order to minimize expenses to the Debtor's estate and any attendant disruption to its business, the Debtor should also be authorized to continue to use its existing Business Forms without reference to its status as a debtor in possession (other than post-petition checks, which will bear a "debtor in possession" designation).  Changing correspondence and business forms would be expensive, unnecessary and burdensome to the Debtor's estate and disruptive to the Debtor's business operations and would not confer any benefit upon the Debtor, its estate, its creditors or those dealing with the Debtor.  The Debtor proposes that in the event that it needs to purchase new Business Forms during the pendency of this chapter 11 case, such forms will include a legend referring to the Debtor's status as a debtor in possession.

77.    For these reasons, the Debtor requests that it be authorized to use existing checks and business forms without being required to place the label "debtor-in-possession" on each.

78.    The Debtor should also be granted an interim and final waiver of the deposit guidelines contained in section 345 of the Bankruptcy Code.  The Debtor submits that a waiver of the deposit guidelines set forth in section 345 of the Bankruptcy Code is necessary to ensure the Debtor's smooth transition into chapter 11 and should pose no risk to its estates or its creditors.  A disruption of the Debtor's Cash Management System could result in harm to the Debtor, its estate and its creditors.  In addition, requiring the Debtor to open multiple accounts at different banks so that the deposits in each such account would be insured by the FDIC would be unnecessarily burdensome.

79.    I believe that a waiver of the deposit guidelines set forth in section 345 of

the Bankruptcy Code is necessary to ensure the Debtor's smooth transition into chapter 11 and should pose no risk to its estates or its creditors.  The deposits at issue are safe because of the strength of the Debtor's banking institution.  Requiring the Debtor to change its deposits and other procedures abruptly could result in harm to the Debtor, its estates and its creditors because it would disrupt the Debtor's Cash Management System.  In addition, requiring the Debtor to open multiple accounts at different banks so that the deposits in each such account would be insured by the FDIC would be unnecessarily burdensome and would prevent the Debtor's limited financial staff from focusing their undivided attention on the Debtor's efforts to reorganize its business.

80.     For each of the foregoing reasons, I submit that a waiver of the deposit guidelines set forth in section 345(b) of the Bankruptcy Code to permit the Debtor to maintain all of its Bank Accounts including those deposit accounts that may from time to time exceed the amount insured by the FDIC is in the best interests of the Debtor, its estate and creditors.

## **CONCLUSION**

81.     Based on the foregoing information, I respectfully request that the Court enter orders granting each of the First Day Motions.

I certify under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

_____*/s/ Tom Werthan*_____
Tom Werthan,
President, Chief Executive Officer and Chief
Financial Officer of EPV Solar, Inc.

Dated: February 24, 2010