**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq. (KR 4963)
S. Jason Teele, Esq. (SJT 7390)
Timothy R. Wheeler, Esq. (TW 3466)
Wojciech F. Jung, Esq. (WJ 2047)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

*Proposed Counsel to the Debtor*
*and Debtor in Possession*

### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>EPV SOLAR, INC.,<br><br>          Debtor. | Chapter 11<br><br>Case No.  10-15173 (MBK) |

**MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTOR
TO OBTAIN POST-PETITION FINANCING, GRANT SECURITY INTERESTS AND
LIENS AND ACCORD PRIORITY STATUS PURSUANT TO 11 U.S.C. §§ 361, 364(c)
AND 364(d); (B) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11
U.S.C. § 363(c)(2)(B); (C) GRANTING ADEQUATE PROTECTION; (D) GIVING
NOTICE OF FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b)(2) AND
(c)(2); AND (E) MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

        EPV Solar, Inc., the above-captioned debtor and debtor in possession (the

"<u>Debtor</u>" or "<u>EPV Solar</u>"),[1] by and through its undersigned proposed counsel, hereby submits

this motion (the "<u>Motion</u>") for interim and final orders (a) authorizing the Debtor to obtain post-

petition financing, grant security interests and liens and accord priority status pursuant to 11

U.S.C. §§ 361, 364(c) and 364(d); (b) authorizing use of cash collateral pursuant to 11 U.S.C. §

363(c)(2)(b); (c) granting adequate protection; (d) giving notice of final hearing pursuant to

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed
to such terms in the EPV Solar, Inc. Priming Super-priority DIP Facility Summary of Indicative
Terms and Conditions dated March 15, 2010 (the "<u>Term</u> <u>Sheet</u>").  *See* Certification of Tom
Werthan submitted herewith (the "<u>Werthan</u> <u>Cert.</u>") at Ex. A.

Bankruptcy Rule 4001(b)(2) and (c)(2); and (e) modifying automatic stay pursuant to 11 U.S.C.

§ 362(d).  In support of this Motion, the Debtor respectfully represents as follows:

## RELIEF REQUESTED

1.      By this Motion, and as more specifically set forth in, and subject in all respects to, the Interim Order and DIP Loan Documentation, the Debtor requests, among other things, authority to: (i) obtain post-petition secured financing to replace the financing under the Prepetition Senior Facility (defined below) pursuant to the DIP Loan Documentation; (ii) grant the DIP Lenders first priority liens and security interests in the Collateral under section 364(c) and (d) of the Bankruptcy Code, in accordance with the terms and provisions of the DIP Loan Documentation and Interim Order; (iii) accord the post-petition financing obligations super-priority administrative claim status under section 503(b) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code, subject only to the Carve-Out; (iv) provide adequate protection to the Senior Secured Noteholders in the form of, *inter alia*, interest payments and replacement liens; and, (v) modify the automatic stay in certain respects in connection with the DIP Loans.  A summary discussion of the salient terms of the proposed DIP Loans and DIP Loan Documentation is set forth in paragraph 21 below.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. The subject matter of this Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are 11 U.S.C. §§ 361, 362 363, and 364(c) and (d) and Federal Rule of Bankruptcy Procedure 4001.

## BACKGROUND

**A.      In General.**

4.      On February 24, 2010 (the "Petition Date"), the Debtor filed a voluntary

petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101,
*et seq.* (the "Bankruptcy Code").

5. The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case. On March 10, 2010, the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

6. For information about the Debtor's history and business and the events leading to this chapter 11 case, the Debtor respectfully refers the Court and parties-in-interest to the Certification in Support of the Debtor's Petition and First Day Motions (Docket No. 2).

**B. The Debtor's Prepetition Financing.**

7. As of the Petition Date, the Debtor was indebted, on a secured basis, under a credit agreement, dated as of November 18, 2009 (as amended, restated, supplemented or otherwise modified from time to time (the "Prepetition Credit Agreement")[2] with Patriarch Partners Agency Services, LLC (the "Prepetition Senior Agent"), and the lenders party thereto (collectively, with the Senior Agent, the "Prepetition Senior Lenders"). In connection with the Prepetition Credit Agreement, the Debtor and Prepetition Senior Lenders are also parties to a security agreement (the "Prepetition Term Security Agreement"[3] and, together with the Prepetition Credit Agreement, the "Prepetition Senior Facility"), dated as of November 18, 2009 (as amended, restated, supplemented or otherwise modified from time to time), which, *inter alia*, grants the Prepetition Senior Lenders, liens on substantially all of the Debtor's assets.

8. As of the Petition Date, the Debtor's obligations under the Prepetition Senior Facility totaled approximately $3.6 million, exclusive of the last interest payment due on February 18, 2010, the maturity date. The Debtor was unable to repay its obligations to the Prepetition Senior Lenders by the maturity date and, on the maturity date, the Prepetition Senior

---

[2] *See* Werthan Cert. at Ex. B.

[3] *See* Werthan Cert. at Ex. C.

Agent provided the Debtor with a Notice of an Event of Default.  Subsequently, on February 22, 2010, the Prepetition Senior Agent provided the Debtor with a notice of disposition of collateral purporting to schedule an auction of the Debtor's assets on March 5, 2010.

9.     Additionally, the Debtor is a party to an indenture (the "Senior Secured Notes Indenture"),[4] dated as of June 4, 2009 (as amended, restated, supplemented or otherwise modified from time to time) with The Bank of New York Mellon, as trustee (the "Senior Secured Notes Trustee"), governing the 1% Convertible Senior Secured PIK Notes Due 2016 (the "Senior Secured Notes", and the holders of the Senior Secured Notes being the "Senior Secured Noteholders").  The Debtor's obligations under the Senior Secured Notes Indenture are secured as set forth in a security agreement (the "Senior Secured Notes Security Agreement"),[5] dated as of June 4, 2009, (as amended, restated, supplemented or otherwise modified from time to time) with The Bank of New York Mellon as the collateral agent for the benefit of the Senior Secured Noteholders.  In certain circumstances, the Senior Secured Notes Indenture may be modified or amended with the approval of a majority (in principal amount) of the Noteholders.[6]  See Senior Secured Notes Indenture at § 9.02 (Werthan Cert. at Ex. D).

10.     The Senior Secured Noteholders' liens upon and security interests in the Debtor's assets are subordinated to the liens and security interests of the Prepetition Senior Lenders pursuant to a subordination agreement dated as of November 18, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Subordination Agreement"),[7] among the Debtor, the Prepetition Senior Agent as administrative agent for the Prepetition Senior Lenders, and the Senior Secured Notes Trustee in its capacity as trustee and

---

[4]     See Werthan Cert. at Ex. D.

[5]     See Werthan Cert. at Ex. E.

[6]     The Ad Hoc Group consists of Senior Secured Noteholders that hold more than 60% of the outstanding Senior Secured Notes.

[7]     See Werthan Cert. at Ex. F.

collateral agent for the Senior Secured Noteholders.  The Prepetition Senior Facility may be "repriced, amended, supplemented, modified, extended, increased, restated, refinanced or replaced in any and all respects" in any amount up to $10 million without the consent of the Subordinated Note Trustee, and in any amount with such consent.  *See* Subordination Agreement at § 6.1 (Werthan Cert. at Ex. F).

11.    Pursuant to the Subordination Agreement, the Senior Secured Noteholders were required to, on or prior to December 23, 2009, grant liens in favor of the Prepetition Senior Agent, senior to their own liens on the capital stock of the Non-Debtor Subsidiaries (defined below) that secured the Senior Secured Notes.  *See* Subordination Agreement at § 10.17 (Werthan Cert. at Ex. F).

12.    As of the Petition Date, the Debtor's obligations under the Senior Secured Notes totaled approximately $56.9 million.

