# Exhibit A

**EPV SOLAR, INC.**

**PRIMING SUPERPRIORITY DIP FACILITY**

<u>Summary of Indicative Terms and Conditions</u>

**March 15, 2010**


Reference is made to (a) that certain indenture, dated as of June 4, 2009 (as amended, supplemented or otherwise modified prior to the date hereof, the "<u>Senior Secured Notes Indenture</u>"), relating to the 1% Convertible Senior Secured PIK Notes Due 2016 (the "<u>Senior Secured Notes</u>", the holders thereof, the "<u>Senior Secured Noteholders</u>"), among EPV Solar, Inc. (the "<u>Debtor</u>"), as issuer, and The Bank of New York Mellon, as trustee (in such capacity, the "<u>Senior Secured Notes Trustee</u>"), and (b) that certain credit agreement, dated as of November 18, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Credit Agreement</u>") between the Debtor and Patriarch Partners Agency Services, LLC (the "<u>Prepetition Senior Agent</u>"), and the lenders party thereto (collectively, with the Senior Agent, the "<u>Prepetition Senior Lenders</u>"). Unless otherwise defined herein, terms defined in the Senior Secured Notes Indenture are used herein with such defined meanings.

| | |
|---|---|
| **BORROWERS:** | (i) EPV Solar, Inc. ("<u>EPV Solar</u>" or the "<u>Debtor</u>"), a debtor-in-possession in the case (the "<u>Case</u>") pending with respect to EPV Solar under chapter 11 of Title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>") filed with the United States Bankruptcy Court for the District of New Jersey (the "<u>Bankruptcy Court</u>"); and (ii) EPV Solar Germany GmbH ("<u>EPV Germany</u>" and, collectively, with the Debtor, the "<u>Borrowers</u>"). |
| **GUARANTORS:** | Each of the subsidiaries of EPV Solar and EPV Germany identified as such on <u>Schedule A</u> hereto (the "<u>Guarantors</u>" and, collectively with the Borrowers, the "<u>Obligors</u>"). |
| **DIP LENDERS:** | Each of the entities identified as such, and having the commitments (the "<u>Commitments</u>") set forth on <u>Exhibit A</u> hereto, as such schedule may be amended prior to the entry of the Final Order (as defined below) referred to below (collectively, the "<u>DIP Lenders</u>"); provided that affiliates (including another fund investment managed by the same entity) of the entities listed on <u>Exhibit A</u> may provide the funding and serve as DIP Lenders. |
| **DIP ADMINISTRATIVE AGENT:** | To be determined (the "<u>DIP Agent</u>"). |
| **DIP FACILITES:** | Debtor-in-possession term loans in an aggregate principal amount, after giving effect to the Roll Up (as defined below), of $20,000,000, as required per the Approved Budget, but subject to the terms and conditions set forth in the DIP Loan Documentation (the "<u>DIP Loans</u>"). |
| **CLOSING DATE:** | Upon the entry of the Final Order (such date, the "<u>Closing Date</u>"), but in no event later than April 15, 2010. |
| **DOCUMENTATION:** | Definitive financing documentation with respect to the DIP Loans satisfactory in form and substance to the DIP Agent and the DIP Lenders and the Borrowers in their sole discretion and approved by the Bankruptcy Court (the "<u>DIP Loan Documentation</u>"). Such DIP Loan Documentation shall be executed and delivered by the parties thereto on |

or prior to March 19, 2010 (the date on which such events occur, the "Definitive Documentation Date") and shall be approved by the Bankruptcy Court upon entry of the Final Order; provided that, in the event no such DIP Loan Documentation is executed and delivered by the Obligors on or prior to March 19, 2010, the Obligors shall be considered in default and the DIP Loans (including, without limitation, any amount advanced at any time after entry of the Interim Order) shall become immediately due and payable.

**USE OF PROCEEDS:**     DIP Loans will be used for (a) the refinancing in full of all of the Obligors' obligations, whether for borrowed money, fees, expenses, or otherwise, under or with respect to the Prepetition Credit Agreement and all related documents, (b)(i) working capital and general corporate purposes of the Obligors (specifically excluding expenses of any other subsidiaries of the Borrowers that are not Obligors) and (ii) bankruptcy-related costs and expenses (subject to the Carve-Out (as defined below) limitations), in each case (other than during the period prior to the Definitive Documentation Date) in accordance with a 13-week budget, as such budget shall be updated for subsequent 13-week periods in form and substance acceptable to the Required DIP Lenders (as defined below) no later than four (4) weeks prior to the end of the period covered by the then-existing budget (as so updated and as otherwise amended from time to time with the consent of the DIP Lenders, the "Approved Budget") and (c) from and after entry of the Final Order, the discharge of a portion of the indebtedness represented by the Senior Secured Notes beneficially held by each DIP Lender as of the date of commencement of the Case (the "Petition Date") as described under "Roll Up" below. The initial Approved Budget shall be provided no later than the Definitive Documentation Date. Any amendments or modifications to the Approved Budget then in effect, and each subsequent Approved Budget, must be consented to in writing by the DIP Agent with the consent of the Required DIP Lenders prior to the implementation thereof. The DIP Loans shall be funded into a segregated cash collateral account subject to the control of, and a first priority lien in favor of, the DIP Agent for the benefit of the DIP Lenders and shall be disbursed solely in accordance with the Approved Budget.

