**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

*Caption in compliance with D.N.J. LBR 9004-2(c)*

COOLEY GODWARD KRONISH LLP
Richard S. Kanowitz, Esq. (RK 0677)
Jay R. Indyke, Esq. (JI 0363)
Michael A. Klein, Esq. (MK 7479)
1114 Avenue of the Americas
New York, NY 10036
Tel. (212) 479-6000
Fax. (212) 479-6275

*Proposed Attorneys for the Official Committee of*
*Unsecured Creditors of EPV Solar, Inc.*

| | |
|---|---|
| In re: | Chapter 11 |
| EPV SOLAR, INC., | Case No.:  10-15173 (MBK) |
| Debtor | Hearing Date: March 22, 2010 at 11:00 am (ET) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO**
**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE**
**DEBTOR TO OBTAIN POST-PETITION FINANCING, GRANT SECURITY**
**INTERESTS AND LIENS AND ACCORD PRIORITY STATUS**
**PURSUANT TO 11 U.S.C. §§ 361, 364(c) AND 364(b); AND**
**(B) AUTHORIZING USE OF CASH COLLATERAL**

The Official Committee (the "Committee") of Unsecured Creditors of EPV Solar, Inc.

(the "Debtor"), by and through its undersigned proposed counsel, hereby submits this objection

(the "Objection") to the Debtor's motion (the "DIP Motion") for interim and final orders (a)

authorizing the Debtor to obtain postpetition financing, grant security interests and liens and

accord priority status pursuant to 11 U.S.C. §§ 361, 364(c) and 364(d); (b) authorizing use of

cash collateral pursuant to 11 U.S.C. § 363(c)(2)(b); (c) granting adequate protection; (d) giving

notice of final hearing pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2); and (e) modifying the

1620139 v3/NY

automatic stay pursuant to 11 U.S.C. § 362(d). In support of this Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

The Committee submits this Objection because if the proposed DIP Facility[1] is approved, this case will proceed for the sole and exclusive benefit of the Subordinated Noteholders without regard to the consequences to the Debtor's general unsecured creditors. The Committee is gravely concerned that the proposed Interim DIP Order is nothing more than a mechanism through which the Subordinated Noteholders will seek to control all aspects of the Debtor's bankruptcy while enhancing their collateral position in an effort to increase the likelihood of payment in full on account of their prepetition claims. The Debtor has failed to provide any evidence that the DIP Facility will facilitate a sale process that will result in the confirmation of a plan that will confer any benefit to creditors other than the Subordinated Noteholders. The Committee cannot support the process contemplated by the DIP Motion unless and until such a showing is made.

As demonstrated by the Budget, the proposed DIP Facility will enable the Debtor to do little more than run a bare-bones sale process that will allow the Subordinated Noteholders to liquidate their collateral without conferring any benefit on unsecured creditors. Indeed, although nominally a $20 million facility, the vast majority of the funds provided by the DIP Lenders will be used to satisfy prepetition obligations of the Debtor to the DIP Lenders and the Senior Lenders. Notably, it appears that the DIP Facility will not provide the Debtor with sufficient funds to satisfy it's working capital needs and pay for the costs of administering this bankruptcy. This is unacceptable. If the Subordinated Noteholders wish to dispose of their collateral

---

[1]    All capitalized terms hereinafter defined.

1620139 v3/NY

pursuant to a chapter 11 process, they must be required to pay for the actual costs of undertaking that process and demonstrate an actual benefit to creditors other than themselves, including a return to unsecured creditors.

In exchange for about $3 million in new money, the DIP Lenders seek to impose onerous terms on the Debtor and its estate that should not be approved by this Court.  As demonstrated below, there is a huge disparity between the benefit to the estate from the proposed DIP Facility and the consideration being provided to the DIP Lenders and the Subordinated Noteholders thereunder:

| Benefit to the Estate from the DIP Facility | Consideration Provided to the DIP Lenders and Subordinated Noteholders |
|---|---|
| • $3 million in new financing | • $2 million in fees to the DIP Lenders<br><br>• 7-month sale process in chapter 11 for the Subordinated Lenders' exclusive benefit<br><br>• Roll-up of $13.3 million of the DIP Lenders' prepetition debt secured by new liens on postpetition assets<br><br>• Assignment of a $24 million receivable owed by EPV Germany to the DIP Lenders<br><br>• 506(c) waiver<br><br>• Payment of legal fees of DIP Lenders and Ad Hoc Group<br><br>• Liens on unencumbered assets of the Debtor, including avoidance actions and the proceeds of leasehold interests<br><br>• Undue restrictions on the Committee's ability to investigate and pursue claims and causes of action against the DIP Lenders, Patriarch, the Subordinated |

3

| | Lenders and the Ad Hoc Group |
| | • Control over the Debtor's budget |
| | • Mandatory prepayments to the DIP Lenders from the sale of assets |

In summary, pursuant to the DIP Motion, the Debtor seeks to provide (i) the DIP Lenders with, among other things, $2 million in fees, a partial roll-up of approximately $13.3 million of their prepetition indebtedness and an assignment of a $24 million receivable owed to the Debtor by EPV Germany; (ii) a waiver of the Debtor's section 506(c) rights; and (iii) liens on previously unencumbered assets, including avoidance actions and the proceeds of leasehold dispositions, and superpriority claims for both the DIP Lenders and the Subordinated Noteholders that extend to the proceeds of heretofore unencumbered assets of the Debtor.  In addition, the DIP Motion proposes significant limitations on the use of the proceeds of the DIP Facility that would make it virtually impossible for the Committee to conduct a meaningful investigation into the liens and claims of the Subordinated Noteholders and other possible causes of action against the Debtor's prepetition lenders.  These terms and conditions are both inappropriate and offensive, and only serve to enhance the Subordinated Noteholders' collateral position, insulate the Subordinated Noteholders from a legitimate review of their claims, prevent collection of over $575,000 in debts owed to the Debtor by one of the Subordinated Noteholders that is not providing postpetition financing, and marginalize the Committee and the interests of unsecured creditors. The Committee simply cannot support entry of an Interim DIP Order that benefits the Subordinated Lenders so disproportionately and prejudices the estate in this manner.

