RIKER, DANZIG, SCHERER, HYLAND
  & PERRETTI LLP
Dennis J. O'Grady, Esq. (DO-7430)
Joseph L. Schwartz, Esq. (JS-5525)
Tara J. Mondelli, Esq. (TM-8155)
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

*Attorneys for The Bank of New York Mellon,*
*as trustee and collateral agent  for the EPV*
*Solar, Inc. 1% Convertible Senior Secured*
*PIK Notes due 2016*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>EPV SOLAR, INC.,<br><br>     Debtor. | Chapter 11<br><br>Case No. 10-15173 (MBK) |

**OBJECTION OF THE BANK OF NEW YORK MELLON, AS TRUSTEE AND COLLATERAL AGENT, TO THE DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, GRANT SECURITY INTERESTS AND LIENS AND ACCORD PRIORITY STATUS PURSUANT TO 11 U.S.C. §§ 361, 364(c) AND 364(d); (B) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2)(B); (C) GRANTING ADEQUATE PROTECTION; (D) GIVING NOTICE OF FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b)(2) AND (c)(2); AND (E) MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

     The Bank of New York Mellon, as Trustee and Collateral Agent (the "Indenture

Trustee") for the EPV Solar, Inc. 1% Convertible Senior Secured PIK Notes Due 2016 (the

"Notes"), by and through its attorneys Riker, Danzig, Scherer, Hyland & Perretti, LLP, hereby

submits this Objection (the "Objection") to the Motion of the Debtor, EPV Solar, Inc. (the

"Debtor") for Interim and Final Orders (A) Authorizing the Debtor to Obtain Post-Petition

Financing, Grant Security Interests and Liens and Accord Priority Status Pursuant to 11 U.S.C.

§§ 361, 364(c), and 364(d); (B) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§

363(c)(2)(B); (C) Granting Adequate Protection; (D) Giving Notice of Final Hearing Pursuant to

Bankruptcy Rule 4001(b)(2) and (c)(2); and (E) Modifying Automatic Stay Pursuant to 11

U.S.C. § 362(d) [Docket No. 74] (the "DIP Financing Motion"), and states as follows:

## PRELIMINARY STATEMENT

1.      Through the DIP Financing Motion, the Debtor seeks approval of a $20

million senior secured, superpriority DIP Loan[1] to be provided by the DIP Lenders, some or all

of whom may also be holders of the Notes.  The Debtor makes several arguments in support of

the DIP Financing Motion, including that: (i) the DIP Loan constitutes necessary financing that

the Debtor intends to use to replace the Patriarch Facility and as working capital to meet its

projected obligations; (ii) the proposed financing is consistent with the Bankruptcy Code and the

terms of the Indenture; and (iii) the Noteholders are adequately protected.

2.      Upon careful review of the DIP Financing Motion, it becomes clear that

one of the principal purposes of the DIP Loan is to improperly elevate the priority of the pre-

petition liens of the DIP Lenders that were granted on account of their position as Noteholders.

The DIP Lenders further improperly seek to elevate their repayment position on the Notes above

the Indenture Trustee and the 40% of the other Noteholders by loaning a maximum of

approximately $6.66 million in new money to the Debtor.  However, despite the fact that the DIP

Lenders only propose to loan a maximum of approximately $6.66 million to the Debtor, after

giving effect to the improper roll-up provision of the DIP Loan, the aggregate principal DIP

Loan will be $20 million.

---

[1] Capitalized terms not otherwise defined in this Preliminary Statement are defined in the text of this Objection.

4026218.3

3.      Further, of the approximate $6.66 million of new money potentially being loaned, (i) at least $3.6 million will be used to repay the Patriarch Facility and (ii) a substantial portion of the remaining $3 million will be used to pay various professional fees and expenses for the DIP Lenders and Ad Hoc Noteholder Group, as well as other fees associated with the DIP Loan.  As a result, it is readily apparent that the actual amount of "new money" available for the Debtor to finance its post-petition operations is very small as compared with the $20 million DIP Loan.

4.      As a result, the DIP Financing Motion appears to be little more than an attempt by the Debtor to rid itself of the Patriarch Facility and Patriarch while allowing the DIP Lenders to enhance their own position at the detriment of 40% of the Noteholders.

## BACKGROUND

### A.  The Debtor

5.      On February 24, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), commencing the bankruptcy case (the "Bankruptcy Case").

