| |  |
|---|---|
| **UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY**<br><br>*Caption in compliance with D.N.J. LBR 9004-2(c)*<br><br>COOLEY GODWARD KRONISH LLP<br>Richard S. Kanowitz, Esq. (RK 0677)<br>Jay R. Indyke, Esq. (JI 0363)<br>Michael A. Klein, Esq. (MK 7479)<br>1114 Avenue of the Americas<br>New York, NY 10036<br>Tel. (212) 479-6000<br>Fax. (212) 479-6275<br><br>*Proposed Attorneys for the Official Committee of Unsecured Creditors of EPV Solar, Inc.* | |
| In re:<br><br>EPV SOLAR, INC.,<br><br>              Debtor | Chapter 11<br><br>Case No.: 10-15173 (MBK)<br><br>Requested Hearing Date: April 12, 2010 at 2:00 p.m. (EDT) |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
PURSUANT TO SECTIONS 105(a) AND 1112(b) OF THE BANKRUPTCY CODE FOR
AN ORDER CONVERTING THIS CASE TO A CASE UNDER
<u>CHAPTER 7 OF THE BANKRUPTCY CODE</u>**

      The Official Committee (the "<u>Committee</u>") of Unsecured Creditors of EPV Solar, Inc. (the "<u>Debtor</u>"), by and through its undersigned proposed counsel, hereby submits this motion (the "<u>Motion</u>"), pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code, for an order converting this case to a case under chapter 7 of the Bankruptcy Code. In support of the Motion, the Committee respectfully represents as follows:

1623210 v2/NY

**PRELIMINARY STATEMENT**

The Debtor commenced this case with the primary goal of staving off a foreclosure action commenced by Patriarch.[1] Over the ensuing 5 weeks, the Debtor has articulated a broader strategy for this case, which involves the marketing and sale of its manufacturing business and the reorganization of the Debtor around its equipment business. The Committee submits this Motion because, notwithstanding its apparent achievement of its primary goal of refinancing its senior secured debt, there is no indication that the Debtor has the ability or the wherewithal to effectuate a reorganization.

Indeed, and as noted in the Committee's objection to the Debtor's motion for an interim order authorizing the Debtor to obtain postpetition financing (the "DIP Facility"), the Debtor has failed to demonstrate that the DIP Facility will provide it with sufficient funds to satisfy it's working capital needs and pay for the costs of administering this bankruptcy, including the full marketing of its assets that is necessary to maximize value and put the Debtor's strategy into motion. By its own admission, the Debtor has yet to engage in any substantive marketing of its assets, and the Debtor has yet to retain an investment banker in this case to run such a process. A full and fair marketing of the Debtor's assets will require some time, and in fact the DIP Facility contemplates a 7-month sale process. Nonetheless, under the proposed DIP Facility, the Debtor will likely run out of cash well before such a sale can be consummated. Thus, it appears that the DIP Facility will enable the Debtor to do little more than run a truncated sale process for the sole benefit of the DIP Lenders (and possibly the prepetition noteholders), leaving unsecured creditors out of the money. Accordingly, the value of the Debtor's assets will not be maximized and it will be impossible for the Debtor to confirm a plan of reorganization.

---

[1] All capitalized terms not expressly defined herein shall be given the meaning ascribed to them in the Debtor's motion for authority to enter into the DIP Facility.

Should the Court allow the Debtor to implement its strategy, this case will convert to chapter 7 shortly after the conclusion of this truncated sale process, with the DIP Lenders paid substantial sums, including fees that total 66% of the new funds provided to the Debtor under the DIP Facility to fund its operations, with no chance of a distribution for the Debtor's general unsecured creditors and, due to the onerous terms of the DIP Facility, without any ability of the chapter 7 trustee to investigate and evaluate the prudence of causes of action that might be available to the estate. Such a result offends fundamental notions of fairness and contravenes the spirit and purpose of chapter 11.

