**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

*Caption in compliance with D.N.J. LBR 9004-2(c)*

COOLEY GODWARD KRONISH LLP
Richard S. Kanowitz, Esq. (RK 0677)
Jay R. Indyke, Esq. (JI 0363)
Michael A. Klein, Esq. (MK 7479)
1114 Avenue of the Americas
New York, NY 10036
Tel. (212) 479-6000
Fax. (212) 479-6275

*Proposed Attorneys for the Official Committee of
Unsecured Creditors of EPV Solar, Inc.*

| | |
|---|---|
| In re: | Chapter 11 |
| EPV SOLAR, INC., | Case No.: 10-15173 (MBK) |
| Debtor | Hearing Date: April 12, 2010 at 2:00 pm (ET) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
DEBTOR'S MOTION FOR FINAL ORDER (A) AUTHORIZING THE DEBTOR TO
OBTAIN POST-PETITION FINANCING, GRANT SECURITY INTERESTS AND
LIENS AND ACCORD PRIORITY STATUS PURSUANT TO 11 U.S.C. §§ 361, 364(c)
AND 364(b); AND (B) AUTHORIZING USE OF CASH COLLATERAL**

The Official Committee (the "Committee") of Unsecured Creditors of EPV Solar, Inc.

(the "Debtor"), by and through its undersigned proposed counsel, hereby submits this objection

(the "Objection") to the Debtor's motion (the "DIP Motion") for a final order (a) authorizing the

Debtor to obtain postpetition financing, grant security interests and liens and accord priority

status pursuant to 11 U.S.C. §§ 361, 364(c) and 364(d); (b) authorizing use of cash collateral

pursuant to 11 U.S.C. § 363(c)(2)(b); (c) granting adequate protection; and (d) modifying the

automatic stay pursuant to 11 U.S.C. § 362(d).  In support of this Objection, the Committee

respectfully represents as follows:

## PRELIMINARY STATEMENT

In its objection to the Debtor's request for interim approval of the DIP Motion, the Committee noted that the DIP Facility[1] was nothing more than a mechanism through which the DIP Lenders are seeking to control all aspects of the Debtor's bankruptcy in furtherance of a sale process that will inure to their sole benefit.  The Committee (i) stated its concern that the DIP Facility will not provide the Debtor with sufficient funds to finance ongoing operations and pay the legal fees of the professionals that have been retained in this case by the Debtor, the Committee, the DIP Lenders and the prepetition lenders, and (ii) highlighted the prejudice to the estate from the excessive fees and unwarranted protections that the Debtor proposed to grant to the DIP Lenders.  By this Objection, the Committee reasserts its objections to the proposed DIP Facility, which have not been addressed by the Debtor in the aftermath of the interim financing hearing.

The inadequacy of the DIP Facility is beyond dispute.  The Debtor has failed to demonstrate that the DIP Facility will provide it with sufficient funds to satisfy it's working capital needs and pay for the costs of administering this bankruptcy, including the full marketing of its assets that is necessary to maximize the value of the Debtor's assets for the benefit of all creditor constituencies.  The Debtor asserts that the DIP Facility will enable it to sell its manufacturing business and reorganize around its equipment business.  However, the Debtor has not engaged in any substantive marketing of its assets and has yet to retain an investment banker in this case to run such a process.  As noted in the Committee's Motion to Convert, which is fully incorporated by reference herein, a full and fair marketing of the Debtor's assets will require some time, and the DIP Facility nominally contemplates a 7-month sale process.

---

[1]      All capitalized terms not expressly defined herein shall be given the meaning ascribed to them in the DIP Motion.

Nonetheless, under the DIP Facility, the Debtor will likely run out of cash well before this process can be completed.

In fact, the DIP Facility will enable the Debtor to do little more than run a sale process for the sole benefit of the DIP Lenders (and possibly the other Senior Secured Noteholders), leaving unsecured creditors out of the money. Such a process will not maximize value for all parties in interest, and will make it impossible for the Debtor to confirm a plan of reorganization. Notwithstanding this reality, the Debtor seeks to provide the DIP Lenders with, among other things, (i) $2 million in fees, (ii) a waiver of the Debtor's section 506(c) rights; (iii) a partial roll-up of approximately $13.3 million of their prepetition indebtedness; (iv) assignment of a €24.5 million receivable purportedly owed to EPV Solar Europe, Limited, one of the Debtor's non-debtor subsidiaries, by EPV Germany, another of the Debtor's non-debtor subsidiaries (the "EPV Germany Receivable"); and (v) liens in and superpriority claims on previously unencumbered assets of the Debtor, including the proceeds of leasehold interests and possibly 35% of its equity interests in EPV Europe.  In addition, the DIP Motion proposes significant limitations on the Committee's ability to fulfill its fiduciary duty in this case, including the provision of an inadequate carve out that caps Committee professional fees and restrictions on the use of the proceeds of the DIP Facility that would make it virtually impossible for the Committee to conduct a meaningful investigation into the liens and claims of the DIP Lenders, Patriarch and the Senior Secured Noteholders and other possible causes of action against the Debtor's prepetition lenders.

The Committee objects to any DIP Facility containing these fees, protections and limitations as not in the best interests of the estate.  If the DIP Lenders are unwilling to agree to a budget that ensures the funding of all of the costs of administration of this case, including an

1623923 v3/NY

appropriate budget for Committee professionals, and that facilitates a sale process that will result in the confirmation of a plan, then the DIP Motion should be denied, and as more fully set forth in the Motion to Convert, the DIP Lenders should not be allowed to liquidate their collateral in chapter 11.

## BACKGROUND

1.      On February 24, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  No trustee or examiner has been appointed in this case.

