RIKER, DANZIG, SCHERER, HYLAND
 & PERRETTI LLP
Dennis J. O'Grady, Esq. (DO-7430)
Joseph L. Schwartz, Esq. (JS-5525)
Tara J. Mondelli, Esq. (TM-8155)
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

*Attorneys for The Bank of New York Mellon,
as trustee and collateral agent for the EPV
Solar, Inc. 1% Convertible Senior Secured
PIK Notes due 2016*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>EPV SOLAR, INC.,<br><br>                    Debtor. | Chapter 11<br><br>Case No. 10-15173 (MBK) |

**OBJECTION OF THE BANK OF NEW YORK MELLON, AS TRUSTEE AND
COLLATERAL AGENT, TO THE DEBTOR'S MOTION FOR A FINAL ORDER
(A) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING,
GRANT SECURITY INTERESTS AND LIENS AND ACCORD PRIORITY STATUS
PURSUANT TO 11 U.S.C. §§ 361, 364(c) AND 364(d); (B) AUTHORIZING USE OF
CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2)(B); (C) GRANTING
ADEQUATE PROTECTION; (D) GIVING NOTICE OF FINAL HEARING PURSUANT
TO BANKRUPTCY RULE 4001(b)(2) AND (c)(2); AND (E) MODIFYING AUTOMATIC
<u>STAY PURSUANT TO 11 U.S.C. § 362(d)</u>**

The Bank of New York Mellon, as Trustee and Collateral Agent (the "Indenture Trustee") for the EPV Solar, Inc. 1% Convertible Senior Secured PIK Notes Due 2016 (the "Notes"), by and through its attorneys Riker, Danzig, Scherer, Hyland & Perretti, LLP, hereby submits this Objection (the "Objection") to the Motion of the Debtor, EPV Solar, Inc. (the "Debtor") for a Final Order (A) Authorizing the Debtor to Obtain Post-Petition Financing, Grant Security Interests and Liens and Accord Priority Status Pursuant to 11 U.S.C. §§ 361, 364(c),

and 364(d); (B) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§ 363(c)(2)(B); (C) Granting Adequate Protection; (D) Giving Notice of Final Hearing Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2); and (E) Modifying Automatic Stay Pursuant to 11 U.S.C. § 362(d) [Docket No. 74] (the "DIP Financing Motion"), and states as follows:

## PRELIMINARY STATEMENT

1.      Through the DIP Financing Motion, the Debtor seeks approval, on a final basis, of a $20 million senior secured, superpriority DIP Loan[1] to be provided by the DIP Lenders, some of whom may also be holders of the Notes. The Court previously approved, on an interim basis, the Debtor's borrowing of up to $4.2 million, which advances allowed the Debtor to repay Patriarch. Although the Debtor now seeks approval of the balance of the DIP Loan, the vast majority of the DIP Loan does not represent actual borrowed advances that will fund the Debtor's operations or provide working capital to enable the Debtor to market and sell its assets. Instead, the vast majority of the remainder of the DIP Loan constitutes an impermissible Roll-Up of the DIP Lenders pre-petition Notes enabling the Debtor to improperly elevate the DIP Lenders' prepetition debt as Noteholders to the status of superpriority DIP liens. The Debtor has provided no legitimate justification for this preferential treatment of the DIP Lender Noteholders. The Roll-Up should not be approved because it serves only to provide a disproportionate benefit to the DIP Lenders as Noteholders to the detriment of the general creditor body, as well as to the detriment of those Noteholders who are not DIP Lenders.

---

[1] Capitalized terms not otherwise defined in this Preliminary Statement are defined in the text of this Objection.

4030563.4

## BACKGROUND

### A. The Debtor

2. On February 24, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), commencing the bankruptcy case (the "Bankruptcy Case").