**C.    The Debtor's Use Of Cash Collateral And Need For Replacement Financing.**

13.    On the Petition Date, the Debtor filed its *Motion for Entry of Interim and Final Orders pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 and Fed. R. Bankr. P. 4001 (i) Approving the Use of Cash Collateral, (ii) Providing Adequate Protection, and (iii) Setting a Final Hearing Pursuant to Fed. R. Bankr. P. 4001* (Docket No. 3) (the "Cash Collateral Motion") seeking authority to use the Prepetition Senior Lenders' cash collateral.  The Prepetition Senior Lenders filed an objection to the Cash Collateral Motion.  *See* Docket No. 21.

14.    After a hearing on March 1, 2010, the Court entered an "agreed-upon" order granting the Cash Collateral Motion on an interim basis.  See Docket No. 33.

15.    When it became apparent that the Prepetition Senior Lenders would object to the entry of a final order granting the Cash Collateral Motion, and in view of the Prepetition Senior Lenders' opposition to the entry of the interim order, the Debtor began to contemplate the need for a replacement facility that would repay the Prepetition Senior Lenders and enable the Debtor to execute on its chapter 11 strategy.  Only the DIP Lenders came forward with a proposal to replace the Prepetition Senior Facility,

whereupon the DIP Lenders and the Debtor commenced extensive arms' length negotiations culminating in the proposal set forth in the Term Sheet.  No other opportunity for secured or unsecured credit on similar or better terms than those proposed by the DIP Lenders materialized.[8]  A more complete summary of the salient terms of the DIP Loans is set forth in paragraph 21 below.

**D.      The Proposed DIP Loans.[9]**

16.      The Debtor proposes to enter into a $20 million post-petition financing arrangement with the DIP Lenders to replace the Prepetition Senior Facility loan on the terms set forth in the Term Sheet and to be set forth in the DIP Loan Documentation, subject to the 13-week budget with certain variances (the "Approved Budget").[10]  *See* Werthan Cert at Ex. G.

17.      The DIP Lenders propose to replace the Prepetition Senior Facility and satisfy all amounts outstanding thereunder, and through amendments to the Senior Secured Notes Indenture, modify the liens granted to the Senior Secured Noteholders to increase the amount of the lien subordination of the Senior Secured Notes up to $20 million.[11]  Such a modification would subordinate the liens of the Senior Secured Noteholders to the DIP Lenders' post-petition liens and security interests.  The Senior Secured Noteholders right of payment is unaffected and they will continue to enjoy the same rights as they presently have in connection with the Prepetition Senior Facility.

---

[8]      The Debtor requested post-petition financing from the Prepetition Senior Lenders, but they refused.

[9]      This discussion encompasses only the most salient provisions of the Term Sheet.  Should any conflict arise between the DIP Loans as described in the Motion and those set forth in the Term Sheet or DIP Loan Documentation, the Term Sheet and DIP Loan Documentation, as appropriate, shall control.

[10]      The Debtor and DIP Lenders intend to file the DIP Loan Documentation with the Court on or before March 23, 2010.

[11]      The DIP Lenders hold more than 50% of the outstanding Senior Secured Notes.

18.     The DIP Loans will increase the amount of the financing under the Prepetition Senior Facility from $3.6 million to $6.66 million, which, after giving effect to the Roll Up provisions of the DIP Loans (described below and in the Term Sheet) will yield an aggregate principal DIP Loan amount of $20 million.

19.     Finally, consistent with section 10.17 of the Subordination Agreement the DIP Lenders will be granted senior first priority liens on all of the Debtor's assets and all outstanding capital stock of the Non-Debtor Subsidiaries that secure the Senior Secured Notes.

20.     As set forth in greater detail in the Term Sheet, the salient terms of the DIP Loans are as follows:

A.      Borrowers:  (i) EPV Solar, Inc. ("EPV Solar" or the "Debtor"), a debtor-in-possession in the case (the "Case") pending with respect to EPV Solar under chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code") filed with the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"); and (ii) EPV Solar Germany GmbH ("EPV Germany" and, collectively, with the Debtor, the "Borrowers").

B.      Guarantors:  Each of the subsidiaries of EPV Solar and EPV Germany identified as such on Schedule A to the Term Sheet (the "Guarantors" and, collectively with the Borrowers, the "Obligors").

C.      DIP Lenders:  Each of the entities identified as such, and having the commitments (the "Commitments") set forth on Exhibit A to the Term Sheet, as such schedule may be amended prior to the entry of the Final Order (as defined below) referred to below (collectively, the "DIP Lenders"); provided that affiliates (including another fund investment managed by the same entity) of the entities listed on Exhibit A may provide the funding and serve as DIP Lenders.

D.      DIP Administrative Agent:  To be determined (the "DIP Agent").

E.      DIP Facilities:  Debtor-in-possession term loans in an aggregate principal amount, after giving effect to the Roll Up (as defined below), of approximately $20,000,000, as required per the Approved Budget, but subject to the terms and conditions set forth in the DIP Loan Documentation (the "DIP Loans").

F.      Closing Date:  Upon the entry of the Final Order (such date, the "Closing Date"), but in no event later than April 15, 2010.

G.      Documentation:  Definitive financing documentation with respect to the DIP Loans satisfactory in form and substance to the DIP Agent and the DIP Lenders and the Borrowers in their sole discretion and approved by the Bankruptcy Court (the "DIP Loan Documentation").  Such DIP Loan Documentation shall be executed and delivered by the parties thereto on or prior to March 19, 2010 (the date on which such events occur, the "Definitive Documentation Date") and shall be approved by the Bankruptcy Court upon entry of the Final Order; provided

that, in the event no such DIP Loan Documentation is executed and delivered by the Obligors on or prior to March 19, 2010, the Obligors shall be considered in default and the DIP Loans (including, without limitation, any amount advanced at any time after entry of the Interim Order) shall become immediately due and payable.

H.    Use of Proceeds:  DIP Loans will be used for (a) the refinancing in full of all of the Obligors' obligations, whether for borrowed money, fees, expenses, or otherwise, under or with respect to the Prepetition Credit Agreement and all related documents, (b)(i) working capital and general corporate purposes of the Obligors (specifically excluding expenses of any other subsidiaries of the Borrowers that are not Obligors) and (ii) bankruptcy-related costs and expenses (subject to the Carve-Out (as defined below) limitations), in each case (other than during the period prior to the Definitive Documentation Date) in accordance with a 13-week budget, as such budget shall be updated for subsequent 13-week periods in form and substance acceptable to the Required DIP Lenders (as defined below) no later than four (4) weeks prior to the end of the period covered by the then-existing budget (as so updated and as otherwise amended from time to time with the consent of the DIP Lenders, the "Approved Budget") and (c) from and after entry of the Final Order, the discharge of a portion of the indebtedness represented by the Senior Secured Notes beneficially held by each DIP Lender as of the date of commencement of the Case (the "Petition Date") as described under "Roll Up" below. The initial Approved Budget shall be provided no later than the Definitive Documentation Date.  Any amendments or modifications to the Approved Budget then in effect, and each subsequent Approved Budget, must be consented to in writing by the DIP Agent with the consent of the Required DIP Lenders prior to the implementation thereof. The DIP Loans shall be funded into a segregated cash collateral account subject to the control of, and a first priority lien in favor of, the DIP Agent for the benefit of the DIP Lenders and shall be disbursed solely in accordance with the Approved Budget.

Upon entry of the Interim Order by the Bankruptcy Court and prior to entry of the Final Order, the Borrowers shall be authorized to draw down, and the DIP Lenders shall be authorized, but not required, to extend DIP Loans in an aggregate principal amount of up to $4,000,000.

None of the proceeds of the DIP Loans shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against (a) the DIP Agent or the DIP Lenders (in any capacity), including in connection with the validity of the liens granted to the DIP Lenders or (b) the members of the Ad Hoc Group (as defined below); provided, that the foregoing shall be without prejudice to any other rights of the Debtor.