Upon entry of the Interim Order by the Bankruptcy Court and prior to entry of the Final Order, the Borrowers shall be authorized to draw down, and the DIP Lenders shall be authorized, but not required, to extend DIP Loans in an aggregate principal amount of up to $4,000,000.

None of the proceeds of the DIP Loans shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against (a) the DIP Agent or the DIP Lenders (in any capacity), including in connection with the validity of the liens granted to the DIP Lenders or (b) the members of the Ad Hoc Group (as defined below); provided, that the foregoing shall be without prejudice to any other rights of the Debtor.

**AVAILABILITY:**     Subject to the terms and conditions of this Summary of Indicative Terms and Conditions, the proceeds of the DIP Loans will be made available upon entry of the Final Order (as defined below), (x) inclusive of amounts applied to discharge the indebtedness allocable to the DIP

Lenders with respect to the Senior Secured Notes beneficially held by each DIP Lender as of the Petition Date as described under "Roll Up" below and (y) exclusive of the amount of accrued and unpaid interest on the Senior Secured Notes that are subject to the Roll Up provisions below, which amount of interest shall be added to the principal amount of DIP Loans.

**ROLL UP:**

Pursuant to the Final Order, the indebtedness represented by the Senior Secured Notes beneficially held by each DIP Lender on the Petition Date shall be discharged with proceeds of the DIP Loans as provided on <u>Exhibit A</u>.  The Borrowers shall pay directly to the transferring DIP Lender all accrued and unpaid interest on the Senior Secured Notes so added to the principal amount of the DIP Loans in cash on the maturity date of such DIP Loans.

All DIP Loans, whether in respect of amounts advanced for working capital purposes or in connection with the discharge of existing Senior Secured Notes, shall be of equal stature and entitled to identical treatment. Notwithstanding the foregoing, if any obligation of the Obligors owing to a DIP Lender in respect of the DIP Loans as a result of such discharge is avoided, disallowed, set aside, or otherwise invalidated, in whole or in part, in any judicial proceeding or otherwise, the aggregate principal amount of Senior Secured Notes held by such DIP Lender prior to the discharge, to the extent theretofore avoided, disallowed, set aside, or otherwise invalidated, shall be reinstated in full force and effect and all guarantees and security in respect thereof shall be restored.

**PRIORITY:**

All DIP Loans and other liabilities and obligations of the Obligors to the DIP Agent and the DIP Lenders under the DIP Loan Documentation shall be:

(i) pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Case of the Debtor over any and all administrative expenses (and pari passu with the superpriority claims granted in respect of use of cash collateral by the Prepetition Senior Agent), whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code (but subject to the Carve-Out);

(ii) pursuant to sections 364(c)(2), secured by a perfected first-priority lien on all now owned or hereafter acquired assets of any kind or nature of the Obligors and the proceeds thereof (the "<u>Collateral</u>"), to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date;

(iii) pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected lien on all the Collateral, to the extent that such Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence at the time of the commencement of the Case or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than property that is subject to the existing liens that secure the obligations under the Senior Secured Notes Indenture, which liens shall be primed by the Priming DIP Liens as described below), subject to such liens in favor of such third parties (the "<u>Second Priority DIP Liens</u>"); and

(iv) pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected first priority, priming and senior security interest and lien granted to the DIP Agent, for the benefit of the DIP Lenders (the "Priming DIP Liens") in and on all the Collateral.  All existing liens, rights and interests granted to or for the benefit of the Senior Secured Noteholders under the Senior Secured Notes Indenture and other related documents (the "Prepetition Senior Secured Notes Liens") shall be primed and made subject to and subordinate to the Priming DIP Liens, which shall also prime any liens granted after the commencement of the Case to provide adequate protection in respect of any of the Prepetition Senior Secured Notes Indenture Liens (the "Senior Secured Notes Adequate Protection Liens" and, together with the Prepetition Senior Secured Notes Liens, the "Primed Senior Secured Notes Liens"), and the Priming DIP Liens shall not be subject to being treated pari passu with or subordinated to any other liens or security interests (whether currently existing or hereafter created);

subject in each case only to permitted exceptions to be agreed upon in writing by the DIP Lenders in their sole discretion, and (x) in the event of the occurrence and during the continuance of an Event of Default (as defined below), the payment of reasonable allowed and unpaid professional fees and disbursements incurred by the Obligors (excluding any incurred and unpaid professional fees and expenses of the DIP Agent or DIP Lenders payable pursuant to the Interim Order or the Final Order) and any statutory committees appointed in the Case in an aggregate amount not in excess of the sum of $100,000 and (y) the payment of fees pursuant to 28 U.S.C. § 1930 to the extent related to the Case of the Obligors (clauses (x) and (y), together, the "Carve-Out").

In light of the Roll Up described above, notwithstanding anything herein to the contrary, the claims, liens and security interests granted to the DIP Lenders shall not extend to causes of action under Chapter 5 of the Bankruptcy Code or the proceeds thereof.

**ADEQUATE PROTECTION:**    The Senior Secured Noteholders under the Senior Secured Notes Indenture, whose liens are primed as described in clause (iv) of *"Priority"* above, shall receive, for adequate protection for such priming, current interest at the non-default rate on the Senior Secured Notes, and a silent second lien on all property of the Obligors, junior to all claims and liens of the DIP Lenders described in the section titled "Priority".