The Committee is willing to support a DIP Facility that adequately protects the Subordinated Noteholders' interests in their prepetition collateral while safeguarding the interests

of unsecured creditors.  However, in its current form, the proposed DIP Facility falls woefully short in this regard.  Accordingly, it is respectfully submitted that the DIP Motion be denied.

## BACKGROUND

1.      On February 24, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  No trustee or examiner has been appointed in this case.

2.      On March 10, 2010, the Committee was appointed by the Office of the United States Trustee (the "US Trustee") consisting of the following five members (i) Guardian Ignition Interlock Manufacturing, Inc.; (ii) Advanced Energy Industries, Inc.; (iii) AGC Flat Glass North America; (iv) Grant Thornton LLP; and (v) Renishaw, Inc.  That same day, the Committee met and decided that it wished to retain Cooley Godward Kronish LLP ("Cooley") as its counsel and Deloitte Financial Advisory Services LLP ("Deloitte") as its financial advisors in this case. Cooley and Deloitte will be filing retention applications with the Court shortly.

**The Debtor's Prepetition Capital Structure**

**A.      The Prepetition Term Loan**

3.      Prior to the Petition Date, the Debtor was a borrower under that credit agreement, dated as of November 18, 2009 (as amended or modified, the "Prepetition Term Loan Agreement"), with Patriarch Partners Agency Services, LLC ("Patriarch") and the other lenders party thereto (collectively with Patriarch, the "Senior Lenders").  In connection with the Prepetition Term Loan Agreement, the Debtor and the Senior Lenders are also parties to a security agreement, pursuant to which the Debtor granted the Senior Lenders liens on substantially all of the Debtor's assets.

1620139 v3/NY

4.      As of the bankruptcy filing, the Debtor's obligations under the Prepetition Term Loan Agreement totaled approximately **$3.6 million**, exclusive of the last interest payment due on the February 18, 2010 maturity date.

### B.      The Subordinated Notes

5.      The Debtor is also party to an indenture, dated as of June 4, 2009 (as amended or otherwise modified, the "Indenture"), with The Bank of New York Mellon, as trustee for the 1% Convertible Senior Secured PIK Notes Due 2016 (the "Subordinated Notes" and the holders of the Subordinated Notes, the "Subordinated Noteholders").  The Debtor's obligations under the Indenture are secured by liens and security interests on substantially all assets pursuant to that security agreement between the Debtor and The Bank of New York Mellon dated June 4, 2009. The Debtor asserts that its obligations under the Subordinated Notes total approximately **$56.9 million**.

6.      The Subordinated Noteholders' liens and security interests in the Debtor's assets are subordinated to the liens and security interests of the Senior Lenders pursuant to a subordination agreement, dated as of November 18, 2009, between the Debtor, the Senior Lenders and the Subordinated Noteholders.

7.      Additionally, the Debtor's obligations to the prepetition secured lenders are further secured by certain pledges of collateral by the Non-Debtor Subsidiaries (defined below). The Debtor is the direct parent and owns 100% of the capital stock of EPV Solar Europe Limited ("EPV Europe"), a non-resident Irish company domiciled in Bermuda.  EPV Europe owns the capital stock of EPV Solar Ireland Limited, an Irish company, which in turn owns 100% of the capital stock of EPV Solar Germany GmbH ("EPV Germany", and together with EPV Europe and EPV Solar Ireland Limited, the "Non-Debtor Subsidiaries").

**The Interim Cash Collateral Order**

8.      The Debtor was unable to pay its obligations to the Senior Lenders by the maturity date under the Prepetition Term Loan Agreement, and on the maturity date, the Senior Lenders provided the Debtor with a Notice of an Event of Default.  Subsequently, on February 22, 2010, Patriarch provided the Debtor with a notice of disposition of collateral purporting to schedule an auction of the Debtor's assets for March 5, 2010, necessitating the Debtor's bankruptcy filing.

9.      On the Petition Date, the Debtor filed its *Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. § 105, 361, 362 and 363 and Fed. R. Bankr. P. 4001 (i) Approving the Use of Cash Collateral, (ii) Providing Adequate Protection, and (iii) Setting a Final Hearing Pursuant to Fed. R. Bankr. P. 4001* (the "Cash Collateral Motion") seeking the authority to use the Senior Lenders' cash collateral.

10.      The Senior Lenders filed an objection to the Cash Collateral Motion, and also moved to lift the automatic stay to continue their efforts to foreclose on the Debtor's assets. After a hearing on March 1, 2010, the Court entered on agreed-upon order granting the Cash Collateral Motion on an interim basis.

**The DIP Facility**

11.      In the days following the entry of the order granting the Cash Collateral Motion, the Debtor sought to acquire financing sufficient to, *inter alia*, repay the Senior Lenders in full, resulting in the filing of the DIP Motion on March 15, 2010.

12.      Annexed to the DIP Motion was a term sheet (the "Term Sheet") which described the key elements of the proposed postpetition financing (the "DIP Facility"), which is proposed to be provided by a group of the Subordinated Noteholders that hold slightly more than 50% of

7

the Subordinated Notes (the "DIP Lenders") pursuant to loan documentation that, as of the date

hereof, has not been completed or produced to the Committee.

13.    Under the proposed DIP Facility, the DIP Lenders will provide the Debtor and

EPV Germany with approximately $20 million of postpetition financing, the vast majority of

which will be used to pay prepetition secured debt.[2]    Indeed, $3.7 million of the DIP Facility

will be utilized to repay the Senior Lenders under the Prepetition Term Loan and $13.3 million

will be used to partially roll up the Debtor's obligations to the DIP Lenders under the

Subordinated Notes.  Only $3 million will be made available pursuant to a budget to fund the (i)

working capital needs of the Debtor and EPV Germany; and (ii) costs of administration of this

case, including the legal fees of the Debtor's, the Committee's and the DIP Lenders'

professionals.  A budget (the "Budget") for the first 13 weeks of the DIP Facility was filed with

the Court contemporaneously with the DIP Motion.