6.      On March 10, 2010, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in the Bankruptcy Case.

### B.  The Indenture, the Notes and the Collateral

7.      The Indenture Trustee serves pursuant to an Indenture dated as of June 4, 2009 (the "Indenture," a true and correct copy of which is attached hereto as Exhibit "A") by and among the Indenture Trustee, the Debtor as "Issuer," and certain domestic subsidiaries of the Debtor as "Guarantors" (the "Guarantors").

4026218.3

8.      Pursuant to the Indenture, the Debtor issued $47,999,450 of Notes, on which the Debtor is obligated to make payment of all amounts due and on which the Guarantors have each guaranteed payment.

9.      As of the Petition Date, the Debtor owed approximately $57,182,643 under the Notes.

10.      The Indenture Trustee serves as Collateral Agent ("Collateral Agent") under the related Security Agreement ("Security Agreement," a true and correct copy of which is attached hereto as Exhibit "B," and collectively, with the Indenture and certain other agreements executed therewith, the "Financing Documents"), dated as of June 4, 2009, for the benefit of the holders of the Notes (the "Noteholders").

11.      Pursuant to the Security Agreement, the Debtor and the Guarantors granted the  Indenture Trustee a security interest in substantially all of the assets of the Debtor and the Guarantors, subject to certain delineated exceptions.  (See Security Agreement at § 3.) Importantly, as part of the issuance of the Notes, the Indenture Trustee was granted a security interest in all the assets of a nondebtor affiliate of the Debtor, EPV Solar Germany GmbH ("EPV Germany").   (See Security Transfer Agreement dated June 4, 2009, by and between the Indenture Trustee and EPV Germany, a true and correct copy of which is attached hereto as Exhibit "C" and Global Assignment Agreement dated June 4, 2009, by and between the Indenture Trustee and EPV Germany, a true and correct copy of which is attached hereto as Exhibit "D.")

C.  **The Patriarch Facility and the Subordination Agreement**

12.      In November 2009, the Debtor obtained a secured term loan (the "Patriarch Facility") from Patriarch Partners Agency Services, LLC ("Patriarch"), which was

purportedly intended to serve as bridge financing to allow the Debtor sufficient time to market its business and assets for sale.  The Debtor failed to repay the Patriarch Facility on its maturity date, and as of the Petition Date, was indebted to Patriarch in the approximate amount of $3.6 million.

13.    In connection with the Patriarch Facility, the Debtor entered into a related Security Agreement (the "Patriarch Security Agreement") dated as of November 18, 2009, with Patriarch, pursuant to which the Debtor granted Patriarch first priority liens on substantially all of the Debtor's assets.[2]

14.    Also, on November 18, 2009, in connection with the Patriarch Facility, and at the direction of 100% of the Noteholders, the Indenture Trustee entered into a Subordination Agreement ("Subordination Agreement," a true and correct copy of which is attached hereto as Exhibit "E") by and among Patriarch, as administrative agent, for, on behalf of and in the stead of the Senior Creditors (defined therein), the Indenture Trustee and the Debtor. Pursuant to the Subordination Agreement, the parties agreed, among other things, that any and all of the Debtor's obligations under the Patriarch Facility would be senior in payment and priority to all of the Debtor's obligations under the Indenture.  (See Subordination Agreement at § 2.)

15.    The Subordination Agreement expressly provides that no party, other than the parties to the Subordination Agreement, may assert any rights, remedies or claims provided for under the Subordination Agreement.  (See Subordination Agreement at § 10.8.)

---

[2] The assets of EPV Germany were not included in this grant of security.

**D.  <u>The Cash Collateral Motion</u>**

16.    On the Petition Date, the Debtor filed a Motion for Entry of Interim and Final Orders pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 and Fed. R. Bankr. P. 4001 (i) Approving the Use of Cash Collateral, (ii) Providing Adequate Protection, and (iii) Setting a Final Hearing Pursuant to Fed. R. Bankr. P. 4001 [Docket No. 3] (the "Cash Collateral Motion").

17.    In the Cash Collateral Motion, the Debtor represented that the use of cash collateral was necessary for the Debtor "to maintain the value and any equity cushion associated with its assets" and to "prevent the abrupt discontinuation of the Debtor's operations."  (<u>See</u> Cash Collateral Motion at ¶ 18.)  Based on the Debtor's thirteen-week budget filed in connection with the Cash Collateral Motion, as well as representations made by the Debtor at the hearing on the Cash Collateral Motion, the Debtor needed approximately $1.6 million to remain operational through the middle of June 2010.  At no time prior to filing the DIP Financing Motion did the Debtor represent or even indicate that it needed additional financing above and beyond the $1.6 million requested through the Cash Collateral Motion.