Unless and until the Debtor and the DIP Lenders agree to fund a sale process that is reasonably likely to result in the confirmation of a plan of reorganization which provides general unsecured creditors with a meaningful chance to obtain a recovery, they should be denied the opportunity to exploit the chapter 11 process. It is respectfully submitted that cause exists to convert the Debtor's case to chapter 7 now, before financing is approved on a final basis. Conversion now will potentially preserve unencumbered assets of the Debtor, which may then be available for the benefit of the estate, rather than being pledged to the DIP Lenders. The Debtor will forego the millions of dollars in legal fees that will likely be incurred by the estate's and the lenders' professionals. The chapter 7 trustee can decide which of the Debtor's remaining 22 employees warrant continued employment, and the chapter 7 trustee can proceed unhampered by a 506(c) waiver.

In light of the foregoing, and for the reasons more fully set forth below, the Committee respectfully requests that cause exists to grant the Motion.

**BACKGROUND**

1.      On February 24, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. No trustee or examiner has been appointed in this case.

2.      On March 10, 2010, the Committee was appointed by the Office of the United States Trustee (the "US Trustee") consisting of the following five members (i) Guardian Ignition Interlock Manufacturing, Inc.; (ii) Advanced Energy Industries, Inc.; (iii) AGC Flat Glass North America; (iv) Grant Thornton LLP; and (v) Renishaw, Inc. That same day, the Committee met and decided that it wished to retain Cooley Godward Kronish LLP ("Cooley") as its counsel and Deloitte Financial Advisory Services LLP ("Deloitte") as its financial advisors in this case. Cooley filed its retention application on March 29, 2010.

3.      As of the Petition Date, the Debtor's obligations to (i) Patriarch and the other prepetition senior lenders totaled **$3.6 million**, exclusive of fees and the last interest payment due on the February 18, 2010 maturity date; (ii) its prepetition subordinated noteholders totaled approximately **$56.9 million**; and (iii) unsecured creditors totaled approximately **$11.5 million**, exclusive of rejection damages claims arising under unexpired leases and executory contracts that will be rejected in this proceeding.

4.      On March 15, 2010, the Debtor filed a motion seeking Court approval of the DIP Facility (the "DIP Motion"). Under the proposed DIP Facility, the DIP Lenders will provide the Debtor and its German non-debtor affiliate with approximately $20 million of postpetition financing, the vast majority of which will be used to pay prepetition secured debt. Indeed, approximately $4 million of the DIP Facility will be utilized to refinance the Debtor's obligations to its prepetition senior secured lenders, and $13.3 million will be used to partially

roll up the Debtor's prepetition obligations to the DIP Lenders. Less than $3 million will be made available pursuant to a budget to fund the (i) working capital needs of the Debtor and its affiliates; and (ii) costs of administration of this case, including professionals.

5. Accordingly, if the DIP Motion is approved, the Debtor's capital structure will include secured debt of over **$63 million** (including over $20 million in postpetition secured debt) and over $11.5 million in unsecured claims.

6. A budget (the "<u>Budget</u>") for the first 13 weeks of the DIP Facility was filed with the Court contemporaneously with the DIP Motion. The Budget indicates that on June 18, 2010, at the end of the 13 week period, the Debtor will have exhausted approximately $5.6 million of the $6.7 million in new funds made available by the DIP Facility and will possess only $66,000 in cash. According to the Budget, although the Debtor's manufacturing business is dormant, the Debtor projects paying $61,000 per week, or $793,000 over 13 weeks, on account of payroll and related obligations for the Debtor's 22 employees.

7. The Debtor has failed to provide the Committee and the Court with a budget for any period after June 18, 2010. However, based on the Debtor's projected cash disbursements in the Budget, it is anticipated that the Debtor will utilize all of its cash and the funds provided by the DIP Facility to fund its operations well before the conclusion of the Debtor's contemplated 7-month sale process, leaving no funds available to pay for the costs of administering this case, including the fees of the investment banker who the Debtor intends to retain to market its assets. Accordingly, the Debtor will be unable to conduct the robust sale process necessary to generate the funds needed to implement its go-forward strategy, and it will not be able to effectuate a plan of reorganization in this case.