2.      On March 10, 2010, the Committee was appointed by the Office of the United States Trustee (the "US Trustee") consisting of the following five members (i) Guardian Ignition Interlock Manufacturing, Inc.; (ii) Advanced Energy Industries, Inc.; (iii) AGC Flat Glass North America; (iv) Grant Thornton LLP; and (v) Renishaw, Inc.  That same day, the Committee met and decided that it wished to retain Cooley Godward Kronish LLP ("Cooley") as its counsel and Deloitte Financial Advisory Services LLP as its financial advisors in this case.  Cooley filed its retention application on March 29, 2010.

**The DIP Facility**

3.      On March 15, 2010, the Debtor filed the DIP Motion, which annexed a term sheet that described the key elements of the proposed postpetition financing (the "DIP Facility") to be provided by a group of the Senior Secured Noteholders that hold slightly more than 50% of the Senior Secured Notes (the "DIP Lenders").

4.      Under the proposed DIP Facility, the DIP Lenders will provide the Debtor and EPV Germany with approximately $20 million of postpetition financing, the vast majority of

which will be used to pay prepetition secured debt.[2]    $4.0 million of the DIP Facility was utilized to refinance the Debtor's obligations under the Prepetition Term Loan and $13.3 million is proposed to be used to partially roll up the Debtor's obligations to the DIP Lenders under the Senior Secured Notes.  Only $3 million will be made available to fund the (i) working capital needs of the Debtor and EPV Germany; and (ii) costs of administration of this case, including the legal fees of the professionals retained by the Debtor, the Committee, the  DIP Lenders, the Ad Hoc Group and the Senior Secured Notes Trustee.  A budget (the "Budget") for the first 13 weeks of the DIP Facility was filed with the Court contemporaneously with the DIP Motion.

5.    As of the date hereof, no executed loan documentation has been filed by the Debtor or provided to the Committee.

**The Interim DIP Order**

6.    At a hearing on March 22, 2010, this Court approved the DIP Motion on an interim basis, as modified pursuant to the Court's rulings and direction, and scheduled a final hearing for April 12, 2010 at 2:00 p.m. (EDT).

7.    On March 26, 2010, the Court entered an order (the "Interim DIP Order") approving the DIP Motion on an interim basis.

**The Motion to Convert**

8.     On March 30, 2010, the Committee filed a motion to convert this case to a case under chapter 7 of the Bankruptcy Code (the "Motion to Convert").

---

[2]    The Debtor's and EPV Germany's obligations under the DIP Facility are to be guaranteed by the Debtor's Non-Debtor Subsidiaries, and the Debtor is guaranteeing the obligations of EPV Germany under the DIP Facility, which may total as much as $900,000.

1623923 v3/NY

## **OBJECTION**

### **The Committee Objects to Approval of Certain Terms of the Proposed DIP Facility**

9.        The Committee would support an effort to maximize the value of estate assets for all constituents through a chapter 11 proceeding.  However, the Committee cannot support the process proposed by the DIP Motion, through which the DIP Lenders, and by extension the Senior Secured Noteholders, are permitted to liquidate their collateral in chapter 11 without agreeing to fund all of the administrative costs of this case.

10.        Postpetition financing should not be authorized if its primary purpose is to benefit or improve the position of a particular secured lender.  See, e.g., In re Aqua Assocs., 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate.").  Courts have long acknowledged the unequal bargaining power inherent in negotiations leading to proposed post-petition financing, as well as the harm that may be suffered if the proposed lender is permitted to take full advantage of its leveraged position.

11.        The unequal bargaining power inherent in the relationship between the Debtor and the DIP Lenders is readily apparent in the onerous terms and conditions set forth in the proposed DIP Facility.  Accordingly, the Committee is compelled to object to the proposed final DIP order (the "Final DIP Order") and the DIP Facility.  The specific grounds for the Objection are as follows.

(a)        **506(c) Waiver**-- The Committee objects to the Debtor's waiver of its right to surcharge the DIP Lenders and the Senior Secured Noteholders for the cost and expense associated with the preservation and disposition of their prepetition collateral.  It is far from clear that the DIP Facility provides the estate with sufficient funds with which to administer this case, and many of the Senior

6

Secured Noteholders are not providing any postpetition financing.  Under these circumstances, a 506(c) waiver is improper.

(b) **Excessive Fees--** The Committee objects to the excessive fees proposed to be paid to the DIP Lenders.  The Court has already approved an "origination fee" equal to $1 million, which becomes due and payable on any date on which the DIP loans are repaid from an asset sale yielding net proceeds of at least $5 million.  Through the DIP Motion, the DIP Lenders also seek payment of an "exit fee" in connection with any pre-payment of the loans, which is likely to equal an additional $1 million.  Given the paltry financing provided by the DIP Facility, the payment of this fee is offensive and unwarranted.

(c) **Partial Roll-up**-- The Committee objects to the partial roll-up of the DIP Lenders' prepetition claims into postpetition claims secured by new assets of the Debtor.  Aside from the grave problems of using postpetition funds to pay prepetition debt outside of a plan of reorganization, the only reasons for the roll-up are to (i) elevate the DIP Lenders' collateral position above that of the other Senior Secured Noteholders, with whom they would otherwise share in a distribution of the Debtor's assets on a *pari passu* basis; (ii) enhance the DIP Lenders' collateral position to increase the likelihood of payment in full in this case; and (iii) provide the DIP Lenders with the ability to submit a credit bid in the context of a sale of the Debtor's assets, which will chill bidding and prevent the Debtor from maximizing the value of its assets.