3. On March 10, 2010, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in the Bankruptcy Case.

### B. The Indenture, the Notes and the Collateral

4. The Indenture Trustee serves pursuant to an Indenture dated as of June 4, 2009 (the "Indenture," a true copy of which was attached to the Initial Indenture Trustee Objection (defined below) as Exhibit "A"), by and among the Indenture Trustee, the Debtor as "Issuer," and certain domestic subsidiaries of the Debtor as "Guarantors" (the "Guarantors").

5. Pursuant to the Indenture, the Debtor issued $47,999,450 of Notes, on which the Debtor is obligated to make payment of all amounts due and on which the Guarantors have each guaranteed payment.

6. As of the Petition Date, the Debtor owed approximately $57,182,643 under the Notes.

7. The Indenture Trustee serves as Collateral Agent ("Collateral Agent") under the related Security Agreement ("Security Agreement," a true copy of which was attached to the Initial Indenture Trustee Objection as Exhibit "B," and collectively, with the Indenture and certain other agreements executed therewith, the "Financing Documents"), dated as of June 4, 2009, for the benefit of the holders of the Notes (the "Noteholders").

8.	Pursuant to the Security Agreement, the Debtor and the Guarantors granted the Indenture Trustee a security interest in substantially all of the assets of the Debtor and the Guarantors, subject to certain delineated exceptions.  (See Security Agreement at § 3.)  Further, as part of the issuance of the Notes, the Indenture Trustee was granted a security interest in all the assets of a nondebtor affiliate of the Debtor, EPV Solar Germany GmbH ("EPV Germany").  (See Security Transfer Agreement dated June 4, 2009, by and between the Indenture Trustee and EPV Germany, a true copy of which was attached to the Initial Indenture Trustee Objection as Exhibit "C" and Global Assignment Agreement dated June 4, 2009, by and between the Indenture Trustee and EPV Germany, a true copy of which was attached to the Initial Indenture Trustee Objection as Exhibit "D.")

  **C.** **The Patriarch Facility and the Subordination Agreement**

9.	In November 2009, the Debtor obtained a secured term loan (the "Patriarch Facility") from Patriarch Partners Agency Services, LLC ("Patriarch"), which was purportedly intended to serve as bridge financing to allow the Debtor sufficient time to market its business and assets for sale.  The Debtor failed to repay the Patriarch Facility on its maturity date, and, according to the Debtor, as of the Petition Date, the Debtor owed Patriarch the approximate amount of $3.6 million.

10.	In connection with the Patriarch Facility, the Debtor entered into a related Security Agreement (the "Patriarch Security Agreement") dated as of November 18, 2009, with Patriarch, pursuant to which the Debtor granted Patriarch first priority liens on substantially all of the Debtor's assets.[2]

---

[2] The assets of EPV Germany were not included in this grant of security.

11. Also, on November 18, 2009, in connection with the Patriarch Facility, and at the direction of 100% of the Noteholders, the Indenture Trustee entered into a Subordination Agreement ("Subordination Agreement," a true copy of which was attached to the Initial Indenture Trustee Objection as Exhibit "E") by and among Patriarch, as administrative agent, for, on behalf of and in the stead of the Senior Creditors (defined therein), the Indenture Trustee and the Debtor. Pursuant to the Subordination Agreement, the parties agreed, among other things, that any and all of the Debtor's obligations under the Patriarch Facility would be senior in payment and priority to all of the Debtor's obligations under the Indenture and the Notes. (See Subordination Agreement at § 2.)

12. The Subordination Agreement expressly provides that no person, other than the actual parties to the Subordination Agreement; to wit Patriarch, the Indenture Trustee and the Debtor, may assert any rights, remedies or claims provided for under the Subordination Agreement. (See Subordination Agreement at § 10.8).

### D.    The Cash Collateral Motion

13. On the Petition Date, the Debtor filed a Motion for Entry of Interim and Final Orders pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 and Fed. R. Bankr. P. 4001 (i) Approving the Use of Cash Collateral, (ii) Providing Adequate Protection, and (iii) Setting a Final Hearing Pursuant to Fed. R. Bankr. P. 4001 [Docket No. 3] (the "Cash Collateral Motion").