I.    Availability:  Subject to the terms and conditions of this Summary of Indicative Terms and Conditions, the proceeds of the DIP Loans will be made available upon entry of the Final Order (as defined below), (x) inclusive of amounts applied to discharge the indebtedness allocable to the DIP Lenders with respect to the Senior Secured Notes beneficially held by each DIP Lender as of the Petition Date as described under "Roll Up" below and (y) exclusive of the amount of accrued and unpaid interest on the Senior Secured Notes that are subject to the Roll Up provisions below, which amount of interest shall be added to the principal amount of DIP Loans.

J.      Roll Up:  Pursuant to the Final Order, the indebtedness represented by the Senior Secured Notes beneficially held by each DIP Lender on the Petition Date shall be discharged with proceeds of the DIP Loans as provided on Exhibit A to the Term Sheet.  The Borrowers shall pay directly to the transferring DIP Lender all accrued and unpaid interest on the Senior Secured Notes so added to the principal amount of the DIP Loans in cash on the maturity date of such DIP Loans.

All DIP Loans, whether in respect of amounts advanced for working capital purposes or in connection with the discharge of existing Senior Secured Notes, shall be of equal stature and entitled to identical treatment. Notwithstanding the foregoing, if any obligation of the Obligors owing to a DIP Lender in respect of the DIP Loans as a result of such discharge is avoided, disallowed, set aside, or otherwise invalidated, in whole or in part, in any judicial proceeding or otherwise, the aggregate principal amount of Senior Secured Notes held by such DIP Lender prior to the discharge, to the extent theretofore avoided, disallowed, set aside, or otherwise invalidated, shall be reinstated in full force and effect and all guarantees and security in respect thereof shall be restored.

K.      Priority:  All DIP Loans and other liabilities and obligations of the Obligors to the DIP Agent and the DIP Lenders under the DIP Loan Documentation shall be:

(i)  pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Case of the Debtor over any and all administrative expenses (and *pari passu* with the super-priority claims granted in respect of use of cash collateral by the Prepetition Senior Agent), whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code (but subject to the Carve-Out);

(ii)  pursuant to sections 364(c)(2), secured by a perfected first-priority lien on all now owned or hereafter acquired assets of any kind or nature of the Obligors and the proceeds thereof (the "Collateral"), to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date;

(iii)  pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected lien on all the Collateral, to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the commencement of the Case or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than property that is subject to the existing liens that secure the obligations under the Senior Secured Notes Indenture, which liens shall be primed by the Priming DIP Liens as described below), subject to such liens in favor of such third parties (the "Second Priority DIP Liens"); and

(iv)  pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected first priority, priming and senior security interest and lien granted to the DIP Agent, for the benefit of the DIP Lenders (the "Priming DIP Liens") in and on all the Collateral.  All existing liens, rights and interests granted to or for the benefit of the Senior Secured Noteholders under the Senior Secured Notes Indenture and other related documents (the "Prepetition Senior Secured Notes Liens") shall be primed and made subject to and subordinate to the Priming DIP Liens, which shall also prime any liens granted after the commencement of the Case to provide adequate protection in respect of any of the Prepetition Senior Secured Notes Indenture Liens (the "Senior Secured Notes Adequate Protection Liens" and,

together with the Prepetition Senior Secured Notes Liens, the "Primed Senior Secured Notes Liens"), and the Priming DIP Liens shall not be subject to being treated *pari passu* with or subordinated to any other liens or security interests (whether currently existing or hereafter created);

subject in each case only to permitted exceptions to be agreed upon in writing by the DIP Lenders in their sole discretion, and (x) in the event of the occurrence and during the continuance of an Event of Default (as defined below), the payment of reasonable allowed and unpaid professional fees and disbursements incurred by the Obligors (excluding any incurred and unpaid professional fees and expenses of the DIP Agent or DIP Lenders payable pursuant to the Interim Order or the Final Order) and any statutory committees appointed in the Case in an aggregate amount not in excess of the sum of $100,000 and (y) the payment of fees pursuant to 28 U.S.C. § 1930 to the extent related to the Case of the Obligors (clauses (x) and (y), together, the "Carve-Out").

In light of the Roll Up described above, notwithstanding anything herein to the contrary, the claims, liens and security interests granted to the DIP Lenders shall not extend to causes of action under Chapter 5 of the Bankruptcy Code or the proceeds thereof.

L.    Adequate Protection:  The Senior Secured Noteholders under the Senior Secured Notes Indenture, whose liens are primed as described in clause (iv) of "Priority" above, shall receive, for adequate protection for such priming, current interest at the non-default rate on the Senior Secured Notes, and a silent second lien on all property of the Obligors, junior to all claims and liens of the DIP Lenders described in the section titled "Priority".

In addition, the Borrowers will pay the reasonable costs and expenses of the ad hoc group of Senior Secured Noteholders (including, without limitation, Aviva Investors, Catalyst Investment Management Co., LLC, funds investment managed by GLG Partners LP, Tenor Capital Management Company, L.P., F. A. Voight & Associates, LP, Jeffrey Parket and Kenneth Calligar, and such other holders that may join the ad hoc group, collectively, the "Ad Hoc Group") and their advisors (limited to one New York law firm, one New Jersey law firm and one financial advisory firm) in connection with the Case, and the Borrowers shall consent and request that the Ad Hoc Group use the same advisors as the DIP Agent and the DIP Lenders.

M.    Collateral:  Substantially all now existing and hereafter acquired property of the Obligors (defined above as the Collateral); as well as pledges of stock of the Obligors in the manner requested by the DIP Agent.

N.    Consent Right:  From and after the date of entry of the Interim Order, no Obligor shall sell, transfer or otherwise dispose of any of its assets out of the ordinary course of business, except with the consent of the DIP Lenders in their sole and absolute discretion.

O.    Compensation:  As a material inducement to the DIP Lenders to make the DIP Loans, the Borrowers agree to compensate the DIP Lenders, from and after the entry of the Final Order, or if the DIP Lenders make any DIP Loans after the entry of the Interim Order, as set forth below.

P.   Origination Fee:  A fee (the "Origination Fee") equal to (i) 5.00% multiplied by (ii) the full aggregate principal amount of the DIP Loans, shall be (x) fully earned on the date of entry of the Interim Order and (y) due and payable to the DIP Agent for the account of the DIP Lenders on any date when the DIP Loans are so repaid in connection with the sale of any Obligor's assets yielding net proceeds (after reasonable and customary expenses of sale) of at least $5,000,000 with respect to all asset sales (taken as a whole) or any other mandatory prepayment event.

Q.   Exit Fee:  Except as provided in the following sentence, the Borrowers shall pay, in connection with any optional, mandatory or other payment or prepayment of DIP Loans, in whole or in part, on any date when the DIP Loans are so repaid, in connection with the sale of any of the Borrower's assets or any other mandatory prepayment event, an amount equal to 5.00% of the amount so prepaid or the amount of the DIP Loans then payable.

R.   Intercompany Loan:  The Debtor shall assign to the DIP Agent, for the benefit of the DIP Lenders, the intercompany loans due to the Debtor from EPV Germany.

S.   Interest Rate:  10% per annum, to be paid in kind with such interest added to the principal amount of the DIP Loans monthly in arrears on the last day of each month.

T.   Default Rate:  At all times while a default exists, principal, interest and other amounts shall bear interest at a rate per annum equal to 2.00% in excess of the interest rate set forth in "Interest Rate" above.

U.   Maturity Date:  The earliest to occur of (i) ten (10) months from the Closing Date, (ii) 30 days after entry by the Bankruptcy Court of the interim order approving the DIP Loans in the Case (the "Interim Order"), if the final order approving the DIP Loans (the "Final Order") has not been entered by the Bankruptcy Court in the Case prior to the expiration of such 30-day period (the "Prepayment Date"), (iii) the effective date of any sale of substantially all of the Borrowers' or any of the Obligors' assets, and (iv) the acceleration of the DIP Loans and the termination of the commitments to make the DIP Loans in accordance with the terms of the DIP Loan Documentation.