In addition, the Borrowers will pay the reasonable costs and expenses of the ad hoc group of Senior Secured Noteholders (including, without limitation, Aviva Investors, Catalyst Investment Management Co., LLC, funds investment managed by GLG Partners LP, Tenor Capital Management Company, L.P., F. A. Voight & Associates, LP, Jeffrey Parket and Kenneth Calligar, and such other holders that may join the ad hoc group, collectively, the "Ad Hoc Group") and their advisors (limited to one New York law firm, one New Jersey law firm and one financial advisory firm) in connection with the Case, and the Borrowers shall consent and request that the Ad Hoc Group use the same advisors as the DIP Agent and the DIP Lenders.

**COLLATERAL:**    Substantially all now existing and hereafter acquired property of the

Obligors (defined above as the Collateral); as well as pledges of stock of the Obligors in the manner requested by the DIP Agent.

**CONSENT RIGHT:** From and after the date of entry of the Interim Order, no Obligor shall sell, transfer or otherwise dispose of any of its assets out of the ordinary course of business, except with the consent of the DIP Lenders in their sole and absolute discretion.

**COMPENSATION:** As a material inducement to the DIP Lenders to make the DIP Loans, the Borrowers agree to compensate the DIP Lenders, from and after the entry of the Final Order, or if the DIP Lenders make any DIP Loans after the entry of the Interim Order, as set forth below.

**ORIGINATION FEE:** A fee (the "Origination Fee") equal to (i) 5.00% multiplied by (ii) the full aggregate principal amount of the DIP Loans, shall be (x) fully earned on the date of entry of the Interim Order and (y) due and payable to the DIP Agent for the account of the DIP Lenders on any date when the DIP Loans are so repaid in connection with the sale of any Obligor's assets yielding net proceeds (after reasonable and customary expenses of sale) of at least $5,000,000 with respect to all asset sales (taken as a whole) or any other mandatory prepayment event.

**EXIT FEE:** Except as provided in the following sentence, the Borrowers shall pay, in connection with any optional, mandatory or other payment or prepayment of DIP Loans, in whole or in part, on any date when the DIP Loans are so repaid, in connection with the sale of any of the Borrower's assets or any other mandatory prepayment event, an amount equal to 5.00% of the amount so prepaid or the amount of the DIP Loans then payable.

**INTERCOMPANY LOAN** The Debtor shall assign to the DIP Agent, for the benefit of the DIP Lenders, the intercompany loans due to the Debtor from EPV Germany.

**INTEREST RATE:** 10% per annum, to be paid in kind with such interest added to the principal amount of the DIP Loans monthly in arrears on the last day of each month.

**DEFAULT RATE:** At all times while a default exists, principal, interest and other amounts shall bear interest at a rate per annum equal to 2.00% in excess of the interest rate set forth in "Interest Rate" above.

**MATURITY DATE:** The earliest to occur of (a) ten (10) months from the Closing Date, (b) 30 days after entry by the Bankruptcy Court of the interim order approving the DIP Loans in the Case (the "Interim Order"), if the final order approving the DIP Loans (the "Final Order") has not been entered by the Bankruptcy Court in the Case prior to the expiration of such 30-day period (the "Prepayment Date"), (c) the effective date of any sale of substantially all of the Borrowers' or any of the Obligors' assets, and (d) the acceleration of the DIP Loans and the termination of the commitments to make the DIP Loans in accordance with the terms of the DIP Loan Documentation.

**AMORTIZATION:** None.

**YIELD PROTECTION
AND INCREASED COSTS;
TAXES:**

Standard yield protection and indemnification, including capital adequacy requirements, will be incorporated into the DIP Loan Documentation that will satisfactorily compensate the DIP Lenders in the event that any changes in law, requirement, guideline or request of relevant authorities shall increase costs, reduce payments or earnings, or increase capital requirements.

The DIP Loan Documentation will provide that all payments are to be made free and clear of any taxes (other than franchise taxes and taxes on overall net income), imposts, assessments, withholdings or other deductions whatsoever, and to the extent applicable, the DIP Loan Documentation will provide for any gross-up for withholding.

The DIP Loan Documentation shall provide for customary funding protection, including gross-up for withholding (subject to customary qualifications) and compensation for increased costs.

**OPTIONAL PREPAYMENTS:**  The Borrowers may prepay the DIP Loans in whole or in part at any time. All optional prepayments shall be applied to the DIP Loans in accordance with the application of payment provisions set forth in "Mandatory Prepayments" below.

**MANDATORY
PREPAYMENTS:**

The following amounts shall be applied to prepay the DIP Loans and obligations related thereto (with additions and modifications to permit and take account of the DIP Loans and others which are usual and customary for debtor-in-possession financings):

1.  100% of the net proceeds of any sale or issuance of equity securities or incurrence of non-trade indebtedness after the Closing Date by any Obligor.

2.  100% of the net proceeds of any sale or other disposition by any Obligor of any assets, in a single transaction or series of related transactions (including any sale or other disposition pursuant to which Akart Enerji Yatirimlari A.S. or any of its affiliates is the buyer), having a value in excess of $25,000 (except for the sale of inventory in the ordinary course of business and certain other sales to be agreed on).