## OBJECTION

### The Committee Objects to Approval of Certain Terms of the Proposed DIP Facility

14.    The Committee would support an effort to maximize the value of estate assets for

all constituents through a chapter 11 proceeding.  However, the Committee cannot support the

process proposed by the DIP Motion, through which the DIP Lenders, and by extension the

Subordinated Noteholders, are permitted to liquidate their collateral in chapter 11 without

agreeing to fund all of the administrative costs of this case.  Further, the DIP Lenders and the

Subordinated Noteholders should not be permitted to obtain excessive fees, additional liens on

all previously unencumbered assets of the Debtor, including the proceeds of avoidance actions,

and use their uneven balance of power to impede the Committee's ability to perform a

---

[2]    The Debtor's and EPV Germany's obligations under the DIP Facility are to be
guaranteed by the Debtor's Non-Debtor Subsidiaries (collectively, the "Obligors")

meaningful investigation of the Senior Lenders and the Subordinated Noteholders and possible causes of action in exchange for the minimal financing provided by the proposed DIP Facility.

### The Committee's Objections to the DIP Facility

15.    Postpetition financing should not be authorized if its primary purpose is to benefit or improve the position of a particular secured lender. See, e.g., In re Aqua Assocs., 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate.").  Courts have long acknowledged the unequal bargaining power inherent in negotiations leading to proposed post-petition financing, as well as the harm that may be suffered if the proposed lender is permitted to take full advantage of its leveraged position.

16.    In In re Levitz Home Furnishings, Inc., Bankruptcy Judge Burton R. Lifland made the following observation relative to a debtor's bargaining power with its lenders in the days leading up to a bankruptcy filing:

> Well, let me just comment about good faith and arm's length, because it's well known when a Debtor is about to go into bankruptcy it is in a deleveraged position with some of the secured stakeholders . . . and it [is] well recognized that the deleveraged Debtor was not in a position to fight off any of the demands, outrageous or rageous, whatever they may be, or was constrained to give in.  So as your spear carrier the Debtor is less than adequate.  The stakeholders at that particular point in time are not in a position to be heard, they are only in a position to be heard in a hearing like this when they are able to come forth and fully protect the interests of the entire estate.

In re Levitz Home Furnishing, Inc., Case No. 05-45189 (Bankr. S.D.N.Y. Oct. 10, 2005) Hr'g Tr. at 32-3; In re FCX, Inc., 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not

ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has

compromised the rights of unsecured creditors.").

17.     The unequal bargaining power inherent in the relationship between the Debtor

and the DIP Lenders is readily apparent in the onerous terms and conditions set forth in the

proposed DIP Facility.   Accordingly, the Committee is compelled to object to the proposed

interim DIP order (the "Interim DIP Order") and the DIP Facility.  The specific grounds for the

Committee's Objection are as follows.

(a)     **506(c) Waiver--** The Committee objects to the Debtor's waiver of its right to surcharge the Subordinated Noteholders for the cost and expense associated with the preservation and disposition of their prepetition collateral.  It is far from clear that the DIP Facility provides the estate with sufficient funds with which to administer this case and many of the Subordinated Noteholders are not providing any postpetition financing.   Under these circumstances, a 506(c) waiver is improper.

(b)     **Excessive Fees--** The Committee objects to the excessive fees proposed to be paid to the DIP Lenders, including: (i) an "origination fee" equal to $1 million, which vests upon entry of the Interim DIP Order and becomes due and payable on any date on which the DIP loans are repaid from an asset sale yielding net proceeds of at least $5 million; (ii) an "exit fee" in connection with any pre-payment of the loans, which is mandated by the DIP Facility if the Debtor consummates a sale of its assets that generates proceeds in excess of $5 million, in an amount equal to 5% of the amount so prepaid or the amount of the DIP Loans then outstanding (which is likely to equal an additional $1 million); and (iii) payments on account of the legal fees and expenses incurred by the DIP Lenders and an ad hoc group of noteholders (the "Ad Hoc Group"), some of whom are not providing financing and actually owe money to the Debtor.

(c)     **Liens on Avoidance Actions and Unwarranted Adequate Protection--** The Committee objects to the Debtor's proposal to provide the (i) DIP Lenders with (a) new liens and superpriority claims on previously unencumbered assets, including the proceeds of any disposition of the Debtor's leasehold interests, (b) assignment of a $24 million receivable owed to the Debtor by EPV Germany; and (ii) the Subordinated Noteholders with adequate protection in the form of interest payments and a second priority lien on all of the property of the Obligors, including avoidance actions.  This amounts to impermissible cross-collateralization, and encumbers assets that would otherwise be available for distribution to unsecured creditors.

(d)     **Inadequate Carve-Out**-- The Committee objects to the inadequacy of the Professional Fee Carve Out (defined below), which does not sufficiently account for either (i) the fees and expenses to be incurred by professionals retained by the Debtor and the Committee, or (ii) the expenses of Committee members incurred in connection with the performance of their statutory duties.

(e)     **Undue Restrictions on the Committee's Investigation Rights**-- The Committee objects to the DIP Lenders' attempt to prohibit the use of the proceeds of the DIP Facility in connection with any investigation of (i) the DIP Lenders in any capacity, including the nature, validity and extent of the DIP Lenders' prepetition liens and claims; or (ii) any investigation of possible causes of action against Patriarch, the Senior Lenders, the Subordinated Noteholders or members of the Ad Hoc Group, one of whom currently owes the Debtor in excess of $575,000 under a promissory note.  The Committee intends to conduct a full investigation with respect to the pre-petition indebtedness due to all of the Debtor's prepetition lenders, the validity of the liens asserted by them, and the existence of claims against them.  The Committee expects its professionals to be compensated fully for its efforts in these areas under the Budget and from the Professional Fee Carve Out.

Moreover, the Committee objects to any limitation on the Committee's time review the liens of and investigate and bring claims against Patriarch, the Senior Lenders and the Subordinated Noteholders.  There is no justifiable reason to limit the review period for the Committee to investigate the role of the Senior Lenders or the Subordinated Noteholders.  The investigation of the acts, conduct and operation of the Debtor's businesses and other matters relevant to this case is an essential part of the enumerated duties given to official committees pursuant to § 1103(c)(2) of the Bankruptcy Code and should not be curtailed.