18.    On February 26, 2010, Patriarch filed an objection to the Cash Collateral Motion [Docket No. 21] on the primary basis that the Debtor purportedly would not provide Patriarch and the Noteholders with adequate protection for the proposed use of cash collateral through the granting of "replacement liens."

19.    On March 1, 2010, the Court entered an order granting the Cash Collateral Motion on an interim basis [Docket No. 33] (the "Cash Collateral Order").  The Cash Collateral Order granted Patriarch and the Indenture Trustee certain adequate protection, including "replacement liens."  A final hearing on the Cash Collateral Motion is scheduled for April 5, 2010.

**E.  The DIP Financing Motion**

20.     On March 15, 2010, prior to the filing of the DIP Financing Motion, the Debtor filed an Application for an Order Shortening the Time Period for Notice and Setting a Hearing on the DIP Financing Motion [Docket No. 72] (the "Application Shortening Time").  An Order granting the Application Shortening Time [Docket No. 73] (the "Order Shortening Time") was entered by the Court later that day, scheduling a hearing date of March 22, 2010 for the DIP Financing Motion.

21.     Late in the evening on March 15, 2010, the Debtors filed the DIP Financing Motion, seeking, *inter alia*, $20 million in post-petition secured financing (the "DIP Loan") and the granting of first priority liens and security interests for the benefit of certain of the Noteholders that purport to extend the financing (the "DIP Lenders").[3]  See DIP Financing Motion at ¶¶ 18-19.

22.     Pursuant to the DIP Financing Motion, the Debtor requests authority to borrow from the DIP Lenders what the Debtor calls a $20 million senior secured, superpriority DIP Loan.[4]  However, of this $20 million, the DIP Lenders only propose to advance a maximum of approximately $6.6 million, with the remainder of the DIP Loan, or approximately $13.3 million, to be a "roll up" of the DIP Lenders' prepetition Notes and not new money.  Further, of the $6.6 million of new funds that may be advanced, at least $3.6 million will be utilized to repay Patriarch under the Patriarch Facility and a substantial portion of the remaining advances will be used to pay the professional fees and expenses of the DIP Lenders and the Ad Hoc Noteholder Group (as defined below), as well as various other fees associated with the DIP Loan.

---

[3] The DIP Lenders purport to hold sixty (60%) percent of the Notes; however, despite the Indenture Trustee's requests, the Ad Hoc Noteholder Group (as defined herein) has failed to provide the Indenture Trustee with a certification or any other documentation confirming the same.

[4] The Debtor has not yet filed or circulated the loan documentation concerning the DIP Loan.

7

## OBJECTION

**A.   The DIP Financing Motion Should not be Approved Because the Debtor Cannot Demonstrate a Need for DIP Financing or That it has Satisfied the Standards Necessary to Obtain DIP Financing on a Senior, Secured and Priming Basis.**

23.    In order to obtain post-petition financing under Section 364(d) of the Bankruptcy Code, a debtor bears the burden of establishing that (i) it is unable to obtain unsecured credit, (ii) the proposed credit is necessary to preserve the assets of the estate and (iii) the terms of the financing are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.  See In re Aqua Assoc., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990).  If a debtor seeks to grant senior or priming liens in connection with the new financing, the debtor must demonstrate that it was unable to obtain financing without the grant of the priming liens.  In re Mid-State Raceway, Inc., 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005).

24.    A bankruptcy court should approve a proposed debtor in possession financing only if such financing "is in the best interest of the general creditor body."  In re Roblin Industries, Inc., 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985).  See also In re Tenney Village Co., Inc., 104 B.R. 562, 569 (Bankr. D.N.H. 1989) ("The debtor's prevailing obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries"); In re Vanguard Diversified, Inc., 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983).

25.    Proposed post-petition financing may be denied if the terms are overreaching and excessively favorable to the lenders.  See Tenney Village Co., Inc., 104 B.R. at 568 (court denies post-petition financing arrangement because it incorporated overreaching terms).