8. On March 19, 2010, the Committee filed an objection to the DIP Motion, highlighting the inadequacy of the DIP Facility and the prejudice to the estate from the protections and fees proposed to be provided to the DIP Lenders thereunder.

9. At a hearing on March 22, 2010, this Court approved the DIP Motion on an interim basis, as modified pursuant to the Court's ruling and direction at the interim financing hearing.

10. To date, the Committee has been provided with almost no information about the Debtor's prepetition operations or projected postpetition performance other than what has been filed with the Court, despite the service of document and deposition requests by the Committee on the Debtor, the Indenture Trustee, the DIP Lenders and the Ad Hoc Group.

## RELIEF REQUESTED AND THE BASES THEREFOR

A. **SECTION 1112(b) OF THE BANKRUPTCY CODE REQUIRES THIS COURT TO CONVERT THE DEBTOR'S CHAPTER 11 CASE TO A CHAPTER 7 CASE FOR CAUSE SHOWN**

11. Pursuant to section 1112(b) of the Bankruptcy Code, as amended by the 2005 amendments to the Bankruptcy Code, a court <u>shall</u> convert a chapter 11 case to a chapter 7 case "for cause" upon the request of a party in interest.[2]  11 U.S.C. § 1112(b).  Section 1112(b) provides, in pertinent part:

> . . . on request of a party in interest, and after notice and hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, **the court shall convert a case under this chapter to a case under chapter 7** or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause . . .

11 U.S.C. § 1112(b) (emphasis added).  Prior to the 2005 amendments to the Bankruptcy Code,

---

[2] The Committee is a party-in-interest in the Debtor's chapter 11 proceeding. See 11 U.S.C. § 1109(b); *In re Gibson Group, Inc.*, 66 F.3d 1436, 1446 n.1 (6th Cir. 1995).

1623210 v2/NY

section 1112(b) contained the language "may convert" as opposed to the "shall convert" language which now appears in section 1112(b). One of the few courts to have directly addressed this linguistic revision observed:

> This change diminishes the discretion the bankruptcy courts have in conversions to Chapter 7. If cause for dismissal or conversion to Chapter 7 exists discretion not to dismiss or convert is limited to those instances in which the court makes specific findings that unusual circumstances 'establish that the requested conversion or dismissal is not in the best interests of creditors and the estate.'

*In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D. S.C. 2007) (citation omitted); *see also In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007) (noting that "the statutory language [of section 1112(b)] has been changed from permissive to mandatory"). Therefore, it is clear that this Court is authorized and, in fact, required to convert the Debtor's chapter 11 case to a chapter 7 case upon a showing of cause and "absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is *not* in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1) (2005) (emphasis added).

12. Before the 2005 amendments to the Bankruptcy Code, section 1112(b) provided a nonexclusive list of 10 "causes" for conversion. 11 U.S.C. § 1112(b)(1)-(10) (2004); *see In re Erin Farms, Inc.*, 336 B.R. 600, 2005 WL 3303957, *6 (6th Cir. BAP Dec. 7, 2005) (unpublished) (Section 1112(b) "contains a non-exhaustive list of ten grounds that may constitute cause for conversion or dismissal. Generally, proof of any one of these factors is sufficient to justify conversion.") (citations omitted); *In re Great American Pyramid Joint Venture*, 144 B.R. 780, 790 (Bankr. W.D. Tenn. 1992) (noting that "causes" listed in § 1112(b) are non-exhaustive).