(d) **Liens on Unencumbered Assets and Unwarranted Adequate Protection--** The Committee objects to the Debtor's proposal to provide the (a) DIP Lenders and the Senior Secured Noteholders with new liens and superpriority claims on previously unencumbered assets, including the proceeds of any disposition of the Debtor's leasehold interests, and (b) the DIP Lenders with assignment of the EPV Germany Receivable.  There is no basis to provide the DIP Lenders and the Senior Secured Noteholders with these unnecessary and expensive protections when this case is proceeding for their exclusive benefit.  The Debtor should not be allowed to grant liens on any heretofore unencumbered assets of the Debtor, when these assets could be the only source of a distribution for unsecured creditors in this case.

(e) **Inadequate Carve-Out**-- The Committee objects to the inadequacy of the Committee carve out, which operates as a cap on Committee fees and does not sufficiently account for the fees and expenses to be incurred by professionals retained by Committee in furtherance of their fiduciary duties in this case.

(f) **Undue Restrictions on the Committee's Investigation Rights--** The Committee objects to the DIP Lenders' attempt to limit the Committee's use of the proceeds of the DIP Facility to review the liens of, and investigate and bring claims against, the DIP Lenders and the other prepetition lenders.  The investigation of the acts, conduct and operation of the Debtor's business and other matters relevant to this

7

case is an essential part of the enumerated duties given to official committees pursuant to § 1103(c)(2) of the Bankruptcy Code and should not be curtailed.

(g) **Credit Bidding--** The DIP Lenders should not be permitted to credit bid any portion of their claim without assurances that sufficient cash will be available to pay the Debtor's administrative creditors in full.  Permitting the DIP Lenders to credit bid up to $20 million in the absence of such assurances would discourage potential bidders who might assume more administrative claims, and would achieve little more than to guarantee the repayment of the DIP Lenders at the expense of administrative, priority and general unsecured creditors.

(h) **Permitted Variances Must Be Reasonable**-- In the DIP Facility, the Debtor covenants that it shall not permit or suffer to exist a variance of the Budget of (i) actual cash receipts that are less than ninety five percent (95%) of the projected amounts set forth in the Budget, in the aggregate, tested weekly; or (ii) actual expenses and cash disbursements that are greater than one hundred and five percent (105%) of the projected amounts set forth in the Budget, in the aggregate, tested weekly on a cumulative basis.  These variances are extremely tight and put the Debtor at risk of a premature default, and should be expanded to at least 10 percent.

The Committee was very recently provided with access to the Debtor's FTP site, which contains over 30,000 pages of documents related to the Debtor's prepetition operations.  Accordingly, the Committee reserves the right to interpose any additional objections to the DIP Motion after it has had the opportunity to review these documents.

A.    **A Section 506(c) Waiver Should Not Be Permitted**

12.    Pursuant to the DIP Motion, the Debtor seeks to waive its rights under section 506(c) of the Bankruptcy Code.  The lenders should not be granted such a waiver in this case because the DIP Facility does not provide for all of the costs of administration of this case.

13.    During the course of this proceeding, the Debtor will accrue significant administrative claims on account professional fees which will accrue to the professionals retained by the Debtor, the Committee, the DIP Lenders, the Ad Hoc Group and the trustee for the prepetition noteholders (including the fees of the investment banker that the Debtor intends to retain to run its sale process).  In addition, according to the Budget, the Debtor will continue to

incur payroll costs totaling $61,000 per week, utilities payments and carrying costs related to its leased properties equal to $135,000 per month, employee benefits and insurance expenses equal to approximately $70,000 per month and miscellaneous costs equal to $40,000 per month.

14.    While the Debtor may be hopeful that the DIP Facility will be sufficient to cover all of the expenses necessary to administer this case and fund its operations, the Committee has not been provided with sufficient information to share that view.   Based on the receipts and disbursements set forth in the Budget, without a significant unforeseen influx of cash, the Debtor will run out of funds sometime after June 18, 2010 but well before the conclusion of the sale process contemplated by the Debtor (which has yet to be commenced).   By waiving its rights under section 506(c), the Debtor is agreeing to pay for any and all expenses associated with the disposition of the collateral of the DIP Lenders and the Senior Secured Noteholders that are not provided for in the Budget, including all costs that the Debtor can show "that absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure."   Brookfield Prod. Credit Ass'n v. Borron, 738 F.2d 951, 952 (8th Cir. 1984) (citations omitted).   In light of the inadequacy of the Budget relative to the likely costs of administration of this case, a section 506(c) waiver is improper.

15.    Indeed, immunizing agreements that prohibit surcharge payment obligations under section 506(c) have been found unenforceable on the basis that such provisions "operate as a windfall to the secured creditor at the expense of administrative claimants."   In re Lockwood Corp., 223 B.R. 170 (8th Cir. BAP 1998).   In addition, the Supreme Court decision in Hartford Underwriters Ins. v. Union Planters Bank N.A. (In re Hen House Interstate Inc.), 530 U.S. 1 (2000), makes clear that such waivers, since they are binding on all parties in interest, should never be lightly granted, nor may the management of a debtor in possession concede this issue

1623923 v3/NY

for any but compelling reasons.  See Hen House, 530 U.S. at 12 (debtor's decision to waive section 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require").  Therefore, an order disadvantaging the estate at this early stage through a section 506(c) waiver should not be entered in this case.