14. In the Cash Collateral Motion, the Debtor represented that the use of cash collateral was necessary for the Debtor "to maintain the value and any equity cushion associated with its assets" and to "prevent the abrupt discontinuation of the Debtor's operations." (See Cash Collateral Motion at ¶ 18.)

5

15. On February 26, 2010, Patriarch filed an objection to the Cash Collateral Motion [Docket No. 21] on the primary basis that the Debtor purportedly could not provide Patriarch and the Noteholders with adequate protection for the proposed use of cash collateral through the granting of "replacement liens."

16. On March 1, 2010, the Court entered an order granting the Cash Collateral Motion on an interim basis [Docket No. 33] (the "Interim Cash Collateral Order"). The Cash Collateral Order granted Patriarch and the Indenture Trustee certain adequate protection, including "replacement liens," as well as liens on all unencumbered assets of the Debtor. A final hearing on the Cash Collateral Motion is scheduled for April 5, 2010.

### E.    The DIP Financing Motion

17. On March 15, 2010, the Debtors filed the DIP Financing Motion, seeking, *inter alia*, $20 million in post-petition secured financing (the "DIP Loan") and the granting of first priority liens and security interests for the benefit of certain of the Noteholders that purport to extend the financing (the "DIP Lenders" or the "DIP Lender Noteholders").[3] (See DIP Financing Motion at ¶¶ 18-19.)

18. In response to the DIP Financing Motion, the Indenture Trustee filed an objection [Docket No. 96] (the "Initial Indenture Trustee Objection") to the approval of the DIP Financing Motion because, among other things, (i) the Debtor failed to establish that the Noteholders who did not participate in the DIP Loan would be adequately protected as a result of the proposed $20 million priming liens and (ii) the proposed DIP Loan was impermissible

---

[3] The DIP Lenders are members of the Ad Hoc Noteholder Group, which holds 64.7% of the Notes. (See Statement Pursuant to Fed. R. Bankr. P. 2019 of Cole, Schotz, Meisel, Forman & Leonard, P.A. [Docket No. 105] at ¶ 3 and Verified Statement of Brown Rudnick LLP Pursuant to Fed. R. Bankr. P. 2019(a) [Docket No. 106] at ¶ 3.) The Debtor has further represented that the DIP Lenders hold 37% of the Notes. (See Transcript of 3/22/10 Hearing (the "3/22/10 Tr."), a true copy of which is attached hereto as Exhibit "1," at 25:15-16.)

6

because the Roll-Up (defined below) sought to improperly subordinate the repayment of the Notes and the obligation due to the Indenture Trustee to the repayment of the DIP Lenders as Noteholders, in violation of the Indenture and bankruptcy law.

19. The Committee also filed an objection [Docket No. 94] (the "Initial Committee Objection"), which highlighted various infirmities with the proposed DIP Loan, including the improper Roll-Up.

20. At the Initial Hearing, the Court approved the DIP Loan, on an interim basis, up to $4.2 million. The Court did not reach the issue of the Roll-Up and reserved judgment on that and other issues for the final hearing on the DIP Financing Motion, which was scheduled for April 12, 2010 at 2:00 p.m. (the "Final Hearing").

21. The Court thereafter entered an Amended Interim Order on March 26, 2010 [Docket No. 122] (the "Interim Order"). Pursuant to the Interim Order, the DIP Lenders were granted, among other things, a perfected first priority, priming and senior security interest and lien in substantially all of the Debtor's assets ("Priming Lien"), except for the liens held by the Indenture Trustee to secure the Debtor's payment of the Indenture Trustee's reasonable fees, disbursements and expenses, which were specifically excepted from the Priming Lien. (See Interim Order at ¶ 3.)