V.   Amortization:  None.

W.   Yield Protection and Increased Costs; Taxes:  Standard yield protection and indemnification, including capital adequacy requirements, will be incorporated into the DIP Loan Documentation that will satisfactorily compensate the DIP Lenders in the event that any changes in law, requirement, guideline or request of relevant authorities shall increase costs, reduce payments or earnings, or increase capital requirements.

The DIP Loan Documentation will provide that all payments are to be made free and clear of any taxes (other than franchise taxes and taxes on overall net income), imposts, assessments, withholdings or other deductions whatsoever, and to the extent applicable, the DIP Loan Documentation will provide for any gross-up for withholding.

The DIP Loan Documentation shall provide for customary funding protection, including gross-up for withholding (subject to customary qualifications) and compensation for increased costs.

X.  Optional Prepayments:  The Borrowers may prepay the DIP Loans in whole or in part at any time. All optional prepayments shall be applied to the DIP Loans in accordance with the application of payment provisions set forth in "Mandatory Prepayments" below.

Y.  Mandatory Prepayments:  The following amounts shall be applied to prepay the DIP Loans and obligations related thereto (with additions and modifications to permit and take account of the DIP Loans and others which are usual and customary for debtor-in-possession financings):

(i) 100% of the net proceeds of any sale or issuance of equity securities or incurrence of non-trade indebtedness after the Closing Date by any Obligor.

(ii) 100% of the net proceeds of any sale or other disposition by any Obligor of any assets, in a single transaction or series of related transactions (including any sale or other disposition pursuant to which Akart Enerji Yatirimlari A.S. or any of its affiliates is the buyer), having a value in excess of $25,000 (except for the sale of inventory in the ordinary course of business and certain other sales to be agreed on).

(iii) 100% of the net proceeds of certain extraordinary receipts (including tax refunds, indemnity payments, pension reversions, acquisition purchase price adjustments and insurance proceeds not included as proceeds of asset dispositions, but excluding the social security reimbursements and salary reimbursements received by EPV Germany from the German government or any agency or instrumentality thereof) by any Obligor.

Notwithstanding the foregoing, no reinvestment with any proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the written consent of the DIP Lenders.

Prepayments will be applied (a) first, to repay up to $4,000,000 in principal amount outstanding in respect of the DIP Loans, (b) second, to pay the Origination Fee, (c) third, to repay any principal amounts outstanding in respect of the DIP Loans and (d) fourth, to pay the exit fee and any other obligations outstanding in respect of the DIP Loans.

Z.  Conditions Precedent:  The several obligations of the DIP Lenders to make, or cause one of their respective affiliates to make, the DIP Loans will be conditioned upon satisfaction or waiver of, among other things, (i) the entry by the Bankruptcy Court of the Interim Order, (ii) the occurrence of the Definitive Documentation Date, (iii) the entry of the Final Order, and (iv) the applicable conditions precedent listed on Schedule I hereto.

AA.  Representations and Warranties:  The DIP Loan Documentation shall contain representations and warranties customary for debtor-in-possession financings, including, without limitation: (i) Accuracy in all material respects of financial statements and other information (including pro forma financial statements, budgets, and cash flow projections); accuracy in all material respects and completeness of disclosure; and absence of undisclosed liabilities: (ii) No

Material Adverse Change (as defined in Schedule 1) subsequent to the Petition Date; (iii) Corporate structure, entity existence, status, power and authority; (iv) Due authorization, execution and delivery of the DIP Loan Documentation; legality, validity, binding effect and enforceability of the DIP Loan Documentation; (v) Execution, delivery, and performance of the DIP Loan Documentation do not violate law or other material contractual obligations enforceable against the Obligors without further action by the Bankruptcy Court; (vi) No material litigation; no government or regulatory approvals required for execution, delivery and performance of the DIP Loan Documentation, other than approvals in effect; (vii) No default under the DIP Loan Documentation; (viii) Ownership of properties and necessary rights to intellectual property; (ix) Liens; (x) Use of proceeds; (xi) Labor matters; (xii) Compliance with laws and regulations, including ERISA, Patriot Act and other counter-terrorism laws and applicable environmental laws and regulations; (xiii) Payment of taxes; (xiv) Insurance; (xv) Compliance with Federal Reserve regulations; (xvi) Inapplicability of the Investment Company Act; (xvii) Ownership of the Borrowers and their respective subsidiaries; (xviii) Validity, priority and perfection of security interests in the Collateral.

BB.    <u>Financial Covenants</u>:  Each of the Obligors agrees to the following financial covenants:  compliance with certain specifically identified line items in the Budget (provided that variances of percentages to be mutually agreed to in respect of each such line item shall be permitted), reported weekly, and tested weekly. The Definitive Documentation will contain additional financial covenants as reasonably determined by the DIP Agent and the DIP Lenders and reasonably acceptable to the Obligors.

CC.    <u>Affirmative Covenants</u>:  The DIP Loan Documentation shall contain affirmative covenants customary for debtor-in-possession financings, including, without limitation: (i) Delivery of financial statements, reports, projections, budgets, borrowing base certificates, officers' certificates and other information requested by the DIP Agent, including without limitation (a) a quarterly compliance certificate (showing covenant calculations) certified by an authorized financial officer, to be delivered in conjunction with the quarterly and annual financial statements, (b) weekly updated 13-week cash flow projections, (c) weekly variance reports (1) showing comparisons of actual results for the immediately prior week against the most recent 13-week cash flow projections including such week, and (2) showing comparisons of that portion of the most recent 13-week cash flow projections corresponding to the current calendar month (which comparisons shall include actual results for such calendar month as of the date of such report), (d) monthly updates to all other projections provided on or before the Closing Date, and (e) weekly updated 5-week forecast and funding data with respect to EPV Germany; (ii) Access to information (including historical information) and personnel, including, without limitation, regularly scheduled meetings as mutually agreed with senior management and other company advisors and the DIP Lenders, and the DIP Lenders' financial advisors shall have access to all information they shall reasonably request; (iii) Compliance with the Approved Budget; (iv) Delivery of notices of default under the DIP Loan Documentation, litigation and other material events; (v) Payment of other obligations of the Obligors consistent with their terms; (vi) Continuation of business and maintenance of existence and material rights and privileges of the Obligors; (vii) Compliance with material contractual obligations of the Obligors; (viii) Maintenance of property and insurance of the Obligors; (ix) Maintenance of books and records of the Obligors; (x) Right of the DIP Lenders to inspect

property and books and records of the Obligors; (xi) Compliance with laws (including, without limitation, ERISA and environmental laws and regulations); (xii) Further assurances (including, without limitation, with respect to security interests in after-acquired property); (xiii) Use of proceeds; (xiv) Payment of taxes; (xv) Maintenance of and adherence to the Borrowers' existing credit and risk control policies; (xvi) The Debtor shall file a plan of reorganization on or before the four (4) month anniversary of the date of entry of the Final Order (the "Plan Deadline"); the Court shall have approved the disclosure statement no more than six (6) weeks after the Plan Deadline (the "Disclosure Statement Deadline"); and the Plan shall have been confirmed no more than six (6) weeks after the Disclosure Statement Deadline (the "Consummation Date"); (xvii) The Borrowers shall have consummated the sale of all or substantially all of their assets, including such assets of their non-debtor subsidiaries, no later than the Consummation Date, unless otherwise agreed; (xviii) From and after the Definitive Documentation Date, holding of the Borrowers' deposit accounts with respect to deposit accounts holding unused proceeds of the DIP Loans at the DIP Agent or at an acceptable financial institution subject to an account control agreement in favor of the DIP Agent for the benefit of the DIP Lenders; (xix) Best efforts to obtain an agreement from the applicable German governmental authorities to subordinate any lien held by such governmental authorities in connection with the grants provided by such governmental authorities to the lien granted to the DIP Agent for the benefit of the DIP Lenders with respect to any Collateral owned by EPV Germany.