3.  100% of the net proceeds of certain extraordinary receipts (including tax refunds, indemnity payments, pension reversions, acquisition purchase price adjustments and insurance proceeds not included as proceeds of asset dispositions, but excluding the social security reimbursements and salary reimbursements received by EPV Germany from the German government or any agency or instrumentality thereof) by any Obligor.

Notwithstanding the foregoing, no reinvestment with any proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the written consent of the DIP Lenders.

Prepayments will be applied (a) first, to repay up to $4,000,000 in principal

amount outstanding in respect of the DIP Loans, (b) second, to pay the Origination Fee, (c) third, to repay any principal amounts outstanding in respect of the DIP Loans and (d) fourth, to pay the exit fee and any other obligations outstanding in respect of the DIP Loans.

**CONDITIONS PRECEDENT:**   The several obligations of the DIP Lenders to make, or cause one of their respective affiliates to make, the DIP Loans will be conditioned upon satisfaction or waiver of, among other things, (i) the entry by the Bankruptcy Court of the Interim Order, (ii) the occurrence of the Definitive Documentation Date, (iii) the entry of the Final Order, and (iv) the applicable conditions precedent listed on <u>Schedule I</u> hereto.

**REPRESENTATIONS AND WARRANTIES:**   The DIP Loan Documentation shall contain representations and warranties customary for debtor-in-possession financings, including, without limitation:

1.  Accuracy in all material respects of financial statements and other information (including pro forma financial statements, budgets, and cashflow projections); accuracy in all material respects and completeness of disclosure; and absence of undisclosed liabilities.

2.  No Material Adverse Change (as defined in Schedule 1) subsequent to the Petition Date.

3.  Corporate structure, entity existence, status, power and authority.

4.  Due authorization, execution and delivery of the DIP Loan Documentation; legality, validity, binding effect and enforceability of the DIP Loan Documentation.

5.  Execution, delivery, and performance of the DIP Loan Documentation do not violate law or other material contractual obligations enforceable against the Obligors without further action by the Bankruptcy Court.

6.  No material litigation; no government or regulatory approvals required for execution, delivery and performance of the DIP Loan Documentation, other than approvals in effect.

7.  No default under the DIP Loan Documentation.

8.  Ownership of properties and necessary rights to intellectual property.

9.  Liens.

10. Use of proceeds.

11. Labor matters.

12. Compliance with laws and regulations, including ERISA, Patriot Act and other counter-terrorism laws and applicable environmental laws and regulations.

13. Payment of taxes.

14. Insurance.

15. Compliance with Federal Reserve regulations.

16. Inapplicability of the Investment Company Act.

17. Ownership of the Borrowers and their respective subsidiaries.

18. Validity, priority and perfection of security interests in the Collateral.

**FINANCIAL COVENANTS:** Each of the Obligors agrees to the following financial covenants: compliance with certain specifically identified line items in the Budget (provided that variances of percentages to be mutually agreed to in respect of each such line item shall be permitted), reported weekly, and tested weekly. The Definitive Documentation will contain additional financial covenants as reasonably determined by the DIP Agent and the DIP Lenders and reasonably acceptable to the Obligors.

**AFFIRMATIVE COVENANTS:** The DIP Loan Documentation shall contain affirmative covenants customary for debtor-in-possession financings, including, without limitation:

1. Delivery of financial statements, reports, projections, budgets, borrowing base certificates, officers' certificates and other information requested by the DIP Agent, including without limitation (a) a quarterly compliance certificate (showing covenant calculations) certified by an authorized financial officer, to be delivered in conjunction with the quarterly and annual financial statements, (b) weekly updated 13-week cash flow projections, (c) weekly variance reports (i) showing comparisons of actual results for the immediately prior week against the most recent 13-week cash flow projections including such week, and (ii) showing comparisons of that portion of the most recent 13-week cash flow projections corresponding to the current calendar month (which comparisons shall include actual results for such calendar month as of the date of such report), (d) monthly updates to all other projections provided on or before the Closing Date, and (e) weekly updated 5-week forecast and funding data with respect to EPV Germany.

2. Access to information (including historical information) and personnel, including, without limitation, regularly scheduled meetings as mutually agreed with senior management and other company advisors and the DIP Lenders, and the DIP Lenders' financial advisors shall have access to all information they shall reasonably request;

3. Compliance with the Approved Budget.

4. Delivery of notices of default under the DIP Loan Documentation, litigation and other material events.

5. Payment of other obligations of the Obligors consistent with their terms.

5.  Continuation of business and maintenance of existence and material rights and privileges of the Obligors.

6.  Compliance with material contractual obligations of the Obligors.

7.  Maintenance of property and insurance of the Obligors.

8.  Maintenance of books and records of the Obligors.

9.  Right of the DIP Lenders to inspect property and books and records of the Obligors.

10. Compliance with laws (including, without limitation, ERISA and environmental laws and regulations).

11. Further assurances (including, without limitation, with respect to security interests in after-acquired property).

12. Use of proceeds.

13. Payment of taxes.

14. Maintenance of and adherence to the Borrowers' existing credit and risk control policies.

15. The Debtor shall file a plan of reorganization on or before the four (4) month anniversary of the date of entry of the Final Order (the "Plan Deadline"); the Court shall have approved the disclosure statement no more than six (6) weeks after the Plan Deadline (the "Disclosure Statement Deadline"); and the Plan shall have been confirmed no more than six (6) weeks after the Disclosure Statement Deadline (the "Consummation Date").