(f)     **Automatic Standing**-- The Committee should be granted automatic standing to pursue any action on behalf of the Debtor's estate that it determines is appropriate against the Subordinated Noteholders without the need to file a motion with the Court seeking the authority to bring such action.

(g)     **Rule 2004 Authority**-- The Committee should be granted authority under Bankruptcy Rule 2004 to take the oral examinations of representative(s) of any Subordinated Noteholder and to issue document and/or oral examination subpoenas to representative(s) of any noteholder.

(h)     **Compliance with Section 506(b)**-- The provision for payment of fees and expenses of professionals engaged by the DIP Lenders and the Ad Hoc Group must comply with section 506(b) of the Bankruptcy Code.  Under section 506(b), the Bankruptcy Court has the power to review the reasonableness of any fees or expenses charged to the estate.  The Debtor and the lenders cannot take this power away from the Court.  To the extent that the DIP Lenders or the Ad Hoc Group assert a claim for fees and expenses under section 506(b) or the terms of any

relevant loan document, such request for fees and expenses should be subject to the reasonableness standard under section 330 of the Bankruptcy Code and the U.S. Trustee Guidelines.

(i)    **Permitted Variances Must Be Reasonable**-- The Term Sheet provides that each of the Obligors will agree that receipts and disbursements under the Budget shall comply with the specifically identified line items therein, subject to permitted variances of percentages to be mutually agreed upon by the Debtor and the DIP Lenders.    The Committee objects to the extent that the permitted variance percentage that is ultimately agreed upon by the parties is too low, which would put the Debtor at risk of a premature default.

As of the date hereof, the Committee has yet to receive a copy of the definitive loan documentation.    Accordingly, the Committee reserves the right to interpose any additional objections to the DIP Motion upon receipt thereof.

## OBJECTION

### A.    The Excessive Fees Proposed To Be Paid To The DIP Lenders Should Not Be Approved

18.    The DIP Lenders seek to have the Debtor pay (i) an "origination fee" equal to $1 million, which vests upon entry of the Interim DIP Order and becomes due and payable on any date on which the DIP loans are repaid from an asset sale yielding net proceeds of at least $5 million; and (ii) an "exit fee" in connection with any optional, mandatory, or other payment or pre-payment of the loans, in an amount equal to 5% of the amount so prepaid or the amount of the DIP Loans then outstanding, which is also likely to equal $1 million.  Not only are these fees unreasonable on their face given the limited financing being made available to the Debtor under the DIP Facility, but they should be viewed with skepticism in light of the disparity in bargaining positions of the Debtor and the DIP Lenders in the days leading up to the execution of the Term Sheet.  See, e.g., In re Levitz Home Furnishing, Inc., Case No. 05-45189, 10/10/2005 Hr'g Tr. at 32-3 (noting deleveraged position of the debtor in negotiation adequate protection in post-petition financing facility); In re Interlogic Trace, Inc., 188 B.R. 557, 560 n.2 (Bankr. W.D. Tex.

12

1995) (noting, in the context of a success fee request, that "courts cannot be bound to honor agreements improvidently made by desperate debtors prior to filing" and that "debtors are not at liberty to bargain away the rights and responsibilities of a debtor-in-possession, nor the protections afforded creditors and other parties in interest in a bankruptcy case, under the guise of freedom of contract.") (citations and quotations omitted).

19.     The fees requested by the DIP Lenders must be disallowed.   When the DIP Lenders' contribution of new money to the estate, $6.7 million, is separated from the proceeds of the DIP Facility being utilized to roll up the DIP Lenders' prepetition debt, the fees, which represent approximately 30 percent of such amount, are clearly unconscionable.   If the exit fee becomes payable, the Debtor would actually be required to pay **67 percent** of the $3 million in new liquidity provided by the DIP Facility back to the DIP Lenders in fees alone.   Even if the proposed fees were based on the total amount of the DIP Facility, the fees represent 10 percent of such amount, a percentage which still is unacceptable under these circumstances.   Accordingly, the Committee objects to the Debtor's request to pay the DIP Lenders the fees set forth in the Term Sheet.

20.     Further, any payment of professional fees and expenses of professionals engaged by the DIP Lenders must comply with section 506(b) of the Bankruptcy Code.   Under section 506(b), the Bankruptcy Court has the power to review the reasonableness of any fees or expenses charged to the estate.   The Debtor and lenders cannot take this power away from the Court.   To the extent that the DIP Lenders assert a claim for fees and expenses under section 506(b) or the terms of any relevant loan document, such request for fees and expenses should be subject to the reasonableness standard under section 330 of the Bankruptcy Code and the U.S. Trustee Guidelines.

B.     **A Section 506(c) Waiver Should Not Be Permitted**

21.     The DIP Motion states that, upon entry of a final DIP order, the Debtor will waive

its rights under section 506(c) of the Bankruptcy Code to charge the Subordinated Noteholders'

collateral for the costs of the administration of this case.  While the Debtor may be hopeful that it

has captured in the Budget all of the expenses necessary to administer this case in chapter 11

during the first 13 weeks of the DIP Facility, the Committee has not been provided with

sufficient information to share that view.  It does not appear that the Budget, which allocates

only $10,000 per week for the fees of Debtor's counsel and the Committee's professionals (in

contrast to the allocation of $61,000 per week for the Debtor's 22 person payroll at a time when

its businesses are largely dormant) adequately accounts for the professional fees that will likely

be incurred at the outset of the case to preserve and maximize the value of the Subordinated

Noteholders' collateral.

22.     By waiving these rights, the Debtor is agreeing to pay for any and all expenses

associated with the disposition of the collateral of the DIP Lenders and the Subordinated

Noteholders that are not provided for in the Budget, including all costs that the Debtor can show

"that absent the costs expended, the property would yield less to the creditor than it does as a

result of the expenditure."  Brookfield Prod. Credit Ass'n v. Borron, 738 F.2d 951, 952 (8th Cir.