4026218.3

26.    Here, the Debtor previously represented to the Court that it needed only approximately $1.6 million to remain operational through the week of June 18, 2010.  Now, the Debtor represents that it needs a DIP Loan in the amount of $20 million – to pay $16.9 million of pre-petition obligations – and approximately $3.1 million to pay the fees and expenses of the DIP Lenders as well as certain operational costs.  As a result, the Debtor has failed to demonstrate why this proposed financing is truly "necessary to preserve the assets of the estate," as required by Section 364 of the Bankruptcy Code, apart from alleging a need to prevent Patriarch from derailing the Bankruptcy Case.[5]  (See DIP Financing Motion at ¶ 15.)

27.    In reality, it appears that the DIP Loan only provides the Debtor with new money in an amount that the Debtor could otherwise obtain through the continued use of cash collateral.

28.    Further, post-petition financing should not be authorized if its primary purpose is to benefit or improve the position of a particular secured lender.  See, e.g., Aqua Assocs., 123 B.R. at 195-98 ("[C]redit should not be approved when it is sought for the primary benefit of a party other than a debtor."); Ames Dep't Stores, Inc., 115 B.R. at 37 ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); Tenney Village Co., Inc., 104 B.R. at 568 (debtor-in-possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the secured creditor.")

---

[5] The Indenture Trustee does not object to the Debtor's borrowing of approximately $3.6 million to refinance and repay Patriarch provided that the concept of a roll-up is eliminated (roll-up discussed herein).

4026218.3

29.    Indeed, the law has long acknowledged the unequal bargaining power inherent in negotiations leading to proposed post-petition financing, as well as the very significant harm that can befall creditors if the proposed financier is permitted to exploit its leverage position.  See In re FCX, Inc., 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.")

30.    Here, it is abundantly apparent that the $20 million DIP Loan is not "necessary to preserve the assets of the estate" in view of the fact that at least eighty percent (80%) of the funds that are to be advanced are committed to the payment of certain select prepetition indebtedness, i.e. Patriarch and certain select Noteholders.

31.    Thus, the Debtor has failed to meet its burden of proof that the DIP Loan is necessary to preserve the assets of the estate or that a priming lien is appropriate.  Therefore, the DIP Financing Motion must be denied.

B.    **The Proposed DIP Financing Impermissibly Elevates the Treatment of the DIP Lenders Over Other Noteholders in Violation of the Financing Documents and the Bankruptcy Code.**

32.    Through the DIP Loan, the DIP Lenders should not be permitted, through the use of a roll-up, to elevate their prepetition claims on account of the Notes into post-petition obligations of the Debtor secured by substantially all of the Debtor's assets.  Such action is specifically prohibited both by the Indenture and by the Bankruptcy Code.

i.    *The DIP Financing Motion Violates the Indenture.*

33.    According to the DIP Financing Motion, the Ad Hoc Noteholder Group is a group of Noteholders that purports to hold more than sixty (60%) percent of the outstanding Notes (the "Ad Hoc Noteholder Group").  (See DIP Financing Motion at ¶ 9, n.6.)  According to

10

the DIP Financing Motion, the members of the Ad Hoc Noteholder Group are also the entities

that propose to finance the DIP Loan.

34.    In the DIP Financing Motion, the Debtor seeks, through amendments and

modifications to the Indenture, to subordinate the liens of the remaining approximately forty

percent (40%) of Noteholders (the "40% Noteholders") by "rolling up" some or all of the

outstanding pre-petition Notes of the Ad Hoc Noteholder Group into the DIP Loan as part of the

requested super-priority claim.  As a result of this requested roll-up, the payment of the Notes

held by the 40% Noteholders will be subordinated to the payment of the Notes held by the Ad

Hoc Noteholder Group.

35.    The Indenture expressly addresses such a subordination.  Section 9.02 of

the Indenture states:

> [T]he Company and the Trustee may amend or supplement this
> Indenture, the Note Guarantee, the Notes, the Security Agreement
> and any Collateral Document with the consent of the Holders of at
> least a majority in principal amount of the Notes then outstanding
> voting as a single class . . . . However, **without the consent of
> each Holder affected**, an amendment or waiver under this Section
> 9.02 may not (with respect to any Notes held by a non-consenting
> Holder) . . . **modify** any provision in this Indenture to **purport to
> subordinate the payment of any Notes** to the payment of other
> obligations

(Indenture at Section 9.02(d) (emphasis added).)

36.    The DIP Financing Motion seeks both to subordinate the liens and the

claims of the 40% Noteholders.[6]  (See DIP Financing Motion at ¶ 20.)  However, Section 9.02 of

Indenture expressly requires the consent of one hundred percent (100%) of the Noteholders to

effect such a subordination.