13. As a result of the 2005 amendments to the Bankruptcy Code, section 1112(b) now provides a nonexclusive list of 16 "causes" for conversion. 11 U.S.C. § 1112(b)(4)(A)-(P)[3]; *see In re Broad Creek Edgewater, LP*, 371 B.R. at n.8 (noting that "Section 1112(b)(4) contains a nonexclusive list of sixteen scenarios which constitute cause"); *In re Lizeric Realty Corp.*, 188 B.R. 499, 502 (Bankr. S.D.N.Y. 1995) ("Section 1112(b) of the Code provides ten (10) nonexclusive bases for dismissing a chapter 11 case or converting it to one under chapter 7 of the Code, whichever is in the best interest of creditors and the estate."); *In re Gucci*, 174 B.R. 401, 409 (Bankr. S.D.N.Y. 1994) (noting that "causes" listed in § 1112(b) are non-exhaustive).

14. Two such separate and independent grounds include where there is either (i) a continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, or (ii) an inability to effectuate substantial consummation of a confirmed plan. 11

---

[3] Section 1112(b)(4) states that "cause" includes—
    (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
    (B) gross mismanagement of the estate;
    (C) failure to maintain appropriate insurance that poses a risk to the estate or the public;
    (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
    (E) failure to comply with an order of the court;
    (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
    (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;
    (H) failure to timely provide information or attend meetings reasonably requested by the United States Trustee (or the bankruptcy administrator, if any);
    (I) failure to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;
    (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;
    (K) failure to pay any fees or charges required under chapter 123 of title 28;
    (L) revocation of an order of confirmation under section 1144;
    (M) inability to effectuate substantial consummation of a confirmed plan;
    (N) material default by the debtor with respect to a confirmed plan;
    (O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and
    (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.
See 11 U.S.C. §1112(b)(4)(A)-(P).

U.S.C. §1112(b)(4)(A) and (M) (formerly §1112(b)(1) and (2)).  This Court should convert the Debtor's chapter 11 case to chapter 7 case because the Committee, as set forth below, has met its burden to prove that each of the above cited grounds for conversion exists.  Moreover, the Debtor can offer no evidence to support a specific finding by this Court that "unusual circumstances" exist, such that a prompt conversion would not serve the best interests of the estate.

**B.    CAUSE EXISTS TO CONVERT THE DEBTOR'S CASE BECAUSE THERE IS A CONTINUING LOSS TO OR DIMINUTION OF THE ESTATE AND AN ABSENCE OF A REASONABLE LIKELIHOOD OF REHABILITATION**

15.    Conversion is warranted where a debtor is "suffering substantial or continuing losses to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. §1112(b)(4)(A); *see also In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003) ("[c]ourts have held that a negative cash flow postpetition and an inability to pay current expenses satisfy the elements of § 1112(b)(1)")[4] (citing *In re Route 202 Corp. t/a Lionti's Villa,* 37 B.R. 367, 374 (Bankr. E.D. Pa. 1984) ("[o]bviously, if the debtor has negative cash flow after entry of the order for relief in the chapter 11 case, the [elements of § 1112(b)(1) are] satisfied"); *In re 3868-70 White Plains Road, Inc.*, 28 B.R. 515, 519 (Bankr. S.D.N.Y. 1983) (explaining that full collateralization of a debtor's assets, coupled with a negative cash flow and an inability to pay current expenses, represents cause to convert a chapter 11 case to a chapter 7 case); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1112.04[5] (citing cases).  Here, the Debtor's manufacturing business is largely dormant, and the Budget projects no positive cash flow from operations.  Accordingly, with each week that the Debtor fails to move forward toward a viable

---

[4]    Both grounds which constitute "cause" relied upon by the Committee in this Motion appear in the pre- and post-amendment versions of section 1112(b) of the Bankruptcy Code.  As such, reference to caselaw which precedes the 2005 amendments to the Bankruptcy Code is equally applicable post-amendment.

reorganization, the value of Debtor's assets continues to diminish, the Debtor's cash position continues to deteriorate and the administrative solvency of this case is thrown further into jeopardy.