## B.    The Excessive Fees Proposed To Be Paid To The DIP Lenders Should Not Be Approved

16.    The Court has already approved an "origination fee" equal to $1 million in connection with the Interim DIP Order, which becomes due and payable on any date on which the DIP loans are repaid from an asset sale yielding net proceeds of at least $5 million.  Through the DIP Motion, the DIP Lenders also seek payment of an "exit fee" in connection with any pre-payment of the loans, which will be equal an additional $1 million.  Not only is the "exit fee" unreasonable on its face given the limited financing being made available to the Debtor under the DIP Facility, but it should be viewed with skepticism in light of the disparity in bargaining positions of the Debtor and the DIP Lenders in the days leading up to the execution of the Term Sheet.  See, e.g., In re Levitz Home Furnishing, Inc., Case No. 05-45189, 10/10/2005 Hr'g Tr. at 32-3 (noting deleveraged position of the debtor in negotiation adequate protection in post-petition financing facility); In re Interlogic Trace, Inc., 188 B.R. 557, 560 n.2 (Bankr. W.D. Tex. 1995) (noting, in the context of a success fee request, that "courts cannot be bound to honor agreements improvidently made by desperate debtors prior to filing" and that "debtors are not at liberty to bargain away the rights and responsibilities of a debtor-in-possession, nor the protections afforded creditors and other parties in interest in a bankruptcy case, under the guise of freedom of contract.") (citations and quotations omitted).

17.    The exit fee must be disallowed.  If the exit fee becomes payable, the Debtor would be required to pay **67 percent** of the $3 million in new liquidity provided by the DIP

10

Facility back to the DIP Lenders in fees alone.  Such a result is unconscionable given that this case is proceeding for the DIP Lenders' sole benefit.

**C.      The Committee Objects to the Roll-up of the DIP Lenders' Prepetition Indebtedness**

18.      The DIP Motion provides that $13.3 million of the DIP Facility will be utilized to partially satisfy the Debtor's prepetition obligations to the DIP Lenders.  This proposed roll-up, which would be secured by heretofore unencumbered assets of the Debtor, is unnecessary and unauthorized by bankruptcy law, and will only serve to prejudice the estate.  If the Debtor is permitted to make these payments, the DIP Lenders would be able to enhance their collateral position and prime their fellow Senior Secured Noteholders, and would provided with the ability to potentially credit bid the amount of the roll-up in connection with a sale of the Debtor's assets, which would chill bidding and further impair the Debtor's already uphill battle to maximize value for creditors.

**(i)      The Bankruptcy Code Does Not Authorize a Debtor to Pay
Prepetition Claims Outside of a Plan of Reorganization**

19.      The Bankruptcy Code contains a comprehensive and coherent scheme for the payment and treatment of secured prepetition claims in chapter 11 cases.  Specifically, Congress guaranteed that a secured claimant would receive the value of its collateral up to the amount of its claim as of the effective date of a plan of reorganization through the reorganization process. See 11 U.S.C. § 1129(b)(A)(i)(II).  In contrast, nothing in the comprehensive scheme established by Congress provides for the payment of prepetition claims before confirmation of a plan of reorganization.  See, e.g., Chiasson v. Matherne & Assoc. (In re Oxford Mgmt., Inc.), 4 F.3d 1329, 1334 (5th Cir.1993) (bankruptcy court improperly allowed the payment of postpetition funds to satisfy prepetition claims and noting that "[n]either the appellees nor the bankruptcy court cited a specific provision of the Code that would allow the payment of postpetition funds to

11

satisfy prepetition claims"); <u>Official Comm. of Equity Sec. Holders v. Mabey (In re A.H.</u>
<u>Robins, Co.)</u>, 832 F.2d 299, 302 (4th Cir.1987) ("The Bankruptcy Code does not permit a
distribution to unsecured creditors in a Chapter 11 proceeding except under and pursuant to a
plan of reorganization that has been properly presented and approved."); <u>Crowe & Assocs., Inc.</u>
<u>v. Bricklayers & Masons Union Local No. 2 (In re Crowe & Assocs.)</u>, 713 F.2d 211, 216 (6th
Cir. 1983) (bankruptcy courts do not have the power to authorize debtors to pay prepetition
claims prior to a plan of reorganization); <u>In re Allegheny Int'l, Inc.</u>, 118 B.R. 282, 296 (W.D. Pa.
1990) ("It is beyond dispute that a debtor may not pay creditors outside of a plan of
reorganization.").

20.     It is well established that the prepayment of even a portion of a secured creditor's
claim before confirmation is barred.  For example, although section 506(b) of the Bankruptcy
Code allows an oversecured creditor to recover interest that accrues throughout the
reorganization process, accrued interest under section 506(b) may not be paid to an oversecured
creditor until a plan's confirmation or effective date, whichever is later.  <u>See</u> <u>United Sav. Ass'n</u>
<u>of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs.,</u>
<u>Ltd.)</u>, 484 U.S. 365, 108 S.Ct. 626 (1988) ("The timing of the payment of accrued interest to an
oversecured creditor [at the conclusion of the proceeding] is doubtless based on the fact that it is
not possible to compute the amount of the §506(c) recovery . . . until the end of the
proceeding.").  For example, in <u>Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (Matter</u>
<u>of T-H New Orleans Ltd. P'ship)</u>, the Fifth Circuit held that the bankruptcy court erred by
ordering the payment of interest on a secured claim before confirmation.  <u>Matter of T-H New</u>
<u>Orleans Ltd. P'ship</u>, 116 F.3d 790, 799 (5th Cir. 1997).  If payment of a fraction of a secured

claim before confirmation is improper, it follows *a fortiori* that the payment of an entire secured claim is impermissible.