22. In connection with the Final Hearing, the Debtor now seeks approval of the remaining balance of the purported senior secured, superpriority DIP Loan. However, of this remaining balance, the vast majority, or approximately $13.3 million, is not new money that will be loaned to the Debtor, but instead is a "roll up" of the DIP Lenders' prepetition obligations as Noteholders. As a result, only a small portion of the proposed DIP Loan will actually be advanced to the Debtor to finance the Debtor's operations pending sale.

**OBJECTION**

A. **The DIP Financing Motion Should not be Approved Because the DIP Loan Provides a Disproportionate Benefit to the DIP Lenders to the Detriment of the Creditor Body as a Whole.**

23.  In order to obtain post-petition financing under Section 364(d) of the Bankruptcy Code, a debtor bears the burden of establishing that (i) it is unable to obtain unsecured credit, (ii) the proposed credit is necessary to preserve the assets of the estate and (iii) the terms of the financing are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. See In re Aqua Assoc., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990). If a debtor seeks to grant senior or priming liens in connection with the new financing, the debtor must demonstrate that it was unable to obtain financing without the grant of the priming liens. In re Mid-State Raceway, Inc., 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005).

24.  A bankruptcy court should approve a proposed debtor in possession financing only if such financing "is in the best interest of the general creditor body." In re Roblin Industries, Inc., 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985). See also In re Tenney Village Co., Inc., 104 B.R. 562, 569 (Bankr. D.N.H. 1989) ("The debtor's prevailing obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries"); In re Vanguard Diversified, Inc., 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983).

25.  Thus, proposed post-petition financing may be denied if the terms are overreaching and excessively favorable to the lenders or if the primary purpose is to benefit or improve the position of a particular creditor. See, e.g., Aqua Assocs., 123 B.R. at 195-98 ("[C]redit should not be approved when it is sought for the primary benefit of a party other than a debtor."); Ames Dep't Stores, Inc., 115 B.R. at 37 ("[A] proposed financing will not be approved

where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); Tenney Village Co., Inc., 104 B.R. at 568 (debtor-in-possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the secured creditor.")

26. Indeed, the law has long acknowledged the unequal bargaining power inherent in negotiations leading to proposed post-petition financing, as well as the very significant harm that can befall creditors if the proposed financier is permitted to exploit its leverage position to the detriment of other creditors and the bankruptcy estate. See In re FCX, Inc., 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.")

27. Here, it appears that the vast majority of the DIP Loan is not "necessary to preserve the assets of the estate" in view of the fact that most of the borrowed funds will not actually be advanced but instead are crafted to secure and prioritize the repayment of the prepetition indebtedness of certain Noteholders who also serve as DIP Lenders. This is improper.

**B.     The Proposed Roll-Up Impermissibly Elevates the Treatment of the DIP Lenders Over Other Noteholders in Violation of the Bankruptcy Code.**

28. The DIP Lenders should not be permitted to exploit their leverage as lenders to create a "roll-up" to elevate their prepetition claims on the Notes into post-petition obligations of the Debtor secured by superpriority priming liens on substantially all of the Debtor's assets (the "Roll-Up").

29. Currently, under the Indenture, all the Notes are to be repaid on a *pari passu* basis. However, if the Roll-Up is approved, approximately thirty-five (35%) percent of

the pre-petition Noteholders will be subordinated to the repayment of the Noteholder indebtedness of the DIP Lenders, without the consent of these Noteholders as required by the Indenture (the "Other Noteholders"). As a result, the DIP Financing Motion attempts to circumvent the priority scheme of the Indenture and the Bankruptcy Code.

30. One of the fundamental principles of bankruptcy law is that similar prepetition claims are to be classified together and treated similarly. See 11 U.S.C. §§ 1122. See also In re Baldwin-United Corp., D.H., 43 B.R. 443, 457 (S.D. Ohio 1984) ("It is . . . beyond travail that the most significant policy in bankruptcy jurisprudence is equality of treatment of like-situated creditors.").