DD.     <u>Negative Covenants</u>:   The DIP Loan Documentation shall contain negative covenants customary for debtor-in-possession financings, including, without limitation: (i) Limitation on indebtedness, preferred stock and contingent obligations relating thereto; (ii) Limitation on creating or permitting to exist any liens or encumbrances on any assets, other than liens securing the DIP Loans and any permitted liens (which liens shall include scheduled liens in existence on the Closing Date to the extent subordinated pursuant to the orders, junior liens granted in connection with adequate protection granted by the Debtor as required hereunder) and other liens described above; (iii) Limitation on further negative pledges (iv) Limitation on guarantee obligations; (v) Unless the DIP Loans and all other amounts owing to the DIP Lenders and the DIP Agent shall have been paid in full in cash, limitation on mergers, consolidations, liquidations, dissolutions, acquisitions and non-ordinary course asset sales not approved by the Required DIP Lenders in their sole discretion (such discretion to include the right to approve potential buyers), excluding the Debtor's disposition of its minority interests in Solar Plus –Produção de Painéis Solares, S.A. and Heliodomi S.A. solely to the extent such disposition is for an amount in excess of $200,000; (vi) Limitation on leases; (vii) Limitation on dividends, other payment restrictions affecting subsidiaries and other payments in respect of capital stock; (viii) Limitation on capital expenditures; (ix) Limitation on investments, acquisitions, loans and advances; (x) Optional payments and modifications of subordinated and other debt instruments (xi) Limitation on transactions with affiliates; limitation on sale and leasebacks; provided, however, the DIP Loan Documentation will provide for the continued funding of the Debtor's subsidiaries pursuant to the Approved Budget; (xii) Limitation on change of fiscal year; (xiii) Limitation on changes in business conducted or changes to the organization documents of either Borrower, other than as required by the Bankruptcy Code; (xiv) Limitation on any Obligor's ability to assert any right of subrogation or contribution against any other Obligor until all borrowings under the DIP Loans are paid in full and the DIP Lenders' Commitments are terminated; (xv) Prohibition on payment of

prepetition claims (other than as approved by the Bankruptcy Court and acceptable to the Required DIP Lenders) and payment of non-budgeted post-petition items; (xvi) Prohibition on consenting to the granting of adequate protection payments or liens, super-priority administrative expense claims or liens having a priority senior or *pari passu* with the liens granted to the DIP Agent, the Prepetition Senior Agent or the Senior Secured Notes Trustee, except as otherwise expressly permitted by the DIP Loan Documentation.

EE.   Events of Default:  Customary for debtor-in-possession facilities and subject to customary grace periods and cure periods, and materiality thresholds reasonably acceptable to the DIP Lenders, including, without limitation: (i) Nonpayment of principal when due; (ii) Nonpayment of interest, fees or other amounts; (iii) Material inaccuracy of representations and warranties; (iv) Violation of covenants; (v) Cross default; (vi) Certain ERISA events; (vii) Material judgments; (viii) Actual or asserted invalidity of any guarantee or security document, subordination provisions or security interest; (ix) Change of control; (x) The Debtor files a Plan that does not provide for payment in full in cash of the DIP Loans and all other amounts owing to the DIP Lenders and the DIP Agent on the effective date of such Plan; (xi) A trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Obligor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), shall be appointed in the Case; (xii) Any other lien shall be granted with respect to any of the Collateral (other than the Carve-Out) without the prior consent of the Required DIP Lenders; (xiii) The occurrence of any insolvency, bankruptcy or similar proceeding with respect to any subsidiary of the Debtor that is not a debtor in the Case; (xiv) Other than payments authorized by the Bankruptcy Court in respect of (a) accrued payroll and related expenses as of the commencement of the Case and (b) certain creditors, in each case to the extent authorized by one or more "first day" or other orders satisfactory to the DIP Lenders, or as otherwise permitted under the DIP Loan Documentation, the Obligors shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables; (xv) The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (a) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Obligor, or (b) to permit other actions that the DIP Lenders may, in their sole discretion, deem to have a material adverse effect on the Debtor or its estate; (xvi) Any material provision of the DIP Loan Documentation shall cease to be valid or binding on any Obligor, or any Obligor shall so assert in any pleading filed in any court; (xvii) Any order shall be entered reversing, amending, supplementing, staying for a period in excess of five (5) business days, vacating or otherwise modifying in any material respect the Interim Order or the Final Order without the prior written consent of the Required DIP Lenders; (xviii) A "Change of Executive Management" (the definition of which shall be agreed upon) shall occur, unless such default is cured to the satisfaction of the Required DIP Lenders within five (5) business days; (xix) Failure of the Definitive Documentation Date to occur on or before April 15, 2010; (xx) The exclusive period for the Debtor to file a plan of reorganization under section 1121(b) of the Bankruptcy Code expires or is terminated; (xxi) The Final Order shall not have been entered by the bankruptcy court within 30 days after the bankruptcy court's entry of the Interim Order; (xxii) Any judgments which are in the aggregate in excess of $25,000 as to any post-petition obligation shall be rendered against the Debtor or other Obligors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or

by consent of the party litigants); or there shall be rendered against the Debtor or other Obligors a nonmonetary judgment with respect to a post-petition event which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Debtor or other Obligors taken as a whole to perform their obligations under the DIP Loan Documentation; (xxiii) Any DIP Loan Document shall cease to be effective or shall be contested by a Borrower or any of its affiliates; (xxiv) Any of the Borrowers or their respective affiliates shall fail to comply with the Interim Order or Final Order; (xxv) The filing of a motion, pleading or proceeding by the Debtor or its direct or indirect subsidiaries which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in a material impairment; (xxvi) Such other usual and customary Events of Default that are reasonably requested by the DIP Lenders.

Upon the occurrence and during the continuance of any Event of Default, the DIP Agent, at the direction of the Required DIP Lenders, may take all or any of the following actions without further order of or application to the Bankruptcy Court, provided that, with respect to clause (iii) below and the enforcement of liens or other remedies with respect to the Collateral referred to in clause (iv) below, the DIP Agent shall provide the Borrowers (with a copy to counsel to each statutory committee appointed in the Case and to the applicable United States Trustee) with five (5) business days' prior written notice, and provided further that, upon receipt of any such notice, the Borrowers may only make disbursements in the ordinary course of business consistent with the Approved Budget and with respect to the Carve-Out, but may not disburse any other amounts; provided further that, in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing:

(i) declare the principal of and accrued interest on the outstanding DIP Loans to be immediately due and payable;

(ii) terminate any further commitment to lend to the Borrowers;

(iii) set-off any amounts held as cash collateral (including, without limitation, in any cash collateral account for the benefit of the DIP Agent and the DIP Lenders) or in any accounts maintained by any of the DIP Lenders or their affiliates, subject to any prior liens of the Prepetition Senior Agent; or

(iv) take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Agent and the DIP Lenders) permitted under the DIP Loan Documentation or by applicable law.

FF.    Required DIP Lenders:  The vote of DIP Lenders holding more than 50% of total Commitments (or if no Commitments are outstanding, total exposure) (the "Required DIP Lenders") shall be required to amend, waive or modify the DIP Loans, except that with respect to matters relating to, among others, the reduction in, or compromise of payment rights with respect to, principal or interest rates, extension of maturity, release of guarantees and/or liens granted on all or substantially all of the Collateral (other than liens on Collateral subject to permitted dispositions), any waiver of the covenants set forth in "Negative Covenants" above and the definition of DIP Requisite Lenders, Required DIP Lenders will be defined as Lenders holding 100% of total Commitments (or if no

Commitments are outstanding, total exposure) under the DIP Loans affected thereby or all affected DIP Lenders, as appropriate.

GG.   <u>Other Bankruptcy Matters</u>:   Among other things, the Final Order shall provide that, upon entry of the Final Order, (a) the DIP Agent, the DIP Lenders, the Senior Secured Noteholders, the Senior Secured Notes Trustee, and all of their respective counsel, advisors and consultants, shall each be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code, and (b) the DIP Agent and the DIP Lenders reserve the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the DIP Loans, in whole or in part, in connection with any sale or disposition of assets in the Case.