16. The Borrowers shall have consummated the sale of all or substantially all of their assets, including such assets of their non-debtor subsidiaries, no later than the Consummation Date, unless otherwise agreed.

17. From and after the Definitive Documentation Date, holding of the Borrowers' deposit accounts with respect to deposit accounts holding unused proceeds of the DIP Loans at the DIP Agent or at an acceptable financial institution subject to an account control agreement in favor of the DIP Agent for the benefit of the DIP Lenders.

18. Best efforts to obtain an agreement from the applicable German governmental authorities to subordinate any lien held by such governmental authorities in connection with the grants provided by such governmental authorities to the lien granted to the DIP Agent for the benefit of the DIP Lenders with respect to any Collateral owned by EPV Germany.

**NEGATIVE COVENANTS:**    The DIP Loan Documentation shall contain negative covenants customary for debtor-in-possession financings, including, without limitation:

1.  Limitation on indebtedness, preferred stock and contingent obligations relating thereto.

2.  Limitation on creating or permitting to exist any liens or encumbrances on any assets, other than liens securing the DIP Loans and any permitted liens (which liens shall include scheduled liens in existence on the Closing Date to the extent subordinated pursuant to the orders, junior liens granted in connection with adequate protection granted by the Debtor as required hereunder) and other liens described above.

3.  Limitation on further negative pledges.

4.  Limitation on guarantee obligations.

5.  Unless the DIP Loans and all other amounts owing to the DIP Lenders and the DIP Agent shall have been paid in full in cash, limitation on mergers, consolidations, liquidations, dissolutions, acquisitions and non-ordinary course asset sales not approved by the Required DIP Lenders in their sole discretion (such discretion to include the right to approve potential buyers), excluding the Debtor's disposition of its minority interests in Solar Plus –Produção de Painéis Solares, S.A. and Heliodomi S.A. solely to the extent such disposition is for an amount in excess of $200,000.

6.  Limitation on leases.

7.  Limitation on dividends, other payment restrictions affecting subsidiaries and other payments in respect of capital stock.

8.  Limitation on capital expenditures.

9.  Limitation on investments, acquisitions, loans and advances.

10. Optional payments and modifications of subordinated and other debt instruments.

11. Limitation on transactions with affiliates; limitation on sale and leasebacks; provided, however, the DIP Loan Documentation will provide for the continued funding of the Debtor's subsidiaries pursuant to the Approved Budget.

12. Limitation on change of fiscal year.

13. Limitation on changes in business conducted or changes to the organization documents of either Borrower, other than as required by the Bankruptcy Code.

14. Limitation on any Obligor's ability to assert any right of subrogation or contribution against any other Obligor until all borrowings under the DIP Loans are paid in full and the DIP Lenders' Commitments are terminated.

15. Prohibition on payment of prepetition claims (other than as approved by the Bankruptcy Court and acceptable to the Required DIP Lenders) and

payment of non-budgeted post-petition items.

16. Prohibition on consenting to the granting of adequate protection payments or liens, superpriority administrative expense claims or liens having a priority senior or pari passu with the liens granted to the DIP Agent, the Prepetition Senior Agent or the Senior Secured Notes Trustee, except as otherwise expressly permitted by the DIP Loan Documentation.

**EVENTS OF DEFAULT:** Customary for debtor-in-possession facilities and subject to customary grace periods and cure periods, and materiality thresholds reasonably acceptable to the DIP Lenders, including, without limitation:

1. Nonpayment of principal when due.

2. Nonpayment of interest, fees or other amounts.

3. Material inaccuracy of representations and warranties.

4. Violation of covenants.

5. Cross default.

6. Certain ERISA events.

7. Material judgments.

8. Actual or asserted invalidity of any guarantee or security document, subordination provisions or security interest.

9. Change of control.

10. The Debtor files a Plan that does not provide for payment in full in cash of the DIP Loans and all other amounts owing to the DIP Lenders and the DIP Agent on the effective date of such Plan.

11. A trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Obligor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), shall be appointed in the Case.

12. Any other lien shall be granted with respect to any of the Collateral (other than the Carve-Out) without the prior consent of the Required DIP Lenders.

13. The occurrence of any insolvency, bankruptcy or similar proceeding with respect to any subsidiary of the Debtor that is not a debtor in the Case.

14. Other than payments authorized by the Bankruptcy Court in respect of (i) accrued payroll and related expenses as of the commencement of the Case and (ii) certain creditors, in each case to the extent authorized by one or more "first day" or other orders satisfactory to the DIP Lenders, or as otherwise permitted under the DIP Loan Documentation, the Obligors shall make any payment (whether by

way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables.

15. The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Obligor, or (ii) to permit other actions that the DIP Lenders may, in their sole discretion, deem to have a material adverse effect on the Debtor or its estate.

16. Any material provision of the DIP Loan Documentation shall cease to be valid or binding on any Obligor, or any Obligor shall so assert in any pleading filed in any court.

17. Any order shall be entered reversing, amending, supplementing, staying for a period in excess of five (5) business days, vacating or otherwise modifying in any material respect the Interim Order or the Final Order without the prior written consent of the Required DIP Lenders.

18.  A "Change of Executive Management" (the definition of which shall be agreed upon) shall occur, unless such default is cured to the satisfaction of the Required DIP Lenders within five (5) business days.