1984) (citations omitted).  However, the Budget only covers 13 weeks of an approximately 7

month sale process, and the Debtor has made no effort to project its working capital needs and

costs of chapter 11 administration after the initial 13-week period.  In light of the uncertainty

surrounding the future costs of administration of this case, a section 506(c) waiver is improper at

this time.

23.     Indeed, immunizing agreements that prohibit surcharge payment obligations under section 506(c) have been found unenforceable on the basis that such provisions "operate as a windfall to the secured creditor at the expense of administrative claimants." In re Lockwood Corp., 223 B.R. 170 (8th Cir. BAP 1998).  In addition, the Supreme Court decision in Hartford Underwriters Ins. v. Union Planters Bank N.A. (In re Hen House Interstate Inc.), 530 U.S. 1 (2000), makes clear that such waivers, since they are binding on all parties in interest, should never be lightly granted, nor may the management of a debtor in possession concede this issue for any but compelling reasons.  See Hen House, 530 U.S. at 12 (debtor's decision to waive section 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require").  Therefore, an order disadvantaging the estate at this early stage through a section 506(c) waiver should not be entered in this case.

**C.     The Committee Objects to the Rollup of the DIP Lenders' Prepetition Indebtedness Into Postpetition Indebtedness Secured by Previously Unencumbered Estate Assets**

24.     The DIP Motion provides that $13.3 million of the DIP Facility will be utilized to partially satisfy the Debtor's obligations to the DIP Lenders under the Subordinated Notes and $3.7 million will be utilized to satisfy the Debtor's obligations under the Prepetition Term Loan Agreement.  If the Debtor is permitted to make these payments, the DIP Lenders would be able to enhance their collateral position by further securing their outstanding prepetition indebtedness with previously unencumbered assets of the Debtor.  Further, Patriarch and the Senior Lenders would receive payment on account of their prepetition claims before the Committee is provided any opportunity to scrutinize their purported liens, claims and prepetition conduct.

25.     Not only is the proposed rollup unnecessary, but it is also unauthorized by bankruptcy law, and the DIP Lenders should not be afforded the protections set forth in section

364(e) of the Bankruptcy Code to insulate the use of the DIP Facility proceeds to pay their

outstanding prepetition indebtedness.

**(i)      The Court Should Not Authorize the Debtor to Make any Payments to**
**Patriarch and the Senior Lenders at This Time**

26.      Patriarch and the Senior Lenders should not be entitled to receive payment on

account of their prepetition claims from postpetition funds until, at a minimum, the Committee is

able to conduct an appropriate investigation.  The Senior Lenders can be adequately protected

while the Committee reviews their liens and claims by the placement of funds in an interest-

bearing escrow account.  There is simply no justification for the disbursement of any funds to

Patriarch and the Senior Lenders at this time.

**(ii)      The Bankruptcy Code Does Not Authorize a Debtor to Pay**
**Prepetition Claims Outside of a Plan of Reorganization**

27.      The Bankruptcy Code contains a comprehensive and coherent scheme for the

payment and treatment of secured prepetition claims in chapter 11 cases.  Specifically, Congress

guaranteed that a secured claimant would receive the value of its collateral up to the amount of

its claim as of the effective date of a plan of reorganization through the reorganization process.

See 11 U.S.C. § 1129(b)(A)(i)(II).  In contrast, nothing in the comprehensive scheme established

by Congress provides for the payment of prepetition claims before confirmation of a plan of

reorganization.  See, e.g., Chiasson v. Matherne & Assoc. (In re Oxford Mgmt., Inc.), 4 F.3d

1329, 1334 (5th Cir.1993) (bankruptcy court improperly allowed the payment of postpetition

funds to satisfy prepetition claims and noting that "[n]either the appellees nor the bankruptcy

court cited a specific provision of the Code that would allow the payment of postpetition funds to

satisfy prepetition claims"); Official Comm. of Equity Sec. Holders v. Mabey (In re A.H.

Robins, Co.), 832 F.2d 299, 302 (4th Cir.1987) ("The Bankruptcy Code does not permit a

distribution to unsecured creditors in a Chapter 11 proceeding except under and pursuant to a

16

plan of reorganization that has been properly presented and approved."); <u>Crowe & Assocs., Inc.</u>
<u>v. Bricklayers & Masons Union Local No. 2 (In re Crowe & Assocs.)</u>, 713 F.2d 211, 216 (6th
Cir. 1983) (bankruptcy courts do not have the power to authorize debtors to pay prepetition
claims prior to a plan of reorganization); <u>In re Allegheny Int'l, Inc.</u>, 118 B.R. 282, 296 (W.D. Pa.
1990) ("It is beyond dispute that a debtor may not pay creditors outside of a plan of
reorganization.").

28.    It is well established that the prepayment of even a portion of a secured creditor's
claim before confirmation is barred.  For example, although section 506(b) of the Bankruptcy
Code allows an oversecured creditor to recover interest that accrues throughout the
reorganization process, accrued interest under section 506(b) may not be paid to an oversecured
creditor until a plan's confirmation or effective date, whichever is later.  <u>See United Sav. Ass'n</u>
<u>of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs.,</u>
<u>Ltd.)</u>, 484 U.S. 365, 108 S.Ct. 626 (1988) ("The timing of the payment of accrued interest to an
oversecured creditor [at the conclusion of the proceeding] is doubtless based on the fact that it is
not possible to compute the amount of the §506(c) recovery . . . until the end of the
proceeding.").  For example, in <u>Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (Matter</u>
<u>of T-H New Orleans Ltd. P'ship)</u>, the Fifth Circuit held that the bankruptcy court erred by
ordering the payment of interest on a secured claim before confirmation.  <u>Matter of T-H New</u>
<u>Orleans Ltd. P'ship</u>, 116 F.3d 790, 799 (5th Cir. 1997).  If payment of a fraction of a secured
claim before confirmation is improper, it follows *a fortiori* that the payment of an entire secured
claim is impermissible.