---

[6] As set forth herein, the DIP Financing Motion also seeks to subordinate the separate lien held by the Indenture
Trustee to secure the Debtor's obligation to pay the Indenture Trustee's fees and expenses.

4026218.3

37.    In an attempt to avoid Section 9.02 of the Indenture, the Debtor claims that the DIP Lenders hold a majority of the Notes and that consent from the majority of Noteholders is acceptable to effectuate a modification or amendment under the Indenture in certain circumstances.[7]    (See DIP Financing Motion at ¶ 9; Indenture at §§ 7.05; 9.02.) However, contrary to the Debtor's suggestions, the subordination proposed by the DIP Financing Motion does not fall within the "majority control provisions" of the Indenture, but instead requires the consent of one hundred percent (100%) of the Noteholders.  Upon information and belief, the Debtor has neither sought nor obtained 100% consent of the Noteholders.

ii.    *Based on the Financing Documents, the DIP Financing Motion Cannot be Predicated on the DIP Lenders Stepping Into the Shoes of Patriarch.*

38.    In the DIP Financing Motion, the Debtor also suggests that the DIP Lenders' act of refinancing the Patriarch Facility purportedly allows the DIP Lenders the right and the ability to step into the shoes of Patriarch and assert all of the rights, remedies and claims of Patriarch under the Subordination Agreement.  However, this suggestion is belied by the relevant documents.

39.    First, the DIP Lenders are clearly not parties to the Subordination Agreement.  Section 10.8 of the Subordination Agreement specifically provides that "nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral."  (Subordination Agreement at § 10.8.)  As a result, the Subordination Agreement itself expressly states that the DIP Lenders cannot step into the shoes of Patriarch and obtain any rights, remedies or claims.

---

[7] Even assuming that consent from a majority of Noteholders was sufficient to effectuate the subordination requested in the DIP Financing Motion, despite the Indenture Trustee's request, counsel for the Ad Hoc Noteholder Group has failed to certify or otherwise provide proof of the total amount of the Ad Hoc Noteholder Group's holdings and has failed to provide any written direction to the Indenture Trustee in connection with the DIP Loan.

4026218.3

40.     Also, and very importantly, the collateral that the Debtor seeks to grant to the DIP Lenders as security for the DIP Loan is not the same collateral as was previously granted to Patriarch.  For example, through the DIP Financing Motion, the Debtor purports to grant a lien on the assets of EPV Germany, a non-debtor, to the DIP Lenders and seeks to have that lien prime the Indenture Trustee's lien on EPV Germany's assets.  However, aside from the fact that this Court does not have jurisdiction over this non-debtor and its non-estate property, and cannot order a priming lien on such property, EPV Germany's assets were never pledged to Patriarch as security for the Patriarch Facility.  As a result, the DIP Lenders are not stepping into the shoes of Patriarch with respect to liens against the assets of EPV Germany because Patriarch does not have and was never granted liens on such assets.

41.     Consequently, the DIP Lenders cannot obtain any of Patriarch's rights, remedies or claims under the Subordination Agreement, and any reference by the Debtor to the Subordination Agreement in the DIP Financing Motion is a red herring.

    *iii.*    *The DIP Financing Motion Violates the Provisions and Spirit of the Bankruptcy Code.*

42.     Through the DIP Financing Motion, the Debtor seeks to "roll up" $13.3 million of the DIP Lenders pre-petition indebtedness on account of the Notes and convert that indebtedness to senior secured, super-priority administrative claims.  Currently, under the Indenture, all the Notes are to be repaid on a *pari passu* basis.  However, if the roll-up is approved, sixty percent (60%) of the Noteholders will elevate the repayment of their indebtedness as Noteholders over that of the Indenture Trustee and the 40% Noteholders.  As a result, the DIP Financing Motion attempts to circumvent the priority scheme of the Indenture and the Bankruptcy Code.

43.    One of the fundamental principles of bankruptcy law is that similar prepetition claims are to be classified together and treated similarly. See 11 U.S.C. §§ 1122. See also In re Baldwin-United Corp., D.H., 43 B.R. 443, 457 (S.D. Ohio 1984) ("It is . . . beyond travail that the most significant policy in bankruptcy jurisprudence is equality of treatment of like-situated creditors.").