16. "Rehabilitation" does not share the same meaning as "reorganization," as it requires an ability to re-establish the debtor-entity on a firm, sound financial basis. *See In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991) ("[h]owever honest in its efforts the debtor may be, and however sincere its motives, the [court] is not bound to clog its docket with visionary or impractical schemes for resuscitation.") (*citing Tennessee Publishing Co. v. American Nat'l Bank*, 299 U.S. 18, 22 (1936); *In re ABEPP Acquisition Corp.*, 191 B.R. 365, 368 (Bankr. N.D. Ohio 1996) (citing *In re Wright Airlines, Inc.*, 51 Bankr. 96, 100 (Bankr. N.D. Ohio 1985)). For example, "visionary schemes that entail risk to creditors without any reasonable probability of success usually warrant prompt conversion to chapter 7." *See* 7 COLLIER ON BANKRUPTCY ¶ 1112.04[5][b]; *see also In re AdBrite Corp.*, 290 B.R. at 215 ("The purpose of [section 1112(b) of the Bankruptcy Code] is 'to prevent the debtor-in-possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation.'"). The inherent requirement of rehabilitation is the establishment of cash flow from which current obligations can be met. *See In re Rundlett*, 136 B.R. at 380 (citing *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1998)). In the instant case, the Debtor has no cash flow from operations. Moreover, the Debtor admits that it cannot rehabilitate its equipment business without a sale of its manufacturing business for considerable cash consideration pursuant to a robust process that has not yet commenced. However, and as is discussed in detail below, due to the inadequacy of the DIP Facility, the Debtor does not possess the funds required to conduct the type of sale process that is necessary

to effectuate its strategy. Meanwhile, the deterioration of the value of the Debtor's assets and the accumulation of administrative expenses continues unabated.

17. While a debtor should be allowed a fair opportunity to reorganize, a debtor's opportunity must be balanced against the protection of creditors' interests and the needs of the chapter 11 system as a whole. *See* 7 COLLIER ON BANKRUPTCY, 1112.04[5][b] (citing *In re Great Am. Pyramid Joint Venture*, 144 B.R. 780, 790-91 (Bankr. W.D. Tenn. 1992)). Despite the passage of one month in this case, the Debtor has failed to explain how it anticipates funding its estate going forward through the contemplated 7-month sale process, much less demonstrate how the relief requested will reasonably lead to a successful rehabilitation of its business.

C. **CAUSE EXISTS TO CONVERT THE DEBTORS' CASES BECAUSE IT IS UNREASONABLE TO EXPECT THAT A PLAN CAN BE EFFECTUATED**

18. Cause for conversion also exists where a party in interest shows that there is an inability to effectuate substantial consummation of a plan of reorganization. 11 U.S.C. §1112(b)(4)(M); *see also In re Great Am. Pyramid Joint Venture*, 144 B.R. at 791 ("Under the statutory ground contained in section 1112(b)(2), the court may 'dismiss or convert a chapter 11 case if the court determines that it is unreasonable to expect that a plan can be confirmed in the chapter 11 case.'"); 5 COLLIER ON BANKRUPTCY 1112.03[ii] at 1112-20). Inability to effectuate a plan arises when the "debtor lacks the ability to formulate a plan or to carry one out." *In re AdBrite Corp.*, 290 B.R. at 216 (citing *In re Dark Horse Tavern*, 189 B.R. 576, 582 (N.D.N.Y. 1995)); *see also Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989) (explaining that application of section 1112(b)(4)(M) is appropriate "whether the reason for the debtor's inability to file is its poor financial condition, the structure of the claims against it, or some other reason").

19. Here, the DIP Facility is insufficient to fund both the Debtor's operating expenses and the administrative expenses of this case through the end of the 7-month sale process, much

less through the confirmation of a plan of reorganization. As noted in the Committee's objection to the DIP Motion, the DIP Facility will do nothing but allow the DIP Lenders to liquidate the Debtor's assets through a truncated process that exclusively benefits the DIP Lenders, obviously not a proper use of the chapter 11 process. Such a liquidation can and should be accomplished more efficiently in chapter 7, where a chapter 7 trustee can operate without the undue burdens imposed on the Debtor by the DIP Lenders under the DIP Facility, including a section 506(c) waiver.