21.    In <u>In re Equalnet Communications Corp.</u> the bankruptcy court specifically prohibited the rollup of prepetition into postpetition debt.  <u>In re Equalnet Communications Corp.</u>, 258 B.R. 368 (Bankr. S.D. Tex. 2000).  There, a secured creditor attempted to pay off prepetition loans with a postpetition line of credit.  <u>Id</u>. at 369.  The result of this rollover of prepetition debt into postpetition financing was to enhance the secured creditors' collateral position and to grant administrative priority for the refinanced prepetition debt.  <u>Id</u>.  The bankruptcy court held that "based on the Eleventh Circuit's ruling in the case of <u>Saybrook Mfg. Co., Inc.</u>, 963 F.2d 1490 (11th Cir. 1992), a secured creditor's prepetition debt balance may not be paid off and/or 'rolled into' a postpetition line of debtor in possession financing, with resultant enhancement of collateral position and administrative priority.  <u>Id</u>.; <u>see also</u> <u>In re Tri-Union Dev. Corp.</u>, 253 B.R. 808, 814 (Bankr. S.D. Tex. 2000) (noting that "it is improper under the current Code and case law for the debtor, pre-confirmation, to cross-collateralize or 'refinance and re-collateralize' a prepetition secured debt secured by substantially all of the debtor's assets").

**(ii)**    **Section 364 Does Not Allow a Postpetition Lender to**
**<u>Have its Prepetition Debt Paid With Postpetition Funds</u>**

22.    Not only does the Bankruptcy Code generally prohibit the payment of prepetition claims outside of a plan of reorganization, but the specific provision of the Bankruptcy Code that authorizes a debtor to obtain postpetition credit does not contemplate this proposed use of postpetition financing.  Rather, section 364 of the Bankruptcy Code specifies, and thereby limits, the benefits that may accrue to a postpetition lender.  For example, a debtor may incur unsecured postpetition debt that will be treated as an administrative expense.  <u>See</u> 11 U.S.C. § 364(a) and (b).    Alternatively, a debtor may incur postpetition debt having priority over all other

13

administrative expenses of the estate (i.e., superpriority), secured by any unencumbered assets of the estate, secured by junior liens, or secured by a priming lien.  However, section 364 of the Bankruptcy Code does not allow a postpetition lender the additional benefit of having its prepetition claim paid with funds borrowed postpetition.

23.     Moreover, section 364 of the Bankruptcy Code cannot be read to grant a court broad authority to approve rollups if necessary to induce a lender to extend postpetition financing to debtors solely on the grounds that section 364 does not expressly forbid such financing.  As the United States Supreme Court has stated in the context of another Bankruptcy Code provision, "[the] theory – that the expression of one thing indicates the inclusion of others unless exclusion is made explicit – is contrary to common sense and common usage."  Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 9, 120 S.Ct. 1942 (2000).  The Eleventh Circuit reached the same conclusion regarding section 364 of the Bankruptcy Code in an analogous case in which the postpetition lender was attempting to obtain cross-collateralization of its prepetition loans.  Shapiro v. Saybrook Mfg. Co., Inc. (In re Saybrook Mfg. Co., Inc.), 963 F.2d 1490 (11th Cir. 1992).  Reviewing the language of section 364 of the Bankruptcy Code, the Saybrook court concluded that by its express terms, "cross-collateralization is not authorized as a method of post-petition financing."  Id. at 1494-95.  Similarly, by its express terms, section 364 of the Bankruptcy Code does not authorize the bankruptcy court to reward a lender who provides postpetition financing with the right to immediate repayment of pre-petition debt through a rollup.  Id.

**(iii)     The Proposed Roll-up is Not Justified Under the Limited
            Doctrine of Necessity**

24.     Although payment of prepetition claims before confirmation of a plan of reorganization is not authorized by the Bankruptcy Code, some courts have recognized a limited

1623923 v3/NY

exception to this rule for certain types of debt. This exception is commonly referred to as the "doctrine of necessity." To the extent the DIP Lenders and the Senior Lenders contend that a rollup is justified under the limited "doctrine of necessity," this argument must fail.

25.     Before the enactment of the Bankruptcy Code, courts recognized that in certain circumstances it was in the best interests of the bankruptcy estate to pay certain prepetition creditors out of turn, as an inducement to continue doing business with the debtor. Miltenberger v. Logansport, 106 U.S. 286, 314 (1882). However, nowhere in the Bankruptcy Code was this doctrine codified. In fact, a trend has developed recently permitting payment of prepetition claims pursuant to the doctrine of necessity "only in rare cases" and "under extraordinary circumstances." In re Zenus is Jewelry, Inc., 378 B.R. 432, 433-34 (Bankr. D. N.H. Oct. 25, 2007) (refusing to permit payment of prepetition claims pursuant to doctrine of necessity); In re Kmart Corp., 359 F.3d 866, 871 (7th Cir. 2004) (not allowing payment of unsecured creditors' pre-petition claims unless all unsecured creditors were paid); In re CoServ, LLC, 273 B.R. 487, 491 (Bankr. N.D. Tex. 2002) (holding payment of prepetition claims pursuant to doctrine of necessity to be authorized "only in rare cases.").

26.     Even courts that do allow for the payment of prepetition claims pursuant to the doctrine of necessity only allow it in limited circumstances – none of which contemplates paying the prepetition claims of a postpetition lender. See In re Just For Feet, 242 B.R. 821 (D. Del. 1999) (authorizing the payment of athletic footwear and apparel vendors' prepetition claims because payment was critical for reorganization); In re Payless Cashways, Inc., 268 B.R. 543 (Bankr. W.D. Mo. 2001) (authorizing the payment of prepetition claims of critical lumber vendors after determining that the deliver of products from these vendors is critical to the

debtors' survival).  Accordingly, there is no basis for the Debtor's proposed rollup pursuant to the doctrine of necessity.