31. In keeping with this principle, the conversion of the DIP Lenders' pre-petition debt into DIP indebtedness, preferring the DIP Lenders over other similarly-situated creditors, runs afoul of the Bankruptcy Code. For this reason, courts have found that roll-ups, such as the one proposed under the DIP Financing Motion, should not be permitted. See In re Equalnet Commc'ns Corp., 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) ("[A] secured creditor's pre-petition debt balance may not be paid off and/or 'rolled into' a postpetition line of debtor in possession financing, with resultant enhancement of collateral position and administrative priority."); Gen. Electric Capital Corp. v. Nigro (In re Appliance Store, Inc.), 181 B.R. 237, 243 (Bankr. W.D. Pa. 1995) (describing the roll-up provision in a proposed cash collateral stipulation as a "contract of adhesion" whereby the prepetition lender "wished to extract a pound of flesh without immediately inflicting a mortal wound upon the debtor"). Cf. Shapiro v. Saybrook Mfg. Co., Inc. (In re Saybrook Mfg. Co., Inc.), 963 F.2d 1490, 1494-95 (11th Cir. 1992) (explaining that a post-petition financing order which violates the fundamental priority scheme of the

Bankruptcy Code to the prejudice of creditors is improper); Farmworker Creditors v. Bland (In re Bland), 308 B.R. 109, 116 (S.D. Ga. 2003) (citing Saybrook for the same).

32.  Furthermore, the United States Bankruptcy Court for the District of New Jersey classifies roll-ups as "extraordinary provisions" that cannot be routinely approved. See U.S.B.C. District of New Jersey General Order Adopting Guidelines for Financing Requests, dated November 25, 2009 (the "General Order"). This view is consistent with that of other bankruptcy courts. See, e.g., U.S.B.C. District of Delaware Local Rule 4001-2; U.S.B.C. Southern District of New York, General Order No. 274, dated September 9, 2002. The General Order provides "that ordinarily [extraordinary provisions] will not be approved in interim orders without substantial cause shown, compelling circumstance and reasonable notice." General Order at p. 2.

33.  The General Order cites several factors that must be considered in approving a roll-up, including:

> (a) The nature and amount of new credit to be extended, beyond the application of proceeds of postpetition financing used to pay in whole or in part the prepetition debt;
>
> (b) Whether the advantages of the postpetition financing justify the loss to the estate of the opportunity to satisfy the prepetition secured debt otherwise in accordance with applicable provisions of the Bankruptcy Code, and the burdens on the estate of incurring an administrative claim;
>
> (c) Whether the rollup can be unwound . . .;
>
> (d) Availability under the terms of the DIP financing and a comparison to the terms that would be available in the absence of the rollup;
>
> (e) The extent to which prepetition and postpetition collateral can, as a practical matter, be identified and/or segregated;
>
> (f) The extent to which difficult "priming" issues would have to be

11

>   addressed in the absence of a rollup; and
>
>   (g) Whether the postpetition advances are used to repay a pre-bankruptcy, "emergency" liquidity facility secured by first priority liens on the same collateral as the postpetition financing, where the prepetition facility was provided in anticipation of, or in an effort to avoid, a bankruptcy filing.

General Order at § II.A.2. Other factors to be considered include: (i) "the degree of consensus among parties"; (ii) "[t]he extent and value of the prepetition liens held by the prepetition lender (and in particular the amount of any 'equity cushion' that the prepetition lender may have)"; (iii) whether the roll-up "will give an undue advantage to prepetition lenders without a countervailing benefit to the estate." General Order at § II.A.1(c)-(e).

34. In light of the foregoing case law and the General Order, the Debtor has not met its burden to demonstrate why the proposed Roll-Up should be approved. Indeed, the Debtor only seeks to actually borrow a maximum of approximately $6.6 million, approximately $4 million of which will be or has been used to repay the Patriarch Facility. Further, the Debtor has represented to this Court that "[t]he proposed DIP is intended to serve fundamentally the same purpose that the Patriarch Loan was intended to serve prepetition." (See 3/22/10 Tr. at 9:17-19). To accomplish this objective, the Debtor solely seeks, <u>at a maximum</u>, approximately $2.6 million to fund operational costs pending sale. The remainder of the $20 million facility constitutes the roll-up of $13.3 million in pre-petition Noteholder obligations, which confers no direct benefit to the estate.