HH.   <u>Costs and Expenses; Indemnification</u>:   All out-of-pocket costs and expenses of the DIP Agent (including, without limitation, fees and disbursements of counsel and of third-party appraisers and consultants advising the DIP Agent, expenses in connection with the appraisal and monitoring of the Collateral, syndication, enforcement of rights and other miscellaneous disbursements) and the DIP Lenders shall be payable by the Borrowers promptly upon written demand (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval in the event the transactions contemplated hereby are consummated; provided, however, that no such costs and expenses shall be due from the Borrowers if the DIP Lenders fail or refuse to advance any funds to the Borrowers in violation of the Term Sheet or the DIP Loan Documentation, or as a result of the Bankruptcy Court's denial of the Debtor's motion to approve the DIP Loans on an interim or final basis.

The Borrowers shall indemnify, pay and hold harmless the DIP Agent and the DIP Lenders (and their respective directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party).

II.   <u>Assignment and Participation</u>:   The DIP Lenders shall be permitted to assign and sell participations in the DIP Loans and their Commitments. In the case of partial assignments (other than assignments to another DIP Lender or an affiliate or approved fund of an existing DIP Lender), the minimum assignment amount shall be $500,000 in the case of the DIP Loans. Upon such assignment, such affiliate, bank, financial institution or entity will become a Lender for all purposes under the DIP Loan Documentation.   Pledges of DIP Loans in accordance with applicable law shall be permitted without restriction.

JJ.   <u>Agency</u>:     Usual   and   customary   for   debtor-in-possession   financings   and nonetheless in form and substance satisfactory to the DIP Agent.

KK.   <u>Amendments and Waivers</u>:   Subject to the consent of the Required DIP Lenders, with certain customary amendments subject to the consent of all DIP Lenders.

LL.   <u>Governing Law and Jurisdiction</u>:   The DIP Loan Documentation will provide that the Obligors shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury.   The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern the DIP Loan Documentation.

MM.  <u>Counsel to DIP Agent and DIP Lenders</u>:  Brown Rudnick LLP.

NN.  <u>Miscellaneous</u>:  The foregoing is intended to summarize certain basic terms of the DIP Loans. It is not intended to be a definitive list of all of the requirements of the DIP Agent and the DIP Lenders in connection with the DIP Loans. The DIP Loan Documentation shall include such other terms and provisions as are customary for debtor-in-possession facilities of this type, including, but not limited to, provisions in respect of confidentiality and sharing of information and Patriot Act notifications.

21.    Upon entry of the Interim Order, the DIP Lenders, in their sole and absolute discretion, are prepared to advance up to $4 million to the Debtor.  These proceeds will be used to refinance the Prepetition Senior Facility and provide the Debtor with sufficient funds to meet its projected obligations through and until the date of the Final Hearing.

<b><u>DISCLOSURE OF "EXTRAORDINARY PROVISIONS"</u></b>

22.    In accordance with the guidelines for financing requests in this District, the Debtor makes the following disclosures as to certain "extraordinary provisions" in the Term Sheet and to be included in the DIP Loan Documentation:

> <u>Roll Up</u>:  The indebtedness represented by the Senior Secured Notes beneficially held by each DIP Lender on the Petition Date shall be discharged with proceeds of the DIP Loans as provided on Exhibit A to the Term Sheet.  The Borrower shall pay directly to the transferring DIP Lender all accrued and unpaid interest on the Senior Secured Notes so transferred in cash in immediately available funds.  All DIP Loans, whether in respect of amounts advanced for working capital purposes or in connection with the discharge of existing Senior Secured Notes, shall be of equal stature and entitled to identical treatment.  Notwithstanding the foregoing, if any obligation of the Obligors owing to a DIP Lender in respect of the DIP Loans as a result of such discharge is avoided, disallowed, set aside, or otherwise invalidated, in whole or in part, in any judicial proceeding or otherwise, the aggregate principal amount of Senior Secured Notes held by such DIP Lender prior to the discharge, to the extent theretofore avoided, disallowed, set aside, or otherwise invalidated, shall be reinstated in full force and effect and all guarantees and security in respect thereof shall be restored.

> <u>Carve-Out</u>:  All DIP Loans and other liabilities and obligations of the Obligors to the DIP Agent and the DIP Lenders under the DIP Loan Documentation shall be prioritized according to the "Priority" section of the Term Sheet and corresponding sections of

the DIP Loan Documentation subject in each case only to permitted exceptions to be agreed upon in writing by the DIP Lenders in their sole discretion, and (x) in the event of the occurrence and during the continuance of an Event of Default, the payment of reasonable allowed and unpaid professional fees and disbursements incurred by the Obligors (excluding any incurred and unpaid professional fees and expenses of the DIP Agent or DIP Lenders payable pursuant to the Interim Order or the Final Order) and any statutory committees appointed in the Case in an aggregate amount not in excess of the sum of $100,000 and (y) the payment of fees pursuant to 28 U.S.C. § 1930 to the extent related to the Case of the Obligors (clauses (x) and (y), together, the "Carve-Out").

Waiver of Debtor's Rights Under 11 U.S.C. § 506(c):  Upon entry of the Final Order, the Debtor will waive its rights under section 506(c) of the Bankruptcy Code.

Termination Event/Events of Default:  Events of Default include, but are not limited to: (a) Change of control; (b) The Borrower files a Plan that does not provide for payment in full in cash of the DIP Loans and all other amounts owing to the DIP Lenders and the DIP Agent on the effective date of such Plan; (c) A trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Obligor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), shall be appointed in any of the Case; (d) The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Obligor which have an aggregate value in excess of $25,000, or (ii) to permit other actions that the DIP Lenders may, in their sole discretion, deem to have a material adverse effect on the Debtor or its estate; (e) Any order shall be entered reversing, amending, supplementing, staying for a period in excess of five (5) days, vacating or otherwise modifying in any material respect the Interim Order or the Final Order without the prior written consent of the DIP Lenders; (f) A "Change of Executive Management" (the definition of which shall be agreed upon) shall occur, unless such default is cured to the satisfaction of the DIP Lenders within five (5) business days; and (g) The filing of a motion, pleading or proceeding by any of the Borrower or its affiliates which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in a material impairment.

Upon the occurrence and during the continuance of any Event of Default, the DIP Agent, at the direction of the DIP Lenders, may take all or any of the following actions without further order of or application to the Bankruptcy Court, provided that, with respect to clause (iii) below and the enforcement of liens or other remedies with respect to the Collateral referred to in clause (iv) below, the DIP Agent shall provide the Borrower (with a copy to counsel to each statutory committee appointed in the Case and to the applicable United States Trustee) with five (5) business days' prior written notice, and provided further that, upon receipt of any such notice, the Borrower may only make disbursements in the ordinary course of business consistent with the Approved Budget and with respect to the Carve-Out, but may not disburse any other amounts; provided further that, in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing: (i) declare the principal of and accrued interest on the outstanding DIP Loans to be immediately due and payable; (ii) terminate any further commitment to lend to the Borrower; (iii) set-off any amounts held as cash collateral (including, without limitation, in any cash collateral account for the benefit of the DIP Agent and the DIP Lenders) or in any accounts maintained by any of the DIP Lenders or their affiliates, subject to any prior liens of the Prepetition Senior Agent; or (vi) take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Agent and the DIP Lenders) permitted under the DIP Loan Documentation or by applicable law.

<u>Exit Fee</u>:    The Borrower shall pay, in connection with any optional, mandatory or other payment or prepayment of DIP Loans, in whole or in part, on any date when the DIP Loans are so repaid, including in connection with the sale of any of the Borrower's assets, an amount equal to 5.00% of the amount so prepaid or the amount of the DIP Loans then payable.

23.    Although these and other listed provisions may be considered "extraordinary" under the Financing Guidelines promulgated in this District, they are typical of DIP financing terms, and the Debtor believes that any other DIP lender would insist on similar, if not identical, provisions.