19. Failure of the Definitive Documentation Date to occur on or before April 15, 2010.

20. The exclusive period for the Debtor to file a plan of reorganization under section 1121(b) of the Bankruptcy Code expires or is terminated.

21. The Final Order shall not have been entered by the bankruptcy court within 30 days after the bankruptcy court's entry of the Interim Order.

22. Any judgments which are in the aggregate in excess of $25,000 as to any post-petition obligation shall be rendered against the Debtor or other Obligors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants); or there shall be rendered against the Debtor or other Obligors a nonmonetary judgment with respect to a post-petition event which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Debtor or other Obligors taken as a whole to perform their obligations under the DIP Loan Documentation.

23. Any DIP Loan Document shall cease to be effective or shall be contested by a Borrower or any of its affiliates.

24. Any of the Borrowers or their respective affiliates shall fail to comply with the Interim Order or Final Order.

25. The filing of a motion, pleading or proceeding by the Debtor or its direct or indirect subsidiaries which could reasonably be expected to result in a material impairment of the rights or interests of the DIP

Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in a material impairment.

26. Such other usual and customary Events of Default that are reasonably requested by the DIP Lenders.

Upon the occurrence and during the continuance of any Event of Default, the DIP Agent, at the direction of the Required DIP Lenders, may take all or any of the following actions without further order of or application to the Bankruptcy Court, provided that, with respect to clause (iii) below and the enforcement of liens or other remedies with respect to the Collateral referred to in clause (iv) below, the DIP Agent shall provide the Borrowers (with a copy to counsel to each statutory committee appointed in the Case and to the applicable United States Trustee) with five (5) business days' prior written notice, and provided further that, upon receipt of any such notice, the Borrowers may only make disbursements in the ordinary course of business consistent with the Approved Budget and with respect to the Carve-Out, but may not disburse any other amounts; provided further that, in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing:

(i)   declare the principal of and accrued interest on the outstanding DIP Loans to be immediately due and payable;

(ii)  terminate any further commitment to lend to the Borrowers;

(iii) set-off any amounts held as cash collateral (including, without limitation, in any cash collateral account for the benefit of the DIP Agent and the DIP Lenders) or in any accounts maintained by any of the DIP Lenders or their affiliates, subject to any prior liens of the Prepetition Senior Agent; or

(iv) take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Agent and the DIP Lenders) permitted under the DIP Loan Documentation or by applicable law.

**REQUIRED DIP LENDERS:**

The vote of DIP Lenders holding more than 50% of total Commitments (or if no Commitments are outstanding, total exposure) (the "Required DIP Lenders") shall be required to amend, waive or modify the DIP Loans, except that with respect to matters relating to, among others, the reduction in, or compromise of payment rights with respect to, principal or interest rates, extension of maturity, release of guarantees and/or liens granted on all or substantially all of the Collateral (other than liens on Collateral subject to permitted dispositions), any waiver of the covenants set forth in "Negative Covenants" above and the definition of DIP Requisite Lenders, Required DIP Lenders will be defined as Lenders holding 100% of total Commitments (or if no Commitments are outstanding, total exposure) under the DIP Loans affected thereby or all affected DIP Lenders, as appropriate.

**OTHER BANKRUPTCY**

**MATTERS:** Among other things, the Final Order shall provide that, upon entry of the Final Order, (a) the DIP Agent, the DIP Lenders, the Senior Secured Noteholders, the Senior Secured Notes Trustee, and all of their respective counsel, advisors and consultants, shall each be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code, and (b) the DIP Agent and the DIP Lenders reserve the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the DIP Loans, in whole or in part, in connection with any sale or disposition of assets in the Case.

**COST AND EXPENSES; INDEMNIFICATION:** All out-of-pocket costs and expenses of the DIP Agent (including, without limitation, fees and disbursements of counsel and of third-party appraisers and consultants advising the DIP Agent, expenses in connection with the appraisal and monitoring of the Collateral, syndication, enforcement of rights and other miscellaneous disbursements) and the DIP Lenders shall be payable by the Borrowers promptly upon written demand (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval in the event the transactions contemplated hereby are consummated; provided, however, that no such costs and expenses shall be due from the Borrowers if the DIP Lenders fail or refuse to advance any funds to the Borrowers in violation of this Summary of Indicative Terms and Conditions or the DIP Loan Documentation, or as a result of the Bankruptcy Court's denial of the Debtor's motion to approve the DIP Loans on an interim or final basis.

The Borrowers shall indemnify, pay and hold harmless the DIP Agent and the DIP Lenders (and their respective directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party).

**ASSIGNMENT AND PARTICIPATION:** The DIP Lenders shall be permitted to assign and sell participations in the DIP Loans and their Commitments. In the case of partial assignments (other than assignments to another DIP Lender or an affiliate or approved fund of an existing DIP Lender), the minimum assignment amount shall be $500,000 in the case of the DIP Loans. Upon such assignment, such affiliate, bank, financial institution or entity will become a Lender for all purposes under the DIP Loan Documentation. Pledges of DIP Loans in accordance with applicable law shall be permitted without restriction.

**AGENCY:** Usual and customary for debtor-in-possession financings and nonetheless in form and substance satisfactory to the DIP Agent.

**AMENDMENTS AND WAIVERS:** Subject to the consent of the Required DIP Lenders, with certain customary amendments subject to the consent of all DIP Lenders.