29.    In <u>In re Equalnet Communications Corp.</u> the bankruptcy court specifically
prohibited the rollup of prepetition into postpetition debt.  <u>In re Equalnet Communications Corp.</u>,

17

258 B.R. 368 (Bankr. S.D. Tex. 2000).  There, a secured creditor attempted to pay off prepetition

loan balance with a postpetition line of credit.  Id. at 369.  The result of this rollover of

prepetition debt into postpetition financing was to enhance the secured creditors' collateral

position and to grant administrative priority for the refinanced prepetition debt.  Id.  The

bankruptcy court held that "based on the Eleventh Circuit's ruling in the case of Saybrook Mfg.

Co., Inc., 963 F.2d 1490 (11th Cir. 1992), a secured creditor's prepetition debt balance may not

be paid off and/or 'rolled into' a postpetition line of debtor in possession financing, with

resultant enhancement of collateral position and administrative priority.  Id.; see also In re Tri-

Union Dev. Corp., 253 B.R. 808, 814 (Bankr. S.D. Tex. 2000) (noting that "it is improper under

the current Code and case law for the debtor, pre-confirmation, to cross-collateralize or

'refinance and re-collateralize' a prepetition secured debt secured by substantially all of the

debtor's assets").

### (iii)    Section 364 Does Not Allow a Postpetition Lender to Have its Prepetition Debt Paid With Postpetition Funds

30.    Not only does the Bankruptcy Code generally prohibit the payment of prepetition

claims outside of a plan of reorganization, but the specific provision of the Bankruptcy Code that

authorizes a debtor to obtain postpetition credit does not contemplate this proposed use of

postpetition financing.  Rather, section 364 of the Bankruptcy Code specifies, and thereby limits,

the benefits that may accrue to a postpetition lender.  For example, a debtor may incur unsecured

postpetition debt that will be treated as an administrative expense.  See 11 U.S.C. § 364(a) and

(b).    Alternatively, a debtor may incur postpetition debt having priority over all other

administrative expenses of the estate (i.e., superpriority), secured by any unencumbered assets of

the estate, secured by junior liens, or secured by a priming lien.  However, section 364 of the

18

Bankruptcy Code does not allow a postpetition lender the additional benefit of having its prepetition claim paid with funds borrowed postpetition.

31.    Moreover, section 364 of the Bankruptcy Code cannot be read to grant a court broad authority to approve rollups if necessary to induce a lender to extend postpetition financing to debtors solely on the grounds that section 364 does not expressly forbid such financing.  As the United States Supreme Court has stated in the context of another Bankruptcy Code provision, "[the] theory – that the expression of one thing indicates the inclusion of others unless exclusion is made explicit – is contrary to common sense and common usage." Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 9, 120 S.Ct. 1942 (2000).  The Eleventh Circuit reached the same conclusion regarding section 364 of the Bankruptcy Code in an analogous case in which the postpetition lender was attempting to obtain cross-collateralization of its prepetition loans.  Shapiro v. Saybrook Mfg. Co., Inc. (In re Saybrook Mfg. Co., Inc.), 963 F.2d 1490 (11th Cir. 1992).  Reviewing the language of section 364 of the Bankruptcy Code, the Saybrook court concluded that by its express terms, "cross-collateralization is not authorized as a method of post-petition financing." Id. at 1494-95.  Similarly, by its express terms, section 364 of the Bankruptcy Code does not authorize the bankruptcy court to reward a lender who provides postpetition financing with the right to immediate repayment of pre-petition debt through a rollup. Id.

      **(iv)    The Proposed Rollup is Not Justified Under the Limited
             Doctrine of Necessity**

32.    Although payment of prepetition claims before confirmation of a plan of reorganization is not authorized by the Bankruptcy Code, some courts have recognized a limited exception to this rule for certain types of debt.  This exception is commonly referred to as the

"doctrine of necessity."  To the extent the DIP Lenders and the Senior Lenders contend that a rollup is justified under the limited "doctrine of necessity," this argument must fail.

33.    Before the enactment of the Bankruptcy Code, courts recognized that in certain circumstances it was in the best interests of the bankruptcy estate to pay certain prepetition creditors out of turn, as an inducement to continue doing business with the debtor.  Miltenberger v. Logansport, 106 U.S. 286, 314 (1882).  However, nowhere in the Bankruptcy Code was this doctrine codified.  In fact, a trend has developed recently permitting payment of prepetition claims pursuant to the doctrine of necessity "only in rare cases" and "under extraordinary circumstances."  In re Zenus is Jewelry, Inc., 378 B.R. 432, 433-34 (Bankr. D. N.H. Oct. 25, 2007) (refusing to permit payment of prepetition claims pursuant to doctrine of necessity); In re Kmart Corp., 359 F.3d 866, 871 (7th Cir. 2004) (not allowing payment of unsecured creditors' pre-petition claims unless all unsecured creditors were paid); In re CoServ, LLC, 273 B.R. 487, 491 (Bankr. N.D. Tex. 2002) (holding payment of prepetition claims pursuant to doctrine of necessity to be authorized "only in rare cases.").

34.    Even courts that do allow for the payment of prepetition claims pursuant to the doctrine of necessity only allow it in limited circumstances – none of which contemplates paying the prepetition claims of a postpetition lender.  See In re Just For Feet, 242 B.R. 821 (D. Del. 1999) (authorizing the payment of athletic footwear and apparel vendors' prepetition claims because payment was critical for reorganization); In re Payless Cashways, Inc., 268 B.R. 543 (Bankr. W.D. Mo. 2001) (authorizing the payment of prepetition claims of critical lumber vendors after determining that the deliver of products from these vendors is critical to the debtors' survival).  Accordingly, there is no basis for the Debtor's proposed rollup pursuant to the doctrine of necessity.