44.    In keeping with this principle, the conversion of pre-petition debt into DIP indebtedness, which benefits certain creditors over other similarly situated creditors, runs afoul of the Bankruptcy Code.   For this reason, courts have found that roll-ups, such as the one proposed under the DIP Financing Motion, should not be permitted.   See In re Equalnet Commc'ns Corp., 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) ("[A] secured creditor's pre-petition debt balance may not be paid off and/or 'rolled into' a postpetition line of debtor in possession financing, with resultant enhancement of collateral position and administrative priority."); Gen. Electric Capital Corp. v. Nigro (In re Appliance Store, Inc.), 181 B.R. 237, 243 (Bankr. W.D. Pa. 1995) (describing the roll-up provision in a proposed cash collateral stipulation as a "contract of adhesion" whereby the prepetition lender "wished to extract a pound of flesh without immediately inflicting a mortal wound upon the debtor"). Cf. Shapiro v. Saybrook Mfg. Co., Inc. (In re Saybrook Mfg. Co., Inc.), 963 F.2d 1490, 1494-95 (11th Cir. 1992) (explaining that a post-petition financing order which violates the fundamental priority scheme of the Bankruptcy Code to the prejudice of creditors is improper); Farmworker Creditors v. Bland (In re Bland), 308 B.R. 109, 116 (S.D. Ga. 2003) (citing Saybrook for the same).

45.    Furthermore, the United States Bankruptcy Court for the District of New Jersey classifies roll-ups as "extraordinary provisions" that cannot be routinely approved.   See U.S.B.C. District of New Jersey General Order Adopting Guidelines for Financing Requests,

dated November 25, 2009 (the "General Order").  This view is consistent with that of other

bankruptcy courts.   See, e.g., U.S.B.C. District of Delaware Local Rule 4001-2; U.S.B.C.

Southern District of New York, General Order No. 274, dated September 9, 2002.  The General

Order provides "that ordinarily [extraordinary provisions] will not be approved in interim orders

without substantial cause shown, compelling circumstance and reasonable notice."   General

Order at p. 2.

      46.    The General Order cites several factors that must be considered in

approving a roll-up, including:

> (a) The nature and amount of new credit to be extended, beyond the application of proceeds of postpetition financing used to pay in whole or in part the prepetition debt;

> (b) Whether the advantages of the postpetition financing justify the loss to the estate of the opportunity to satisfy the prepetition secured debt otherwise in accordance with applicable provisions of the Bankruptcy Code, and the burdens on the estate of incurring an administrative claim;

> (c) Whether the rollup can be unwound . . .;

> (d) Availability under the terms of the DIP financing and a comparison to the terms that would be available in the absence of the rollup;

> (e) The extent to which prepetition and postpetition collateral can, as a practical matter, be identified and/or segregated;

> (f) The extent to which difficult "priming" issues would have to be addressed in the absence of a rollup; and

> (g) Whether the postpetition advances are used to repay a pre-bankruptcy, "emergency" liquidity facility secured by first priority liens on the same collateral as the postpetition financing, where the prepetition facility was provided in anticipation of, or in an effort to avoid, a bankruptcy filing.

General Order at § II.A.2.  Other factors to be considered include: (i) "the degree of consensus among parties"; (ii) "[t]he extent and value of the prepetition liens held by the prepetition lender (and in particular the amount of any 'equity cushion' that the prepetition lender may have)"; (iii) whether the roll-up "will give an undue advantage to prepetition lenders without a countervailing benefit to the estate."  General Order at § II.A.1(c)-(e).

47.     In light of the foregoing caselaw and the General Order, the Debtor has failed to carry its burden and demonstrate why the proposed roll-up should be approved.  Given the fact that the Debtor has previously represented that it can continue to operate through June 18 solely by using approximately $1.6 million of cash collateral, there does not appear to be any justification for a roll up of $13.3 million, particularly where the Debtor only seeks to borrow a maximum of approximately $6.6 million, and where most of those funds would be used to repay Patriarch and pay the fees and expenses of the DIP Lenders.

48.     Also of note is the fact that the Ad Hoc Noteholder Group, in their capacity as proposed DIP Lenders, may not even be the entities making the DIP Loan.  Instead, "affiliates (including another fund investment managed by the same entity) of the [DIP Lenders] may provide the funding and serve as DIP Lenders." (DIP Financing Motion at ¶ 20.C.)  Further, the DIP Lenders are permitted to assign and sell participations both in the DIP Loans and in the commitments to make the DIP Loans.  (DIP Financing Motion at ¶ 20.II).  In light of this, the justification for the roll-up becomes even more tenuous.