20. Indeed, if this case progresses in chapter 11, the Budget indicates that the Debtor will incur significant administrative claims. In addition to the professional fees which will accrue to the professionals retained by the Debtor, the Committee, the DIP Lenders, the Ad Hoc Group and the trustee for the prepetition noteholders (including the fees of the investment banker that the Debtor intends to retain to run its sale process), the Debtor will continue to incur payroll costs totaling $61,000 per week, utilities payments and carrying costs related to its leased properties equal to $135,000 per month, employee benefits and insurance expenses equal to approximately $70,000 per month and miscellaneous costs equal to $40,000 per month. Based on the receipts and disbursements set forth in the Budget, without a significant unforeseen influx of cash, the Debtor will run out of funds sometime after June 18, 2010 but well before the conclusion of the 7-month sale process.

21. Because the Debtor has yet to commence any marketing efforts in furtherance of the disposition of its assets, and (ii) the time required to run the full marketing process that will be necessary to maximize the value of the Debtor's assets, the inadequacy of the DIP Facility ensures that the Debtor will be unable to maximize the value of its assets. As a result, the Debtor will be unable to implement its reorganization strategy and the sale process proposed by the

Debtor will amount to nothing more than a liquidation conducted for the sole benefit of the Debtor's lenders and the professionals in the case. Such a process is contrary to the spirit and the purpose of chapter 11. Indeed, in determining whether to authorize the use, sale or lease of property of the estate outside the ordinary course of business, courts require a debtor to show that a sound business purpose justifies such actions. *See generally In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). The Second Circuit in *Lionel* held that there must be some articulated business justification, **other than appeasement of major creditors**, for using, selling, or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b). *In re Lionel Corp., 722 F.2d at 1070* (emphasis added).

22. It is well established by courts applying the long-standing *Lionel* standard that chapter 11 in general, and section 363 of the Bankruptcy Code in particular, not be "utilized as a means of avoiding Chapter 11's plan confirmation procedures. Where it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b) and should not be approved under that section." *In re Westpoint Stevens, Inc.*, 333 B.R. 30, 52 (S.D.N.Y. 2005); *In re The Babcock & Wilcox Co.*, 250 F.3d 955, 960 (5th Cir. 2001) ("The provisions of § 363 … do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan.").

23. Here, the expedited sale process mandated by the inadequacy of the DIP Facility will create an estate incapable of confirming a chapter 11 plan of reorganization and that will not be administratively solvent. At this juncture, there is no evidence that a sale of the Debtor's assets will yield sufficient funds to pay the Debtor's stated secured indebtedness, much less provide a return for unsecured creditors holding over $11.5 million in claims. Those courts that

have considered the propriety of section 363 sales run for the exclusive benefit of secured creditors have found such use unwarranted and improper. *See In re Encore Healthcare Assocs.*, 312 B.R. 52 (Bankr. W.D. Pa. 2004) (applying *Lionel* standard and finding no business justification as sole purpose of section 363 sale was to liquidate assets for benefit of secured creditor); *In re Fremont Battery Co.*, 73 B.R. 277 (Bankr. W.D. Ohio 1987) (applying *Lionel* standard and finding no business reason to justify sale, the proceeds of which would, at best, benefit only one creditor). Both the *Encore Healthcare* and *Fremont Battery* courts found that no business reason justifies a proposed sale which would not allow for the confirmation of a plan and that, at best, would benefit only secured creditors and "not create proceeds which would inure to the benefit of the unsecured creditors." *In re Fremont Battery Co.*, 73 B.R. at 279.

24. In light of the fact that the confirmation of a plan of reorganization in this case is not reasonably likely, there is no basis for allowing the Debtor to attempt to implement its tenuous strategy in chapter 11 for the sole benefit of the DIP Lenders and the professionals administering the estate. This case should be converted now, before the already considerable administrative expenses of this estate increase any further.