### (iv)    The Roll-up Is Not Warranted Under the New Jersey Guidelines For Financing Requests

27.    As discussed more fully in the objection to the Interim DIP Order filed by the Senior Secured Notes Trustee, the roll-up is unwarranted under the financing guidelines adopted by the United States Bankruptcy Court for the District of New Jersey.  The guidelines cite several factors that must be considered in approving a roll-up, including:

(i)    The amount of the new financing to be extended, beyond the application of the proceeds of postpetition financing being used to pay down the prepetition debt;

(ii)    Whether the advantages of the postpetition financing justify the loss to the estate of the opportunity to satisfy the prepetition secured debt in accordance with applicable provisions of the Bankruptcy Code, and the burdens on the estate of incurring an administrative claim;

(iii)    Whether the roll-up can be unwound;

(iv)    The degree of consensus among the parties; and

(v)    Whether the roll-up will give an undue advantage to prepetition lenders without a countervailing benefit to the estate.

See U.S.B.C. District of New Jersey General Order Adopting Guidelines for Financing Requests, dated November 25, 2009.  The Debtor has made no effort to address these factors, all of which militate against the approval of the roll-up in this case.

### D.    The DIP Lenders Should Not be Granted Liens In or Super-Priority Claims On Any Unencumbered Assets of the Debtor or its Foreign Subsidiaries

28.    The DIP Motion proposes to grant the DIP Lenders and the Senior Secured Noteholders with liens in previously unencumbered assets of the Debtor's estate, including the Debtor's leasehold interests and possibly 35% of the Debtor's interest in the capital stock of EPV

16

Europe,[3] as collateral in exchange for the minimal financing provided by the DIP Facility.  The

Committee submits that neither lender should be granted a lien on any heretofore unencumbered

assets of the Debtor when these assets may be all that is available for unsecured creditors.

29.    As stated above, the proposed DIP Facility is nothing more than a vehicle created

by the DIP Lenders to enable them to take money out of their postpetition pockets and place

those same funds right back into their prepetition pockets, while controlling a sale process that

inures to their sole benefit at the expense of unsecured creditors.  If the Debtor is permitted to

grant the lenders liens in, and the DIP Lenders' superpriority claims on, on any remaining

unencumbered assets in connection therewith, in exchange for patently inadequate financing or,

in the case of certain of the Senior Secured Noteholders, no financing whatsoever, any possibility

of a distribution to general unsecured creditors will disappear and the Debtor will begin the

fruitless exercise of preserving and disposing of the lenders' enhanced collateral positions in

these chapter 11 case – all on the backs of the Debtor's unsecured creditors.

30.    In addition, under the DIP Facility, the Debtor's non-debtor subsidiaries,

including EPV Germany, have agreed to provide the DIP Lenders with a lien on substantially all

of their assets as consideration for the DIP loans.  These liens should not be approved, as they

will impair the ability of the Debtor's estate to recognize the value of any sale consummated in

this case.  For example, The Debtor has indicated that the sale of its Senftenberg, Germany

manufacturing plant is a key element of its reorganization strategy.  However, if the Debtor is

empowered to grant new liens on the assets of EPV Germany, then its debts will increase by $20

---

[3]    To date, the Committee has not been provided with documents evidencing the extent and validity
of the prepetition lenders' liens in the Debtor's assets, including documents relative to the scope of the
lenders' security interests in the Debtor's capital stock of EPV Europe.  The DIP Facility provides the
DIP Lenders and the Senior Secured Noteholders with a lien on 65% of the Debtor's equity interests in its
foreign subsidiaries, with the opportunity to increase the extent of its security to 100% in the event of
certain modifications to the Internal Revenue Code.

million, and the likelihood that the proceeds generated by any sale of the Senftenberg facility will remain available to satisfy claims against the Debtor's estate will be significantly diminished.

**E.    Adequate Protection for the Senior Secured Noteholders is Unwarranted**

31.    The Debtor proposes to provide the Senior Secured Noteholders with adequate protection in the form of: (i) a replacement lien, (ii) the repayment of prepetition debt of the DIP Lenders; (iii) interest payments; and (iv) payments of fees and costs of the Senior Secured Notes Trustee and the Ad Hoc Group.  However, the fundamental premise that adequate protection is required to protect the Senior Secured Noteholders has not been established.

32.    The purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy."  See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987).  Adequate protection is, therefore, a protection for the creditor to assure its collateral is not depreciating or diminishing in value and is made on a case-by-case basis.  Id. at 1397; see also United Savings Ass'n v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 370 (1988) (an "interest is not adequately protected if the security is depreciating during the term of the stay."); In re Saypol, 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983) ("In the context of the automatic stay, Congress believed the existence vel non of such a decline [in the value of the secured creditor's interest] to be almost decisive in determining the need for adequate protection.").

33.    For these reasons, the secured creditor "must, therefore, prove this decline in value -- or the threat of a decline -- in order to establish a prima facie case."  In re Gunnison Ctr. Apts., LP, 320 B.R. 391, 396 (Bankr. D. Colo. 2005); In re Elmira Litho, Inc., 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).  Secured creditors are only entitled to adequate protection to the extent

of the anticipated or actual decrease in value of the secured collateral during the bankruptcy case.

See In re First South Savings Assoc., 820 F.2d 700, 710 (5th Cir. 1987); In re Gallegos Research

Group, Corp., 193 B.R. 577, 584 (Bankr. D. Col. 1995).  A corollary to that rule is that "the

adequate protection provided must not substantially exceed that to which the secured creditor is

entitled."   In re Blehm Land & Castle Co., 859 F.2d 137 (10th Cir. 1988).   Finally, in

determining the need for adequate protection, "[t]he primary, and often determinative factor, is

the existence of an adequate equity cushion."   In re Carson, 34 B.R. 502, 506 (Bankr. D. Kan.