35. Also of note is the fact that certain members of the Ad Hoc Noteholder Group, in their capacity as proposed DIP Lenders, may not even be the same entities making the DIP Loan. Instead, "affiliates (including another fund investment managed by the

12

same entity) of the [DIP Lenders] may provide the funding and serve as DIP Lenders." (DIP Financing Motion at ¶ 20.C.)

36. Additionally, the DIP Lenders may also assign and sell their participations both in the DIP Loans and in the commitments to make the DIP Loans to third parties who may not be members of the pre-petition Noteholder class. (DIP Financing Motion at ¶ 20.II). In light of this, the justification for the Roll-Up becomes even more tenuous.

37. In sum, through the improper Roll-Up, the DIP Financing Motion proposes to elevate the claims and liens of the DIP Lenders to the detriment of the Indenture Trustee and the rest of the Noteholder constituency. This should not be permitted.

### C. The Debtor Has Failed to Demonstrate That the Proposed Adequate Protection is Sufficient.

38. Sections 363(p)(1) and 364(d)(2) of the Bankruptcy Code places the burden of proof on the issue of adequate protection on the Debtor. See 11 U.S.C. §§ 363(p)(1) and 364(d)(2); Save Power Ltd. v. Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.), 193 B.R. 713, 716 (Bankr. D. Del. 1996). The main purpose of adequate protection is to maintain the status quo and protect the value of a secured creditor's interest in its collateral as of the time of the bankruptcy filing. Roe Excavating, Inc. v. Thorp Discount, Inc. (In re Roe Excavating, Inc.), 52 B.R. 439, 440 (Bankr. S.D. Ohio 1984); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (adequate protection is meant to "safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization").

39. As the Third Circuit explained in Resolution Trust Corp. v. Swedeland Development Group, Inc. (In re Swedeland Development Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994):

13

> [A] proposal depending upon a pre-petition lender having adequate protection, no matter its form, "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." [citations omitted] Whether protection is adequate "depends directly on how effectively it compensates the secured creditor for loss of value" caused by the superpriority given to the post-petition loan [citations omitted]. In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing.

Swedeland, 16 F.3d at 564.

40. In Swedeland, the Third Circuit determined that the debtor's proposed adequate protection, which included: (i) payment of future release prices for each unit sold, (ii) the increased value of the property due to continued construction, (iii) continuation of prepetition liens, (iv) turnover of a portion of a cash collateral account to the lender, and (v) personal guaranties by the debtor's principals, was insufficient to adequately protect the prepetition secured lender's interest. Id. at 565-66. The Third Circuit in Swedeland also determined that "continued construction based on projections and improvements to the property does not alone constitute adequate protection" but could serve as adequate protection only when made in conjunction with the provision of additional collateral beyond the contemplated improvements. Id. at 566 (citation omitted).

41. Here, the Debtor offers much less to the Other Noteholders by way of adequate protection than the debtor in Swedeland, which the Third Circuit deemed insufficient.[4] In fact, here, the Debtor's offer of adequate protection under the DIP Financing Motion is very similar to the adequate protection <u>already provided</u> in connection with the Cash Collateral Order.

---

[4] The Indenture Trustee's lien to secure the Debtor's payment of its reasonable fees, disbursements and expenses was not impaired by the entry of the Interim Order because it was specifically excepted from the DIP Lenders' Priming Lien and should similarly not be impaired by any final Order. (See Interim Order at ¶ 3.)