## **APPLICABLE AUTHORITY**

24.    Refinancing the Prepetition Senior Facility and obtaining immediate

access to sufficient post-petition financing and access to cash collateral is vital to the success of

the Debtor's reorganization.  The preservation of the Debtor's business and the Debtor's ability

to reorganize successfully depend heavily upon the expeditious approval of the DIP Loans and

the use of cash collateral for general working capital purposes.  Absent this Court's approval of

the interim relief sought herein, the Debtor faces a substantial risk of severe disruption to its

business operations and irreparable damage to its relationships with its vendors and customers.

          25.    The Court should approve the DIP Loans and the requested use of cash

collateral because: (i) the Debtor is unable to obtain financing on an unsecured (or other) basis;

(ii) the DIP Lender's and Senior Secured Noteholders' interests in the collateral are adequately

protected; (iii) the proposed financing is on market terms for similarly situated debtors; and (iv)

approval of the DIP Loans is in the best interests of the Debtor's estate.

## I.    Approval for Incurrence of Secured Debt and the Use of Cash Collateral Under Sections 363 and 364 of the Bankruptcy Code.

          26.    The statutory requirement for obtaining post-petition credit under section

364(c) of the Bankruptcy Code is a finding, made after notice and a hearing, that the debtor is

"unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]

as an administrative expense." [12]  *See In re Garland Corp.*, 6 B.R. 456, 461 n.11 (1st Cir. BAP

1980) (secured credit under section 364(c)(2) is authorized, after notice and a hearing, upon

showing that unsecured credit cannot be obtained); *In re Crouse Group, Inc.*, 71 B.R. 544, 549

(Bankr. E.D. Pa.), *modified on other grounds*, 75 B.R. 553 (1987) (debtor seeking unsecured

credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain

---

[12]    Section 364(c) of the Bankruptcy Code provides that:

    (c) If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —

    (1)    with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;

    (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or secured by a junior lien on property of the estate that is subject to a lien.

unsecured credit pursuant to section 364(b) of the Bankruptcy Code); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

27.     Section 363(c)(2) of the Bankruptcy Code permits debtors in possession to use "cash collateral" under subsection (c)(1) only if either of two alternative circumstances exist:

(A)     each entity that has an interest in such cash collateral consents; or

(B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  If a secured creditor does not consent to the use of its cash collateral, the court can authorize the debtor in possession to use said cash collateral under Bankruptcy Code § 363(c)(2)(B) if the court determines that the debtor has provided "adequate protection" of the secured creditor's interest in the cash collateral.  11 U.S.C. §§ 363(e), 363(o); *see also In re Glassstream Boats, Inc.*, 110 B.R. 611 (Bankr. M.D. Ga. 1990).

28.     In addition, section 364(d)(1) of the Bankruptcy Code authorizes a debtor-in-possession to incur super-priority senior secured or "priming" liens if: (a) the debtor is unable to obtain financing from another source, and (b) the interests of the secured creditors whose liens are being primed by the DIP financing are adequately protected. *See* 11 U.S.C. § 364(d)(1)(A) and (B).

29.     Accordingly, the Debtor may incur "priming" liens and use cash collateral if the Debtor is unable to obtain unsecured or junior secured credit and either (i) the DIP Lenders and Senior Secured Noteholders have consented, or (ii) the DIP Lenders' and Senior Secured Noteholders' interests in the Collateral are adequately protected.

## II.     Financing Is Not Available on an Unsecured Basis.

30.     As set forth in the Werthan Certification, and as the evidence at the Final Hearing will demonstrate, the Debtor is unable to obtain post-petition financing on the terms and

of the type required in this case on an unsecured basis.

31.    To show that the credit required is not obtainable on an unsecured basis, the Debtor needs only to demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by sections 364(c) or 364(d) of the Bankruptcy Code.  *See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  The Bankruptcy Code does not require debtors to "seek credit from every possible lender before concluding that such credit is unavailable."  *Id.* at 1088; *see also Ames*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders").  Moreover, where few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

32.    Here, only the DIP Lenders came forward with a proposal to refinance the Prepetition Senior Facility and provide post-petition financing sufficient to meet the Debtor's needs.  The Debtor submits that it has satisfied the requisite showing that credit was not available on an unsecured or even a similar subordinate basis.  The proposal offered by the DIP Lenders is the best replacement financing available to the Debtor under the circumstances of this case.

**III.    The Interests Of The Senior Secured Noteholders Are Adequately Protected.**

**A.    Standards For Adequate Protection.**

33.    If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, it may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien (*i.e.*, a "priming lien").  *See* 11 U.S.C. §364(d).  Such relief may be granted so long as there is adequate protection of the interests of the holder of the lien on

the property on which the senior lien is proposed to be granted. *See* 11 U.S.C. § 364(d). The Bankruptcy Code does not explicitly define "adequate protection." However, section 361 of the Bankruptcy Code suggests that adequate protection may be provided by (i) periodic cash payments to the extent that there is a decrease in the lien holder's interest in the property; (ii) providing additional or replacement liens; or (iii) other relief resulting in the realization of the "indubitable equivalent" of the lien holder's interest in the property. *See* 11 U.S.C. § 361. The third possibility is regarded as a "catch-all" provision, affording courts discretion, on a case-by-case basis, to determine what level of protection is appropriate to provide a secured party. See *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

34.     The goal of adequate protection is to protect a secured lender against diminution in the value of its collateral during the reorganization process. *See, e.g., Swedeland*, 16 F.3d at 564; *In re 848 Brickell Ltd.*, 243 B.R. 142, 148 (S.D. Fla. 1998). This is true whether the prepetition creditor is oversecured or undersecured. The protection to which the secured creditor is entitled is protection against any subsequent decrease in such creditor's interest in collateral that may be occasioned by the debtor's use thereof. *See* 11 U.S.C. § 361. Accordingly, it follows that if the value of the prepetition creditor's interest in collateral is not being diminished by the priming of its liens by a DIP facility, the creditor is not entitled to adequate protection. *See In re Continental Airlines, Inc.*, 154 B.R. 176, 180 (Bankr. D. Del. 1993) (prepetition creditors only entitled to adequate protection to the extent of the decline in value of their interests in collateral); *see also In re Integrated Health Servs.*, Inc., 260 B.R. 71, 74 (Bankr. D. Del. 2001) (same).

**B.      The Interests Of The Senior Secured Noteholders Are Adequately Protected.**

35.     The Senior Secured Noteholders under the Senior Secured Notes Indenture will receive, as adequate protection: (i) current interest at the non-default rate on the Senior Secured Notes; and, (ii) a silent second lien on all property of the Debtor, subject only to the claims and liens of the DIP Lenders. In addition, the Senior Secured Noteholders are protected by the equity in the Debtor's assets in excess of the amount of the DIP Loans.

-24-

36.    When a debtor's proposed use of cash collateral and the use of funds from additional financing augment the value of the secured creditor's collateral, adequate protection exists.  *See Sky Valley*, 100 B.R. at 114 (noting the flexible nature of section 361(3) and observing case law support for the concept that an increase in the value of the collateral generated by the improvements resulting from the super-priority financing could constitute adequate protection).    Indeed, courts have noted that "[a]ctivities of a debtor can enhance collateral value and thereby provide adequate protection."  *In re Ralar Distrib., Inc.*, 166 B.R. 3, 6 (Bankr. D. Mass. 1994) (creditor had adequate protection where debtor's use of collateral allowed realization of more than liquidation value).