**GOVERNING LAW AND JURISDICITON:** The DIP Loan Documentation will provide that the Obligors shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern the DIP Loan Documentation.

**COUNSEL TO DIP AGENT AND DIP LENDERS:**    Brown Rudnick LLP.

**MISCELLANEOUS:**    The foregoing is intended to summarize certain basic terms of the DIP Loans. It is not intended to be a definitive list of all of the requirements of the DIP Agent and the DIP Lenders in connection with the DIP Loans. The DIP Loan Documentation shall include such other terms and provisions as are customary for debtor-in-possession facilities of this type, including, but not limited to, provisions in respect of confidentiality and sharing of information and Patriot Act notifications.

**Schedule I**

SUMMARY OF CONDITIONS PRECEDENT TO THE DIP LOANS

1.    <u>Corporate Structure, Organizational Documents</u>. The corporate structure, capital structure, other debt instruments, material contracts, cash management systems, governing documents of the Borrowers, their parents and direct and indirect subsidiaries and any other Obligors, tax effects resulting from the commencement of the Case and the DIP Loans and the transactions contemplated hereby, shall be satisfactory to the DIP Lenders.

2.    <u>Interim Order And Final Order</u>.  The Interim Order and the Final Order, and all motions    relating thereto, approving and authorizing the DIP Loans, all provisions thereof and the priorities and liens granted under Bankruptcy Code section 364(c) and (d), as applicable, shall be in form and substance satisfactory to the DIP Lenders and their counsel, shall be entered by the Bankruptcy Court no later than March 22, 2010 and April 15, 2010, respectively, and shall include, without limitation, provisions (a) modifying the automatic stay to permit the creation and perfection of the DIP Agent's liens on the Collateral, (b) providing for the automatic vacation of such stay to permit the enforcement of the DIP Agent's and DIP Lenders' remedies under the DIP Loans, including, without limitation, the enforcement, upon 5 days' prior written notice, of such remedies against the Collateral, requiring the Borrowers' best efforts (subject to applicable law) to sell the Collateral if requested by the DIP Agent and directing that the DIP Agent and its representatives be granted access to all locations during the continuance of an Event of Default in support of the enforcement and exercise of such remedies, (c) upon entry of the Final Order, prohibiting the assertion of claims arising under section 506(c) of the Bankruptcy Code against the DIP Agent or any DIP Lender or, except as expressly permitted therein, the commencement of other actions adverse to the DIP Agent or any DIP Lender or their respective rights and remedies under the DIP Loans, the Interim Order, the Final Order, or any other order, (d) prohibiting the incurrence of debt by any of the Obligors, other than permitted indebtedness to be agreed, with priority equal to or greater than the DIP Loans, except as provided herein, (e) prohibiting any granting or imposition of liens other than liens acceptable to the DIP Lenders, except as provided herein, and (f) authorizing and approving the DIP Loans and the transactions contemplated thereby, including, without limitation, the granting of the super priority status, he first-priority and priming security interests and liens upon the Collateral and the payment of all fees and expenses due to the DIP Lenders and the DIP Agent.

3.    <u>Compliance with Interim Order</u>.  The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the DIP Lenders.  The Borrowers shall be in compliance in all respects with the Interim Order.

4.    <u>Debtor-in-possession</u>.  No trustee or examiner shall have been appointed with respect to the Debtor or its properties, and EPV Germany shall not have filed (voluntarily or involuntarily) for protection under bankruptcy, insolvency, administration laws or similar laws.

5.    <u>First Day Motions</u>.  All "first day" motions and related orders (including, without limitation, in respect of cash management) entered by the Bankruptcy Court in the Case shall be in form and substance satisfactory to the DIP Lenders and their counsel.

6.    <u>Approved Budget and Projections</u>. The DIP Lenders shall have received (i) an Approved Budget in form and substance acceptable to the DIP Lenders, and thereupon advances of the DIP Loans shall be released from the collateral account to the Obligors solely in accordance with the Approved Budget, (ii) a forecast of sources and uses of cash by the Obligors on a weekly basis for the succeeding 13 calendar weeks, which shall be in form and substance satisfactory to the DIP Lenders (the "<u>Cash Flow Forecast</u>"), and (iii) such other information (financial or otherwise) as may be reasonably requested by them.

7.    <u>Performance of Obligations</u>. All costs, fees, expenses (including, without limitation, legal fees and expenses) and other compensation payable to the DIP Agent and the DIP Lenders shall have been paid to the extent due and payable in accordance with the terms of the Interim Order and the DIP Loans, and the Obligors shall have complied in all material respects with all of their other obligations to the DIP Lenders.

8.    <u>Litigation, etc.</u>   There shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Case) or threatened in any court or before any arbitrator or governmental authority that, in the opinion of the DIP Agent or any DIP Lender, affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a material adverse change or material adverse condition in or affecting the businesses, assets, operations or condition (financial or otherwise) of the Borrowers, their parents and direct and indirect subsidiaries, taken as a whole, or any of the transactions contemplated hereby.

9.    <u>Customary Closing Documents</u>. Except with respect to the DIP Loans made on the Closing Date, all documents required to be delivered under the DIP Loan Documentation, including customary legal opinions, corporate records, documents from public officials and officers' certificates and other information (including other information and documentation required by customer identification programs pursuant to the Patriot Act), shall have been delivered and reviewed to the satisfaction of the DIP Lenders.