1620139 v3/NY

**D.**    **The Lenders Should Not be Granted Liens or Super-Priority Claims In Any Unencumbered Assets of the Debtor**

35.    As previously stated, the DIP Lenders have requested previously unencumbered assets of the Debtor's estate, including the Debtor's leasehold interests, as collateral in exchange for financing sufficient only to fund that a sale process that inures to their sole benefit– leaving general unsecured creditors woefully dissatisfied.  In addition, the Debtor also seeks to provide the Subordinated Noteholders with adequate protection liens and claims that would extend to all previously unencumbered assets, including the proceeds of avoidance actions, without any obligation whatsoever on the part of the Subordinated Noteholders to extend new financing.  The Committee submits that neither lender should be granted a lien on these unencumbered assets when these assets may be all that is available for unsecured creditors.

36.    Numerous courts severely limit a debtor in possession's ability to grant a lien in avoidance actions as security for postpetition financing.  See, e.g., In re Goold Elecs. Corp., 1993 WL 408366 at *3-*4 (N.D. Ill. Sept. 22, 1993) (vacating bankruptcy court order approving postpetition financing "to the extent that the order assigns to the bank a security interest in the debtor's preference actions").  This is because avoidance actions are not property of the estate. In re Cybergenics Corp., 226 F.3d 237, 244 (3d Cir. 2000) (stating that avoidance actions are not property of the estate, but are rather rights held by the estate for the benefit of creditors); In re Sweetwater, 55 B.R. 724, 731 (D. Utah 1985), rev'd on other grounds, 884 F.2d 1323 (10th Cir. 1989) ("The avoiding powers are not 'property' but a statutorily created power to recover property.").  Accordingly, there is no legal basis for the Court to grant the Subordinated Lenders a lien in and a security interest on the Debtor's chapter 5 avoidance actions.

37.    Moreover, and as stated above, the proposed DIP Facility is nothing more than a vehicle created by the DIP Lenders to enable them to take money out of their postpetition

pockets and place those same funds right back into their prepetition pockets, while controlling a sale process that inures to their sole benefit at the expense of unsecured creditors.  If the Debtor is permitted to grant the lenders liens and superpriority claims on its remaining unencumbered assets in connection therewith, in exchange for patently inadequate financing or, in the case of certain of the Subordinated Noteholders, no financing whatsoever, any possibility of a distribution to general unsecured creditors will disappear and the Debtor will begin the fruitless exercise of preserving and disposing of the lenders' enhanced collateral positions in these chapter 11 case – all on the backs of the Debtor's unsecured creditors.

## E.    Adequate Protection for the Subordinated Noteholders is Unwarranted

38.    In addition to the grave problems involved with granting new liens to secure prepetition indebtedness, the fundamental premise that adequate protection is even required to protect the Subordinated Noteholders has not been established.  The purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy."  See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987).  Adequate protection is, therefore, a protection for the creditor to assure its collateral is not depreciating or diminishing in value and is made on a case-by-case basis.  Id. at 1397; see also United Savings Ass'n v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 370 (1988) (an "interest is not adequately protected if the security is depreciating during the term of the stay.");  In re Saypol, 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983) ("In the context of the automatic stay, Congress believed the existence vel non of such a decline [in the value of the secured creditor's interest] to be almost decisive in determining the need for adequate protection.").

39.    For these reasons, the secured creditor "must, therefore, prove this decline in value -- or the threat of a decline -- in order to establish a prima facie case."  In re Gunnison Ctr.

Apts., LP, 320 B.R. 391, 396 (Bankr. D. Colo. 2005); In re Elmira Litho, Inc., 174 B.R. 892, 902

(Bankr. S.D.N.Y. 1994).  Secured creditors are only entitled to adequate protection to the extent

of the anticipated or actual decrease in value of the secured collateral during the bankruptcy case.

See In re First South Savings Assoc., 820 F.2d 700, 710 (5th Cir. 1987); In re Gallegos Research

Group, Corp., 193 B.R. 577, 584 (Bankr. D. Col. 1995).  A corollary to that rule is that "the

adequate protection provided must not substantially exceed that to which the secured creditor is

entitled."   In re Blehm Land & Castle Co., 859 F.2d 137 (10th Cir. 1988).   Finally, in

determining the need for adequate protection, "[t]he primary, and often determinative factor, is

the existence of an adequate equity cushion."   In re Carson, 34 B.R. 502, 506 (Bankr. D. Kan.

1983).

40.     The Subordinated Noteholders have not offered any semblance of proof in this

regard.  Moreover, the Debtor chooses to remain silent on this issue, notwithstanding the fact that

the Subordinated Noteholders have been adequately protected on their prepetition collateral

interests by the very posture of this chapter 11 case.   Nevertheless, the Debtor proposes to

provide the Subordinated Noteholders with adequate protection in the form of: (i) a replacement

lien, (ii) the repayment of prepetition debt of the Subordinated Noteholders who are DIP

Lenders; (iii) interest payments; and (iv) payments of fees and costs of the Ad Hoc Group.

41.     As the Subordinated Noteholders have not made out a *prima facie* case for

adequate protection, this Court should not grant the Subordinated Noteholders the requested

adequate protection.  To the extent that the Court is inclined to permit the Debtor to provide the

Subordinated Noteholders with adequate protection in the form of replacement liens and

superpriority claims, those liens and claims should not extend to previously unencumbered assets

of the Debtor, including the proceeds of leasehold interests and avoidance actions.   As the

Second Circuit explained in In re Texlon Corp., 596 F.2d 1092, 1094 (2d Cir. 1979), the encumbrance of such postpetition assets to secure the lenders' prepetition debts amounts to impermissible cross-collateralization.

**F.      The Omission of an Adequate Professional Fee Carve Out From the Interim DIP Order Precludes the Committee from Fulfilling its Fiduciary Duties to the Estate**

42.      The terms of the proposed Interim DIP Order disadvantage the Committee by providing for wholly disparate treatment of its professionals.  Indeed, while the Debtor's counsel has been provided with a $375,000 retainer in this case, the Interim DIP Order provides for a $100,000 carve-out (the "Professional Fee Carve-Out") from the proposed liens and superpriority claims of the DIP Lenders and the Subordinated Noteholders that must satisfy the allowed and unpaid fees and expenses incurred by both the Debtor's counsel and the Committee's professionals in this case.  As such, the Interim DIP Order establishes an uneven playing field that would prevent the Committee from playing any meaningful role in this case, while permitting the Subordinated Noteholders to benefit from the orderly sale of their collateral in chapter 11 to the detriment of general unsecured creditors.