49.     In sum, through the improper roll-up, the DIP Financing Motion proposes to elevate the claims and liens of the DIP Lenders to the detriment of the Indenture Trustee and the rest of the Noteholder constituency.  This should not be permitted.

C. **The Debtor Has Failed to Demonstrate That the Proposed Adequate Protection is Sufficient.**

50.     Section 363(p)(1) of the Bankruptcy Code places the burden of proof on the issue of adequate protection on the Debtor.  See 11 U.S.C. § 363(p)(1); Save Power Ltd. v. Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.), 193 B.R. 713, 716 (Bankr. D. Del. 1996).  The main purpose of adequate protection is to maintain the status quo and protect the value of a secured creditor's interest in its collateral as of the time of the bankruptcy filing. Roe Excavating, Inc. v. Thorp Discount, Inc. (In re Roe Excavating, Inc.), 52 B.R. 439, 440 (Bankr. S.D. Ohio 1984); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (adequate protection is meant to "safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization").

51.     As the Third Circuit explained in Resolution Trust Corp. v. Swedeland Development Group, Inc. (In re Swedeland Development Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994):

> [A] proposal depending upon a pre-petition lender having adequate protection, no matter its form, "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights."  [citations omitted]  Whether protection is adequate "depends directly on how effectively it compensates the secured creditor for loss of value" caused by the superpriority given to the post-petition loan [citations omitted].  In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing.

Swedeland, 16 F.3d at 564.

52.     In Swedeland, the Third Circuit determined that the debtor's proposed adequate protection, which included: (i) payment of future release prices for each unit sold, (ii) the increased value of the property due to continued construction, (iii) continuation of

17

prepetition liens, (iv) turnover of a portion of a cash collateral account to the lender, and (v) personal guaranties by the debtor's principals, was insufficient to adequately protect the prepetition secured lender's interest.  Id. at 565-66.  The Third Circuit in Swedeland also determined that "continued construction based on projections and improvements to the property does not alone constitute adequate protection" but could serve as adequate protection only when made in conjunction with the provision of additional collateral beyond the contemplated improvements.  Id. at 566 (citation omitted).

53.    Here, the Debtor offers much less to the 40% Noteholders by way of adequate protection than the debtor offered, and which the Third Circuit deemed insufficient, in Swedeland.  In fact, here, the Debtor's offer of adequate protection under the DIP Financing Motion is very similar to the adequate protection already offered and provided in connection with the Cash Collateral Motion.  In particular, as adequate protection under the Cash Collateral Motion, the Debtor offered, and has provided on an interim basis through this Court's March 1, 2010 Cash Collateral Order, among other things, replacement liens on all of the Debtor's assets. (See Cash Collateral Order at ¶ 2.)  Now, pursuant to the DIP Financing Motion, the Debtor purports to offer the 40% Noteholders replacement liens, current interest at the non-default rate on the Notes, and a "silent second lien" on all property of the Obligors, junior to all claims and liens of the DIP Lenders.  (See DIP Financing Motion at ¶ 20.L).

54.    Very importantly, through the DIP Financing Motion, the DIP Lenders seek to elevate their pre-petition liens over the lien granted to the Indenture Trustee under the Indenture to secure the Debtor's obligation to pay the Indenture Trustee's fees and expenses, which lien has priority over the liens of the Noteholders.  (See Indenture at ¶ 8.06).  This cannot

be done without providing adequate protection to the Indenture Trustee, which the Debtor fails to offer at all.

55.    Also, the Debtor cannot impair the replacement liens previously granted by this Court to the Indenture Trustee and the Noteholders under the Cash Collateral Order as adequate protection for the Debtor's use of cash collateral.  See In re Plabell Rubber Products, Inc., 137 B.R. 897 (Bankr. N.D. Ohio 1992).

56.    Additionally, given the fact that the Debtor has little, if any, ongoing operations, the Debtor's offer of replacement liens is illusory.  This is particularly true in light of the fact that the value of the replacement liens proposed by the DIP Financing Motion cannot possibly adequately protect against the more than $16 million by which the DIP Loan would diminish the Indenture Trustee's and the 40% Noteholders' interests in the Debtor's assets.

57.    Similarly, the granting of a "silent second lien" is also illusory due to the fact that the 40% Noteholders already hold liens against most, if not all, of these assets.