**D.    THE BEST INTERESTS OF THE ESTATE ARE SERVED BY IMMEDIATE CONVERSION**

25. Once a court determines that cause exists to convert a debtor's chapter 11 case to a chapter 7 case, the court is required to convert the case "absent unusual circumstances specifically identified by the court that establish that the requested conversion . . . is not in the best interests of creditors and the estate . . . " 11 U.S.C. §1112(b)(1). A variety of factors demonstrate that it is in the best interest of the Debtor's estate to convert this chapter 11 case to chapter 7.

26. First, conversion of a chapter 11 bankruptcy case meets the best interests of the creditors test where a debtor's assets are neither fixed nor liquidated. *See In re BTS, Inc.*, 247 B.R. 301, 310 (Bankr. N.D. Okla. 2000); *In re Camden Ordnance Mfg. Co. of Arkansas, Inc.*, 245 B.R. 794, 799 (E.D. Pa. 2000); *In re Brogdon Inv. Co.*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982). The vast majority of the Debtor's assets, which intellectual property, fixtures, furniture and equipment, and leases, have not yet been fixed, sold or liquidated. Thus, there are significant assets for a chapter 7 trustee to oversee and liquidate for the benefit of all creditors. A chapter 7 trustee could determine the extent of the Debtor's assets, investigate and pursue potential causes of action against creditors and insiders of the Debtor, investigate the validity of alleged liens of the prepetition noteholders, and confirm the existence of any other assets currently unknown to the Committee. As such, relief is proper in the present case pursuant to sections 105(a) and 1112(b)(3) of the Bankruptcy Code.

27. Second, the best interests of the estate analysis focuses upon whether the economic value of the estate is greater inside or outside of bankruptcy. *See In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 359 (Bankr. S.D.N.Y. 2001) (considering "whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise"); *In re Clark*, 1995 WL 495951, at *5 (N.D. Ill. 1995); *In re Staff Inv. Co.*, 146 B.R. 256, 261 (Bankr. E.D. Cal. 1993). Here, conversion of the Debtor's chapter 11 case to chapter 7 will maximize the value of this estate by minimizing administrative costs associated with the winddown of the estate in chapter 11.

28. Thus, as no unusual circumstances exist that can be identified by the Court to establish that conversion is not in the best interests of creditors and the estate, this case must be

converted to a case under chapter 7 pursuant to sections 1112(b)(4) and 105(a) of the Bankruptcy Code.

## NOTICE

29. Notice of this Motion has been provided to (i) the Debtor and counsel to the Debtor; (ii) the US Trustee; (iii) counsel to the DIP Lenders; (iv) counsel to The Bank of New York Mellon, indenture trustee for the prepetition noteholders; and (v) each person or entity that has filed a notice of appearance and request for service of documents herein. In light of the nature of the relief requested, the Committee submits that no other or further notice need be provided.

30. No previous application for the relief sought herein has been made to this or any other court.

**WHEREFORE**, Applicant hereby respectfully requests that the Court enter an Order: (i) denying the Debtor's request for the extended use of cash collateral; (ii) converting this chapter 11 case to a case under chapter 7 of the Bankruptcy Code; and (iii) such other and further relief as the Court deems just and proper.

Dated: March 30, 2010
New York, New York

Respectfully Submitted,

By: /s/ Richard S. Kanowitz
Richard S. Kanowitz , Esq.

Cooley Godward Kronish LLP
Richard S. Kanowitz, Esq. (RK 0677)
Jay R. Indyke, Esq. (JI 0363)
Ronald R. Sussman, Esq. (RS 0641)
Michael A. Klein, Esq. (MK 7479)

1114 Avenue of the Americas
New York, New York 01136

1623210 v2/NY

(212) 479-6000

*Proposed Counsel For The Official Committee Of
Unsecured Creditors Of EPV Solar, Inc.*

1623210 v2/NY