1983).

34.    The Senior Secured Noteholders have not offered any semblance of proof in this

regard.  Moreover, the Debtor chooses to remain silent on this issue, notwithstanding the fact that

the Senior Secured Noteholders are being adequately protected on their prepetition collateral

interests by the very posture of this chapter 11 case.   As the Senior Secured Noteholders have

not made out a *prima facie* case for adequate protection, this Court should not grant the the

requested adequate protection.

**F.    The Debtor Should Not Be Authorized to Assign the EPV Germany Receivable to
the DIP Lenders**

35.    Pursuant to the DIP Facility, the Debtor seeks to assign the EPV Germany

Receivable to the DIP Lenders.  This proposed assignment is problematic for several reasons.

First, because the EPV Germany Receivable is owed by one foreign non-debtor entity to another

foreign non-debtor entity, it is not property of the estate and is not under the jurisdiction of this

Court.  Accordingly, the Court does not have the authority to effectuate the assignment of the

EPV Germany Receivable through the Final DIP Order.  See, e.g., Torkelsen v. Maggio (In re

Guild & Gallery Plus, Inc.), 72 F.3d 1171, 1181 (3d Cir. 1996) (noting that a matter involving

assets that are not property of the estate is beyond the bankruptcy court's jurisdiction); Bass v.

<u>Denney</u>, 171 F.3d 1016, 1022-23 (5th Cir. 1999) (holding that court lacks jurisdiction to hear an adversary proceeding between third parties that does not concern property of the estate).

36.     Second, the assignment is unwarranted given the minimal financing provided by the DIP Facility.   The fees and protections proposed by the DIP Facility are excessive consideration for this new money even without the assignment of the EPV Germany Receivable to the DIP Lenders.  In light of the fact that the face amount of the EPV Germany Receivable exceeds the total amount of the total amount of the proposed DIP Facility by at least $4.5 million, the DIP Lenders' request for this additional consideration is plainly unreasonable.

37.     Third, assignment of the EPV Germany Receivable will impair the Debtor's ability to maximize the value of its assets for all creditors.  The Debtor has indicated that (i) EPV Germany owes the EPV Germany Receivable to EPV Europe, and (ii) EPV Europe has significant outstanding obligations to the Debtor.   The Debtor has also indicated that EPV Europe has no operations or assets other than its equity interests in the Debtor's subsidiaries and the obligations owed to it on account of intercompany transfers.   Accordingly, it appears that EPV Europe must collect the EPV Germany Receivable in order to have any ability to satisfy its obligations to the estate, and the assignment of the EPV Germany Receivable to the DIP Lenders may cause the Debtor to forfeit a valuable estate asset.   There is no basis for prejudicing the estate in this way before the Committee has an opportunity to fully investigate the prepetition relationship between the Debtor and its non-debtor subsidiaries.

**G.     The Lack of an Adequate Committee Professional Fee Carve Out Precludes the Committee from Fulfilling its Fiduciary Duties to the Estate**

38.     The terms of the DIP Facility disadvantage the Committee by providing for wholly disparate treatment of its professionals.  Indeed, while the Debtor's counsel has been provided with a $375,000 retainer in this case and a $200,000 carve-out, the Final DIP Order

provides for a $100,000 cap (the "Committee Cap") on the fees and expenses incurred by the Committee's professionals in the discharge of their duties in this case.

39.     This is a significant change from what had been set forth in the proposed Interim DIP Order, which provided for a small carve out to satisfy the allowed and unpaid fees of the Debtor's counsel and the Committee's professionals, over and above the budgeted fees for such professionals, that was only triggered upon the occurrence of an event of default under the DIP Facility.  As the Committee noted in its objection to the Interim DIP Order, this carve out was insufficient to enable the Committee from fulfilling its fiduciary duties and established an uneven playing field that would prevent the Committee from playing any meaningful role in this case, while permitting the DIP Lenders to benefit from the orderly sale of their collateral in chapter 11.  The Committee Cap is even more prejudicial to the Committee than the Debtor's initial carve-out proposal, as it imposes a hard cap on Committee professional fees regardless of (i) what is set forth in the Budget and (ii) whether an event of default has occurred and is continuing.  The DIP Lenders' effort to hamstring the Committee's professionals in this way cannot stand, and demonstrates the DIP Lenders' unwillingness to fund a budget that provides for all of the administrative costs that will be incurred by the Debtor while in chapter 11.

40.     The purpose of postpetition financing is to facilitate the chapter 11 process.  Such financing should not be approved if its purpose is simply to pervert the reorganization process from one designed to accommodate all classes of creditors and equity interests to one specifically crafted for the benefit of the bank.  In re Ames Dept. Stores, Inc.., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  The purpose of administrative carve-outs has been said "to preserve the adversary system."  Ames, 115 B.R. at 38; In re Tenney Village Co., 104 B.R. 562, 567-68

(Bankr. D.N.H. 1989) (provisions of proposed financing would give lender improper control of

the case).  As more fully stated by the Court in <u>Tenney Village</u>:

> Under the guise of financing a reorganization, the [b]ank would
> disarm the Debtor of all weapons usable against it for the
> bankruptcy estate's benefit, place the Debtor in bondage working
> for the [b]ank, seize control of the reins of reorganization, and steal
> a march on other creditors in numerous ways The Financing
> Agreement would pervert the reorganizational process from one
> designed to accommodate all classes of creditors and equity
> interests to one specially crafted for the benefit of the [b]ank and
> the Debtor's principals who guaranteed its debt.  It runs roughshod
> over numerous sections of the Bankruptcy Code.