4030563.4

In particular, as adequate protection under the Cash Collateral Motion, the Debtor offered, and has provided on an interim basis through this Court's March 1, 2010 Cash Collateral Order, among other things, replacement liens on all of the Debtor's assets, including liens on all of the Debtor's then-unencumbered assets. (See Cash Collateral Order at ¶ 2.) Now, pursuant to the DIP Financing Motion, the Debtor purports to offer the Other Noteholders replacement liens, current interest at the non-default rate on the Notes and a "silent second lien" on all property of the Obligors, junior to all claims and liens of the DIP Lenders. (See DIP Financing Motion at ¶ 20.L).

42. The Debtor cannot impair the liens and replacement liens previously granted to the Noteholders under the Cash Collateral Order. See In re Plabell Rubber Products, Inc., 137 B.R. 897 (Bankr. N.D. Ohio 1992).

43. Given the fact that the Debtor has little, if any, ongoing operations, the Debtor's offer of replacement liens is surely illusory. This is particularly true in light of the fact that the value of the replacement liens proposed by the DIP Financing Motion cannot possibly adequately protect against the more than $16 million by which the DIP Loan is increased and which would diminish the Other Noteholders' previously-granted adequate protection and other lien interests in the Debtor's assets in connection with the use of Cash Collateral.

44. Similarly, the granting of a "silent second lien" is also illusory due to the fact that the Other Noteholders already hold liens against most, if not all, of these assets.

45. Furthermore, mere assertions of a substantial equity cushion by the Debtor are not sufficient to establish adequate protection. Because the Debtor has the burden on

4030563.4

the issue of adequate protection, unless and until the Debtor can competently demonstrate that the Other Noteholders are adequately protected, the DIP Financing Motion should be denied.

### D. The DIP Financing Motion Contains Numerous Other Objectionable Provisions Which Should not be Approved by the Court.

46. In addition to the foregoing, the Indenture Trustee objects to the DIP Financing Motion for the reasons enumerated below:

47. **Benefits to DIP Lenders.** The DIP Financing Motion provides the DIP Lenders with consideration far beyond a priming lien. For example, the DIP Lenders would also receive by way of assignment the intercompany loans due from EPV Germany, which purportedly have a face value in excess of $24 million. (See DIP Financing Motion at ¶ 20.R.).

48. Also, the DIP Lenders would improperly receive the right to credit bid up to $20 million in connection with any sale or disposition of assets in the Bankruptcy Case, which would likely result in the DIP Lenders' controlling the Bankruptcy Case. (See id. at ¶ 20.GG).

49. **Unjustified Fees.** The fees paid or payable to the DIP Lenders under the DIP Financing Motion are excessive and improper. For example, the Interim Order allowed for the vesting of a $1 million Origination Fee (five (5%) percent multiplied by the full aggregate principal amount of the DIP Loan) to be repaid in connection with the sale of any of the Debtor's assets. (See Interim Order at ¶ 10.) The DIP Lenders also seek, in connection with the entry of a final order, a $1 million Exit Fee (five (5%) percent of the amount so prepaid or the DIP Loan then payable) to be paid in connection with the sale of the Debtor's assets or any other mandatory prepayment event. (See DIP Financing Motion at ¶ 20.Q.) The justification for such fees, on top of the other consideration already being granted to the DIP Lenders, is excessive.

## **CONCLUSION**

WHEREFORE, for all of the foregoing reasons, the Indenture Trustee respectfully requests that the Court (i) deny approval of the DIP Financing Motion on a final basis, and (ii) provide for such other and further relief as the Court deems appropriate.

Dated:   April 5, 2010
         Morristown, New Jersey

                        RIKER DANZIG SCHERER HYLAND
                         & PERRETTI LLP
                             /s/ Joseph L. Schwartz
                        Dennis J. O'Grady, Esq.
                        Joseph L. Schwartz, Esq.
                        Tara J. Mondelli, Esq.

*Attorneys for The Bank of New York Mellon, as trustee and collateral agent for the EPV Solar, Inc. 1% Convertible Senior Secured PIK Notes due 2016*