37.    Furthermore, courts have found that a creditor may be adequately protected if an equity cushion exists.  *See, e.g., In re Phoenix Steel Corp.*, 39 B.R. 218, 224 (D. Del. 1984).  The term "equity cushion" has been defined as "the value in the property, above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during the time the automatic stay remains in effect." *LNC Inv., Inc. v. First Fidelity Bank*, 1995 WL 231322, at * 3 (S.D.N.Y. Apr. 19, 1995) (*quoting In re Mellor*, 734 F.2d 1396, 1400 n.2 (9th Cir. 1984)).[13]

38.    Several courts have held that an equity cushion may, in and of itself, provide adequate protection of a secured creditor's interest in collateral.  *See, e.g., Phoenix Steel*, 39 B.R. at 224 ("an equity cushion may be a basis for finding the existence of adequate protection"); *In re Heath*, 79 B.R. 616, 618 (Bankr. E.D. Pa. 1987) ("The existence of an equity cushion may provide sufficient protection of a lender's interests.    Application of the equity cushion concept has been so widespread that it has been denominated a 'classic form' of protection for secured debt"); *In re Indian Palms Assocs., Ltd., B.C. (Indian Palms Assocs.)*, 61 F.3d 197, 207 (3rd Cir. 1995) (noting that "[i]n determining whether a secured creditor's interest

_____

[13]    Alternatively, an equity cushion may be viewed as "the surplus of value remaining after the amount of indebtedness is subtracted from the fair market value of the collateral."  *In re Grant Broad. of Philadelphia, Inc.*, 75 B.R. 819, 824 (E.D. Pa. 1987) (*quoting Commonwealth of Pa. State Employees Ret. Fund v. Roane*, 14 B.R. 542, 545 (E.D. Pa. 1981)).

is adequately protected, most courts engage in an analysis of the property's 'equity cushion'"); *In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987) ("[c]ase law has established that the existence of an equity cushion may, in and of itself, constitute adequate protection of an oversecured creditor"); *In re Sharon Steel Corp.*, 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) ("the existence of an equity cushion alone can constitute adequate protection").

39.     The Debtor submits that these forms of adequate protection are sufficient to protect the Senior Secured Noteholders from any post-petition diminution in the value of the Debtor's property securing their claims.

## IV.     The DIP Loans Are On Market Terms For Similarly Situated Debtors.

40.     Only the DIP Lenders came forward with a proposal to refinance the Prepetition Senior Facility and provide post-petition financing adequate to meet the Debtor's financial needs on an expedited basis.  The Prepetition Senior Lenders were asked to provide post-petition financing, but they refused.  Given the expedited time frame, inherent risk to the DIP Lenders and the overall complexity of the proposed DIP Loans, the Debtor submits that the DIP Loans are market priced for similarly situated debtors.

41.     Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment ... [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); *cf. Group of Inst. Investors v. Chicago, Mil., St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court.").  In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost,

interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank*, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

42.     The facts of the Debtor's case make it abundantly clear that the proposed DIP Loans are reasonable under the circumstances.  <u>First</u>, the Prepetition Senior Lenders opposed the Debtor's proposed use of their cash collateral.  <u>Second</u>, the Prepetition Senior Lenders filed a motion for relief from the automatic stay to foreclose on the Debtor's assets, which are worth substantially more than the amount of the Prepetition Senior Lenders' claims ($3.6 million).  <u>Third</u>, replacement financing will mitigate the uncertainty associated with the Debtor's proposed use of cash collateral and to cut of the enormous expense associated with discovery sought by the Prepetition Senior Lenders in connection with the Cash Collateral Motion and their stay relief motion.  <u>Finally</u>, the DIP Lenders are the only lenders willing to provide post-petition financing on an expedited basis in an amount necessary to refinance the Prepetition Senior Facility and satisfy the Debtor's needs.  Absent the post-petition financing proposed herein, the Debtor faces the real and substantial risk of an immediate liquidation at the hands of the Prepetition Senior Lenders.  The post-petition financing is the sole means for the Debtor to maintain its potential going concern value and to conduct an orderly liquidation of its manufacturing business.

43.     Accordingly, the Debtor respectfully submits that the Court should approve the Debtor's decision to accept and enter into the DIP Facility.

**V.      Approval of the DIP Loans Is in the Best Interests of the Debtor's Estate.**

44.     Denial of this Motion will cause immediate and irreparable harm to the Debtor, its estate and its creditors, and will have a detrimental impact on the Debtor's assets. Absent access to the DIP Loans and the use of the cash collateral, the Debtor will have no ability to execute its chapter 11 strategy or meet ongoing obligations to suppliers, vendors, employees and other creditors.

45.     The terms of the DIP Loans, which the Debtor believes are fair and

reasonable, were negotiated in good faith and at arm's length, with all parties represented by experienced counsel.  Before finally agreeing on the terms of the DIP Loans, the Debtor and the DIP Lenders engaged in vigorous negotiations regarding the monetary and non-monetary terms and conditions of the DIP Loans.  Accordingly, the Debtors submit that the DIP Lenders should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the Interim or Final Orders are later modified, vacated, stayed or terminated by subsequent order of this or any other court, the DIP Lenders shall be fully protected with respect to any amounts previously advanced.

46.    In sum, the Debtor has concluded, in a sound exercise of its business judgment, that the DIP Loans are the best financing alternative available to it.  The financing contemplated hereunder is clearly for the benefit of the Debtor's estate and its creditors and will preserve, enhance and maximize the value of the Debtor's assets.

47.    Accordingly, the Debtor respectfully requests that this Court grant the relief requested herein.

## REQUEST FOR INTERIM RELIEF

48.    The Debtor submits that, for the reasons set forth herein, authority to obtain post-petition financing and use of cash collateral on an interim basis as requested in this Motion is necessary to avert immediate and irreparable harm to the Debtor's business.

49.    Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), a minimum of fifteen (15) days' notice is required before a final hearing on this Motion may commence.  However, such Rule provides that the Court may conduct a hearing before such fifteen (15) day period expires, but the Court may authorize the obtaining of credit or authorize the use of cash collateral, as the case may be, only to the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Bankruptcy Rule 4001(b)(2) and (c)(2).  It is essential to the continued operation of the Debtor's business that it be authorized by this Court to obtain interim financing on the terms set forth in the Interim Order pending the final hearing on the Motion.  Unless this Motion is approved on an interim basis, the Debtor will have difficulty

paying its employees and suppliers and obtaining adequate trade terms, which would have a devastating effect on the Debtor's operations, customer base and revenue. Thus, funds are urgently needed to meet all of the Debtor's working capital and other liquidity needs. In the absence of immediate relief, the Debtor's attempts to reorganize will be immediately and irreparably jeopardized. Accordingly, the Debtor respectfully requests that, pending a final hearing on the Motion, the terms and provisions of the DIP Loans be implemented and approved on an emergency interim basis, on the terms and subject to the conditions set forth in the DIP Loan Documentation and the Interim Order, or on any other terms that the Court may deem appropriate.

## REQUEST FOR FINAL HEARING

50.     The Debtor also requests that the Court schedule a final hearing on the Motion on or before April 15, 2010 with objections to the Final Order being due in writing on or before the date that is at least seven (7) business days prior to such final hearing.

## NOTICE

51.     Notice of this Motion has been given to (i) counsel for the Committee, (ii) counsel for the proposed DIP Lenders, (iii) counsel for the Prepetition Senior Agent, (iv) counsel for the Senior Secured Note Trustee, (v) the Office of the United States Trustee, (vi) the United States Attorney for the District of New Jersey, (vii) the United States Internal Revenue Service, (viii) the Attorney General of the State of New Jersey, and (ix) any party who has entered a notice of appearance pursuant to Fed. R. Bankr. P. 2002. The Debtor respectfully submits that such notice is sufficient, and requests that this Court find that no further notice of the relief requested herein is required.

## NO PRIOR REQUEST

52.     No previous motion for the relief sought herein has been made to this or to any other court.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an Order, substantially in the form submitted herewith, granting the relief requested herein and for such other and further relief as this Court may deem just and proper.

**LOWENSTEIN SANDLER PC**

/s/  *S. Jason Teele*

Kenneth A. Rosen, Esq. (KR 4963)
S. Jason Teele, Esq. (SJT 7390)
Timothy R. Wheeler, Esq. (TW 3466)
Wojciech F. Jung, Esq. (WJ 2047)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400
*Proposed Counsel to the Debtor*
 *and Debtor in Possession*

Dated:  March 15, 2010
         Roseland, New Jersey