10.   <u>Satisfactory Documentation</u>. Except with respect to the DIP Loans made on the Closing Date, the DIP Loan Documentation shall be prepared by counsel to the DIP Lenders and shall be in form and substance satisfactory to the DIP Agent and the DIP Lenders, and the DIP Lenders shall have perfection of liens and pledges on the UCC collateral securing the DIP Loans.

11.   <u>Compliance with Final Order</u>.  The Final Order shall not have been reversed, modified, amended, stayed or vacated, and the Debtor and Obligors shall be in compliance with the Final Order.

12.   <u>Lien Search, etc.</u> Except with respect to the DIP Loans made on the Closing Date, the DIP Agent shall have received the results of a recent lien, tax and judgment search in each relevant jurisdiction with respect to the Obligors, and such search shall reveal no liens on any of the assets of the Obligors other than liens permitted hereby and other liens acceptable to the DIP Lenders.

13.   <u>Cash Management</u>. Except with respect to the DIP Loans made on the Closing Date, cash management arrangements satisfactory to the DIP Lenders in form and substance shall be in place. The DIP Lenders or their advisors shall have completed a review of the Obligors' cash management systems and determined that all cash and cash equivalents of the Obligors are subject to a valid and perfected first priority security interest in favor of the DIP Agent, for the benefit of the DIP Lenders, pursuant to control agreements, and if required by the DIP Lenders, a cash management order encompassing the cash management arrangements currently in place under the Prepetition Credit Agreement and otherwise satisfactory to the DIP Lenders shall be in full force and effect.

14.   <u>Insurance/Assets</u>. The Interim Order shall provide that the DIP Agent shall be named as loss payee (in respect of property/casualty insurance policies maintained by the Obligors) and additional insured (in respect of liability insurance policies maintained by the Obligors), and that the DIP Agent shall be provided with 30 days' advance notice of all non-renewal/cancellation/amendment riders in respect of such policies.

15.   <u>Material Adverse Change</u>. Since the Petition Date, there shall not have been any material adverse

change, individually or in the aggregate (other than with respect to a plan of reorganization and the DIP Loans), in the validity or enforceability of any of the DIP Loan Documentation or the rights and remedies of the DIP Agent and the DIP Lenders under any of the DIP Loan Documentation, or in the operations, assets, revenues, financial condition, profits or prospects of the Borrowers, taken as a whole (a "Material Adverse Change").

16.    Waivers/Consents. As may be required, the DIP Agent shall have received all necessary third party and governmental waivers and consents, and the Borrowers shall, and shall have caused the other Obligors to, have complied with all applicable laws, decrees and material agreements.

17.    No Default. No default that, with the passage of time or the giving of notice, or both, could result in an Event of Default under the DIP Loan Documentation shall exist at the time of, or after giving effect to the making of, the DIP Loans with respect to the DIP Loans on the Closing Date.

18.    Patriarch Facility.  The DIP Agent and the DIP Lenders shall have received reasonable evidence of the repayment, termination and discharge of all the Obligors' obligations under the Prepetition Credit Agreement.

19.    Representations and Warranties.  All representations and warranties in the DIP Loan Documentation shall be true and correct in all material respects as of the Closing Date and every date thereafter when DIP Loans are made to the Borrowers.

20.    Amendment to Indenture.  The Senior Secured Noteholders shall have amended  the terms and conditions of the Senior Secured Notes Indenture, or the terms and conditions of the Senior Secured Notes Indenture shall have been deemed amended by order of the Bankruptcy Court, as necessary to effectuate the transactions contemplated by this Summary of Indicative Terms and Conditions.

21.    Replacement of Prepetition Credit Agreement.  The Bankruptcy Court shall have found and so ordered that the DIP Loans are a refinancing or replacement of the Prepetition Credit Agreement and the DIP Agent and DIP Lenders are entitled to all of the rights, interests and benefits held by the Prepetition Senior Agent and Prepetition Senior Lenders, respectively.

## Exhibit A

DIP LENDERS AND MINIMUM COMMITMENTS

| Name of Lender | Commitment as of Closing Date | Total Commitments (excluding the amount of interest on Senior Secured Notes that is added to the DIP Loans, but not funded by DIP Lenders) |
|---|---|---|
| Catalyst Investment Management | $1,000,000 | $3,000,000, of which $1,000,000 is new commitment and $2,000,000 of which is applied to Roll-Up of Senior Secured Notes |
| GLG Partners, Inc. | $3,000,000 | $9,000,000, of which $3,000,000 is new commitment and $6,000,000 of which is applied to Roll-Up of Senior Secured Notes |
| Jeffrey Parket | $333,334 | $1,000,000,000, of which $333,334 is new commitment and $666,666 of which is applied to Roll-Up of Senior Secured Notes |
| Kenneth Calligar | $333,333 | $1,000,000,000, of which $333,333 is new commitment and $666,667 of which is applied to Roll-Up of Senior Secured Notes |
| Tenor Capital | $2,000,000 | $6,000,000, of which $2,000,000 is new commitment and $4,000,000 of which is applied to Roll-Up of Senior Secured Notes |
| Aggregate of all DIP Lenders | $6,666,667 | $20,000,000, of which $6,666,667 is new commitment and $13,333,333 of which is applied to Roll-Up of Senior Secured Notes |
| | | |

**Schedule A**

GUARANTORS

[European subsidiaries]