43.      The purpose of postpetition financing is to facilitate the chapter 11 process.  Such financing should not be approved if its purpose is simply to pervert the reorganization process from one designed to accommodate all classes of creditors and equity interests to one specifically crafted for the benefit of the bank.  In re Ames Dept. Stores, Inc.., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  The purpose of administrative carve-outs has been said "to preserve the adversary system."  Ames, 115 B.R. at 38; In re Tenney Village Co., 104 B.R. 562, 567-68 (Bankr. D.N.H. 1989) (provisions of proposed financing would give lender improper control of the case).  As more fully stated by the Court in Tenney Village:

> Under the guise of financing a reorganization, the [b]ank would disarm the Debtor of all weapons usable against it for the

24

> bankruptcy estate's benefit, place the Debtor in bondage working
> for the [b]ank, seize control of the reins of reorganization, and steal
> a march on other creditors in numerous ways The Financing
> Agreement would pervert the reorganizational process from one
> designed to accommodate all classes of creditors and equity
> interests to one specially crafted for the benefit of the [b]ank and
> the Debtor's principals who guaranteed its debt.  It runs roughshod
> over numerous sections of the Bankruptcy Code.

104 B.R. at 568.   Thus, while a secured lender may be selective in deciding the scope and

beneficiary of carve outs,  see, e.g., In re American Resources Mgt. Corp., 51 B.R. 713 (Bankr.

D. Utah 1985), this right is not open-ended and should be addressed at the beginning rather than

the conclusion of the case.

44.      In short, the issue is one of whether a party may enjoy the benefits of chapter 11

without permitting the adversary system to function.  Accordingly, it is respectfully submitted

that in the event that the Court grants the DIP Motion, the Committee's professionals be

provided with an appropriate carve-out with which to carry out their fiduciary duties to the

estate, including a full investigation of the extent and validity of the Subordinated Noteholders'

liens and possible causes of action.  The Subordinated Noteholders should not be permitted to

march quickly through their agenda, while denying the Committee the necessary funds to

perform its statutory obligations to the estate.

## G.      The Interim DIP Order Should Not Limit the Committee's Ability to Exercise its Statutory Mandate

45.      In addition to providing for a Professional Fee Carve-Out that is wholly

insufficient to enable the Committee to play a meaningful role in this case, the Interim DIP Order

places impermissible restrictions on the Committee's ability to fulfill its fiduciary duties to the

estate.  Indeed, the Interim DIP Order provides that (i) none of the proceeds of the DIP loans

may be used to investigate the DIP Lenders in any capacity or members of the Ad Hoc Group;

and (ii) no more than $15,000 of the DIP Facility may be used to investigate, initiate or prosecute

1620139 v3/NY

any claims, causes of action or causes of action against Patriarch or the Subordinated Noteholders. In the event that this Court approves the DIP Motion, this limitation must be stricken from the DIP Facility. The Committee must be empowered to conduct a full investigation with respect to the pre-petition indebtedness due to the Senior Lenders and the Subordinated Noteholders, the validity of the liens asserted by them, and the existence of claims against them. This is particularly true in the case of the Ad Hoc Group, which includes F.A. Voight & Associates, L.P. ("Voight"), an entity that owes the estate approximately $575,000 pursuant to a promissory note. The DIP Lenders should not be able use the DIP Facility to insulate Voight from any action by the estate to recover this debt, which is legitimately due and owing.

46.     The Interim DIP Order also requires the Committee to initiate an adversary proceeding or any other type of proceeding against the Senior Lenders and the Subordinated Noteholders with respect to their claims or security interests within 60 days from the date of an order approving the retention of Committee counsel. There is no justifiable reason to limit the review period for the Committee to investigate the role of the Senior Lenders or the Subordinated Noteholders. The investigation of the acts, conduct and operation of the Debtor's businesses and other matters relevant to these cases are an essential part of the enumerated duties given to official committees pursuant to § 1103(c)(2) of the Bankruptcy Code and should not be curtailed.

47.     Nonetheless, the Committee submits that a 90-day period should be sufficient to investigate the validity, extent, perfection, priority or enforceability of the Subordinated Noteholders' liens provided that the Interim DIP Order and any final DIP Order provide the Committee with the authority to take the oral examinations of representative(s) of any

Subordinated Noteholder and to issue document and/or oral examination subpoenas to representative(s) of any noteholder under Bankruptcy Rule 2004 and standing to commence an adversary proceeding or to file any other pleading with this Court asserting an objection or defense with respect to the Subordinated Noteholders' liens.  The Committee cannot rely on voluntary cooperation alone to accomplish its investigation in such a limited time frame.  The Committee additionally submits it is inappropriate to establish any investigation deadline with respect to Patriarch or the Senior Lenders.

**H.**     **Technical Modifications**

48.     Items described in paragraph 17 are incorporate herein by reference, and the Committee respectfully requests modification to the proposed interim order to address each issue detailed above.

**RESERVATION OF RIGHTS**

49.     In the event that any further proposed orders are submitted to the Bankruptcy Court prior to the hearing, the Committee reserves all of its rights to object to any and all provisions of such orders.

**WHEREFORE,** the Committee respectfully requests that this Court enter an order denying the Debtor's DIP Motion or modifying the proposed Interim DIP Order as recommended by the Committee, and granting such additional relief as is just.

Dated:       March 19, 2010
             New York, New York

                              Respectfully Submitted,

                    By:    /s/ Richard S. Kanowitz
                           Richard S. Kanowitz , Esq.

                           Cooley Godward Kronish LLP
                           Richard S. Kanowitz, Esq. (RK 0677)

1620139 v3/NY

Jay R. Indyke, Esq. (JI 0363)
Michael A. Klein, Esq. (MK 7479)

1114 Avenue of the Americas
New York, New York 01136
(212) 479-6000

*Proposed Counsel For The Official Committee Of
Unsecured Creditors Of EPV Solar, Inc.*

1620139 v3/NY