58.    Also, the Debtor fails to present any evidence to support its argument that a substantial equity cushion exists.

59.    Mere assertions by the Debtor are not sufficient to establish adequate protection.  Because the Debtor has the burden on the issue of adequate protection, unless and until the Debtor can competently demonstrate that the Indenture Trustee and the 40% Noteholders are adequately protected, the DIP Financing Motion should be denied.

**D.  The DIP Financing Motion Contains Numerous Other Objectionable Provisions Which Should not be Approved by the Court.**

60.    In addition to the foregoing, the Indenture Trustee objects to the DIP Financing Motion for the reasons enumerated below:

19

61.    **Benefits to DIP Lenders.**  The DIP Financing Motion provides the DIP Lenders with consideration far beyond a priming lien.  For example, the DIP Lenders would also receive by way of assignment the intercompany loans due to the Debtor from EPV Germany, the value of which is not disclosed but which the Indenture Trustee believes to have a face value in excess of $24 million.  (See DIP Financing Motion at ¶ 20.R.).

62.    Also, the DIP Lenders would improperly receive the right to credit bid up to $20 million in connection with any sale or disposition of assets in the Bankruptcy Case, which would likely result in the DIP Lenders' controlling the Bankruptcy Case.  (See id. at ¶ 20.GG).

63.    **Unjustified Fees.**  The fees paid or payable to the DIP Lenders under the DIP Financing Motion are excessive and improper.  For example, if approved, the DIP Financing Motion would require the Debtor to pay a $1 million Origination Fee (five (5%) percent multiplied by the full aggregate principal amount of the DIP Loan) to be repaid in connection with the sale of any of the Debtor's assets.  (See DIP Financing Motion at ¶ 20.P.)  The DIP Lenders would also be entitled to a $1 million Exit Fee (five (5%) percent of the amount so prepaid or the DIP Loan then payable) to be paid in connection with the sale of the Debtor's assets or any other mandatory prepayment event.  (See DIP Financing Motion at ¶ 20.Q.)

64.    **Professional Fees and Related Provisions.**  Several provisions proposed in the DIP Financing Motion regarding the payment of professional fees are objectionable.  The DIP Financing Motion provides for the Debtor having to pay (i) the costs and expenses of the DIP Agent and the DIP Lenders, including their professional fees for multiple sets of professionals, as well as indemnification from the Debtor for the DIP Agent and DIP Lenders (see DIP Financing Motion at ¶ 20.HH), and (ii) reasonable costs and expenses of the Ad Hoc Noteholder Group (see DIP Financing Motion at ¶ 20.L).

4026218.3

65.     If all of the fees, including the Origination Fee, the Exit Fee, the other fees and expenses and the professional fees and expenses are allowed, the "new money" being loaned will largely, if not totally, be spent on these fees, without even considering the costs associated with the proposed indemnity.

66.     **Milestone Covenants.**  The DIP Loan requires the Debtor to file a plan of reorganization on or before the four (4) month anniversary of the date of entry of the Final Order (the "Plan Deadline") and consummate a sale of all or substantially all of their assets no more than twelve (12) weeks after the Plan Deadline.  (<u>See</u> DIP Financing Motion at ¶ 20.CC.)

67.     These deadlines will likely be far too short and, if approved by the Bankruptcy Court, would allow the DIP Lenders to control the Bankruptcy Case.

68.     **Sections 506(c) Waiver.**  The DIP Financing Motion also improperly seeks approval for the Debtor's waiver of their section 506(c) rights.  (<u>See</u> DIP Financing Motion at ¶ 22).

<u>**RESERVATION OF RIGHTS**</u>

69.     The Indenture Trustee hereby reserves its right to set forth further objections to the DIP Financing Motion as new facts emerge in relation to the DIP Financing Motion and the DIP Loan.

## <u>CONCLUSION</u>

Wherefore, for all of the foregoing reasons, the Indenture Trustee respectfully requests that the Court (i) deny approval of the DIP Financing Motion, and (ii) provide for such other and further relief as the Court deems appropriate.

Dated:    March 19, 2010
         Morristown, New Jersey

                    RIKER DANZIG SCHERER HYLAND
                      & PERRETTI LLP

                    /s/ Joseph L. Schwartz
                    Dennis J. O'Grady, Esq.
                    Joseph L. Schwartz, Esq.
                    Tara J. Mondelli, Esq.

*Attorneys for The Bank of New York Mellon, as trustee and collateral agent for the EPV Solar, Inc. 1% Convertible Senior Secured PIK Notes due 2016*

4026218.3