104 B.R. at 568.  Thus, while a secured lender may be selective in deciding the scope and

beneficiary of carve outs,  <u>see</u>, <u>e.g.</u>, <u>In re American Resources Mgt. Corp.</u>, 51 B.R. 713 (Bankr.

D. Utah 1985), this right is not open-ended and should be addressed at the beginning rather than

the conclusion of the case.

41.    In short, the issue is one of whether a party may enjoy the benefits of chapter 11

without permitting the adversary system to function.  Accordingly, it is respectfully submitted

that in the event that the Court grants the DIP Motion, the Committee's professionals be

provided with an appropriate carve-out with which to carry out their fiduciary duties to the

estate, including a full investigation of the extent and validity of Patriarch's and the Senior

Secured Noteholders' liens and possible causes of action.  A full and fair investigation of these

claims must be conducted.  The DIP Lenders should not be permitted to march quickly through

their agenda, while denying the Committee the necessary funds to perform its statutory

obligations to the estate.

## H.    The Final DIP Order Should Not Limit the Committee's Ability to Exercise its Statutory Mandate

42.    In addition to providing for a cap on Committee fees that will not enable the

Committee to play a meaningful role in this case, the DIP Facility places impermissible

restrictions on the Committee's ability to fulfill its fiduciary duties to the estate.  Indeed, the

proposed Final DIP Order provides that no more than $25,000 of the DIP Facility may be used to

investigate any claims, causes of action or causes of action against the Debtor's prepetition

lenders.  In the event that this Court approves the DIP Motion, this limitation should be stricken

from the DIP Facility.  The Committee must be empowered to conduct a full investigation with

respect to the Debtor's pre-petition indebtedness, the validity of the liens asserted by the

prepetition lenders, and the existence of claims against them.  This is particularly true in the case

of the Ad Hoc Group, which includes F.A. Voight & Associates, L.P. ("Voight"), an entity that

owes the estate approximately $500,000 pursuant to a promissory note.  The DIP Lenders should

not be able use the DIP Facility to insulate Voight from any action by the estate to recover this

debt, which is legitimately due and owing.

**I.      The DIP Lenders Should Be Precluded From Credit Bidding In Connection with a
        363 Sale Unless the Administrative Solvency of This Estate is Assured**

        43.      The DIP Facility provides that the DIP Lenders must be authorized under the

Final DIP Order to credit bid the amount of their postpetition claims in connection an asset sale

under section 363 of the Bankruptcy Code.  The DIP Lenders should not be permitted to credit

bid any portion of their claim without assurances that sufficient cash will be available to pay the

Debtor's administrative creditors in full.  Not only would permitting the DIP Lenders to credit

bid up to $20 million in the absence of such assurances discourage other prospective purchasers

who might assume more of the Debtor's administrative and priority claims, it would achieve

little more than to guarantee the repayment of the DIP Lenders at the expense of administrative,

priority and general unsecured creditors.

1623923 v3/NY

**J.     The Permissible Budget Variances Must Be Expanded to Avoid the Risk of the Debtor's Premature Default Under the DIP Facility**

44.     In the DIP Facility, the DIP Lenders require the Debtor to covenant that it shall not permit or suffer to exist a variance of the Budget of (i) actual cash receipts that are less than ninety five percent (95%) of the projected amounts set forth in the Budget, in the aggregate, tested weekly; and (ii) actual expenses and cash disbursements that are greater than one hundred and five percent (105%) of the projected amounts set forth in the Budget, in the aggregate, tested weekly on a cumulative basis.  <u>See</u> DIP Facility § 6.2(a).   These variances are extremely tight and put the Debtor at risk of a premature default. Accordingly, the allowed variances should be expanded to at least 10 percent.

<u>**RESERVATION OF RIGHTS**</u>

45.     In the event that any further motions or proposed orders are submitted to the Bankruptcy Court prior to the hearing, the Committee reserves all of its rights to object to any and all provisions of such orders.

<u>**CONCLUSION**</u>

46.     The Debtor and the DIP Lenders are likely to respond to the Committee's objections by asserting that the DIP Facility must be approved as proposed because it is the only way for the Debtor to maximize the value of its assets for the benefit of all parties in interest. This contention is without merit.  It is evident that the DIP Lenders have agreed to provide the DIP Facility in order to minimize their exposure under the Senior Secured Notes and to maximize their return from the sale of the Debtor's assets to the detriment of other credit constituencies, including unsecured creditors.  As such, there is no justification for the enormous fees and excessive protections proposed by the DIP Facility or the undue restrictions that the DIP Lenders seek to impose on the Committee.  Indeed, the relief requested by the DIP Motion is

1623923 v3/NY

contrary to the spirit and purpose of the Bankruptcy Code and they should not be approved by this Court.

**WHEREFORE,** the Committee respectfully requests that this Court enter an order denying the Debtor's DIP Motion or modifying the proposed Final DIP Order as recommended by the Committee, and granting such additional relief as is just.

Dated:          April 5, 2010
               New York, New York

Respectfully Submitted,

By:    /s/ Richard S. Kanowitz
       Richard S. Kanowitz , Esq.

Cooley Godward Kronish LLP
Richard S. Kanowitz, Esq. (RK 0677)
Jay R. Indyke, Esq. (JI 0363)
Michael A. Klein, Esq. (MK 7479)

1114 Avenue of the Americas
New York, New York 01136
(212) 479-6000

*Proposed Counsel For The Official Committee Of Unsecured Creditors Of EPV Solar, Inc.*

25