**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq. (KR 4963)
S. Jason Teele, Esq. (SJT 7390)
Timothy R. Wheeler, Esq. (TW 3466)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

*Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>EPV SOLAR, INC.,<br><br>               Debtor. | Chapter 11<br><br>Case No.  10-15173 (MBK) |

**MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363 AND 365 (I) AUTHORIZING AND APPROVING THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT, (III) PROVIDING A WAIVER OF THE STAY UNDER BANKRUPTCY RULES 6004(h) AND 6006(d) AND (IV) GRANTING RELATED RELIEF**

EPV Solar, Inc. the debtor-in-possession in the above-captioned case ("EPV" or the "Debtor"), by and through its undersigned counsel, submits this motion (the "Motion") for entry of an order pursuant to 11 U.S.C. §§ 105(a), 363 and 365 (i) authorizing and approving the sale of substantially all of the Debtor's assets free and clear of liens, claims, encumbrances, and interests, (ii) authorizing and approving the asset purchase agreement, (iii) providing a waiver of the stay under Bankruptcy Rules 6004(h) and 6006(d), and (iv) granting related relief.  In support of the Motion, the Debtor respectfully states as follows:

**PRELIMINARY STATEMENT**

1.     In the almost two months since this Court approved the Akart Sale Transaction (defined below) on June 16, 2010, the Debtor's management team has worked

tirelessly to consummate the Akart Sale Transaction. These efforts included multiple trips to Turkey to assist Akart (defined below) in obtaining final approval for bank financing and grants from the government of the Republic of Turkey, assist Akart in negotiating the purchase of real estate on which the Turkish factory was contemplated to be situated, extend, through its Sunco subsidiary, certain loans to Akart, resolve issues related to the modification and delivery of the hard assets, assist with planning and design of the Turkish factory, and work out the final closing details with Akart representatives. Although substantial progress toward a closing was made as a result of these efforts, Akart's CEO, Kemal Celik, became very difficult to reach and non-communicative, disappearing without explanation for several days on end and failing to show up for multiple meetings with the Debtor's management team as well as bank and government officials. On their final trip to Turkey in late July 2010, members of the Debtor's management team arrived in Istanbul expecting to close the Akart Sale Transaction on July 26, 2010, but Mr. Celik was non-responsive and nowhere to be found. After postponing the closing for two additional days in the hope of salvaging the asset sale, the Debtor, in consultation with the DIP Lenders, made the difficult, but necessary decision to abandon the Akart Sale Transaction and consider other options.

2.    The DIP Financing Facility (defined below) is now entirely expended. Under its express terms, the Debtor's failure to close the Akart Sale Transaction is an event of default under the DIP Financing Facility (defined below) and triggered the Debtor's obligations to immediately repay all amounts due thereunder. With no other viable offers to purchase the Debtor's assets, the Debtor commenced negotiations with the DIP Lenders, which culminated in the DIP Lenders' credit bid offer to purchase the Debtor's assets, subject to higher and better offers at the hearing on this Motion.

3.    Crucially, the Debtor has no other alternatives available to it. The DIP Lenders are unwilling to provide further financing to the estate. Thus the Debtor faces the Hobson's choice of a foreclosure by the DIP Lenders or the sale, subject to higher and better offers, proposed herein. Moreover, the proposed sale is the only means to preserve the value of

the Debtor's assets and business, which will preserve numerous jobs and ensure a going concern (albeit one that is owned by the DIP Lenders) that will purchase goods and services from vendors well into the future.  Under the circumstances present in this case, the Debtor has concluded that the sale proposed herein is in the best interests of the estate and all creditors.

## RELIEF REQUESTED

4.      By this Motion, the Debtor seeks the entry of an order approving the sale of substantially all of the Debtor's assets to the DIP Lenders (the "DIP Lenders Sale Transaction") or the entity that submits the highest and best offer at the hearing on this Motion (the "Second Sale Hearing").

## JURISDICTION AND VENUE

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory predicates for the relief requested herein are Sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules and Bankruptcy Procedures (the "Bankruptcy Rules") 2002, 6004, 6006 and 9014.

## HIGHLIGHTED DISCLOSURES

7.      This Motion conforms to the November 25, 2009 *General Order Adopting Guidelines for Sale of Estate Property* (the "Guidelines").  The Guidelines require specific disclosure of certain provisions affecting a sale of the Debtor's assets, the justification therefor, and the location of any such provisions in the proposed sale order and any agreement related to the sale.  The disclosures required by the Guidelines are set forth in **Exhibit A** hereto.

## BACKGROUND

**A.      In General.**

8.      On February 24, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its

business and manage its properties as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this case. On March 10, 2010, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in this case.

        9.      The Debtor is a New Jersey corporation that designs, develops, manufactures, and markets low-cost amorphous silicon thin-film photovoltaic solar modules ("a-Si Modules") using the Debtor's proprietary Integrated Manufacturing System (the "IMS"). The Debtor has designed several a-Si Module manufacturing facilities around the world that utilize the equipment comprising the IMS and related technology.

        10.     In addition to its United States-based business, the Debtor conducts business abroad through three non-debtor subsidiaries. The Debtor is the direct parent, and owns 100% of the capital stock, of EPV Solar Europe Limited ("EPV Europe"), a non-resident Irish company domiciled in Bermuda. EPV Europe in turn owns 100% of the capital stock of EPV Solar Ireland Limited ("EPV Ireland"). EPV Ireland owns 100% of the capital stock of EPV Solar Germany GmbH ("EPV Germany", and together with EPV Europe and EPV Ireland, the "Non-Debtor Subsidiaries"). EPV Germany owns an a-Si Module manufacturing facility in Senftenberg, Germany. The Non-Debtor Subsidiaries are not debtors in this or any insolvency proceeding.

        11.     On March 15, 2010, the Debtor filed a motion for interim and final orders authorizing post-petition financing (the "DIP Financing Motion") (Docket No. 74). The DIP Financing Motion sought interim and final approval for a $20 million post-petition financing facility with certain lenders (the "DIP Lenders"), including Tenor Capital Management Company, L.P. ("Tenor Capital"), to among other things, refinance and replace the Debtor's pre-petition secured financing facility and provide the Debtor with working capital (as amended and supplemented, the "DIP Financing Facility").

        12.     On March 26, 2010 the Court entered an order granting the DIP Financing Motion on an interim basis (the "Interim DIP Financing Order") (Docket No. 122).

13.     On April 20, 2010, the Debtor filed a motion for a supplemental post-petition financing (the "Supplemental Application for DIP Financing") (Docket No. 246).  In the Supplemental Application for DIP Financing, the Debtor sought, among other things, Court approval of an additional $11.3 million in post-petition financing from Tenor Capital to facilitate the proposed sale of the Debtor's manufacturing assets (the "Akart Sale Transaction") to a Turkish entity, Akart Anerji Fabrika Anonim Siirketi ("Akart"), for payments totaling $52.5 million plus other consideration (the "Purchase Price").

14.     On May 10, 2010, the Court entered an order approving the DIP Financing Motion and Supplemental Application for DIP Financing on a final basis (the "Final DIP Financing Order") (Docket No. 298).  As approved by the Final DIP Financing Order, the DIP Financing Facility contemplated, *inter alia*, funding the Debtor's asset sale process through consummation of the Akart Sale Transaction.

15.     Following extensive negotiations, the Debtor, along with other relevant parties and the Committee agreed to a settlement agreement that resolved the Committee's issues in this chapter 11 case (the "Committee Settlement") and cleared the path toward completion of the Akart Sale Transaction.  On April 30, 2010, the Debtor filed an application to approve the Committee Settlement (the "9019 Motion").  On May 24, 2010, the Court entered an order granting the 9019 Motion and approving the Committee Settlement (Docket No. 342).

16.     On June 1, 2010, the Debtor filed a motion for an order pursuant to sections 105 and 363 of the Bankruptcy Code approving the Akart Sale Transaction (the "Sale Motion") (Docket No. 361).

17.     On June 16, 2010, the Court entered an order granting the Sale Motion and approving the Akart Sale Transaction (the "Akart Sale Order").

18.     Upon the entry of the Akart Sale Order, the Debtor's management team immediately began working to consummate the Akart Sale Transaction.  These efforts included multiple trips to Turkey to assist Akart in obtaining final approval for bank financing and grants from the government of the Republic of Turkey, assist Akart in negotiating the purchase of real

estate on which the Turkish factory was contemplated to be situated, extend, through its Sunco subsidiary, certain loans to Akart, resolve issues related to the modification and delivery of the hard assets, assist with planning and design of the Turkish factory, and work out the final closing details with Akart representatives.  Although substantial progress toward a closing was made as a result of these efforts, Akart's CEO, Kemal Celik, became very difficult to reach and non-communicative, disappearing without explanation for several days on end and failing to show up for multiple meetings with the Debtor's management team as well as bank and government officials.

19.    On their final trip to Turkey in late July 2010, members of the Debtor's management team arrived in Istanbul expecting to close the Akart Sale Transaction on July 26, 2010, but Mr. Celik was non-responsive and nowhere to be found.  After postponing the closing for two additional days in the hope of salvaging the asset sale, the Debtor, in consultation with the DIP Lenders, made the difficult, but necessary decision to abandon the Akart Sale Transaction and consider other options.

20.    Pursuant to the Final DIP Financing Order, the Debtor's failure to close the Akart Sale Transaction is an event of default under the DIP Financing Facility and triggered the Debtor's obligations to immediately repay all amounts due thereunder, which as of the date of this Motion amount to approximately $27,210,293.00.[1]  *See* Final DIP Financing Order, ¶¶ 3, 12.  As a result of the default the DIP Lenders may enforce their first-priority liens and foreclose on their collateral.  *See* Final DIP Financing Order, ¶¶ U, 3, 5, 13-14.

21.    To avoid a foreclosure, the Debtor commenced negotiations with the DIP Lenders that culminated in the DIP Lenders' offer to credit bid up to the total amount of their post-petition secured claim (approximately $27,210,293.00) to purchase substantially all of the Debtor's assets, subject to higher and better offers at the Second Sale Hearing.

---

[1]    The initial aggregate amount of the DIP Financing Facility was $38,500,293.00.  Upon the failure of the Akart Sale Transaction to close, the Debtor repaid $11,290,000.00 of "Additional New Money Loans" to Tenor Capital pursuant to the Final FIP Financing Order.

22.     Although the Debtor was working to close the Akart Sale Transaction, it received one unsolicited expression of interest to acquire only the Debtor's New Jersey manufacturing assets.  The Debtor provided this party with substantial due diligence, including management presentations and site tours, but no firm offer was ever made.  Other than the DIP Lenders' offer embodied in the DIP Lenders' proposal (described below), Debtor has no firm offers for any of its assets and has received no definitive expressions of interest with proof of funds from any party.

**B.      Summary Of The Proposed DIP Lenders Sale Transaction.**

23.     In connection with the DIP Lenders Sale Transaction, the DIP Lenders and the Debtor propose to enter into an asset purchase agreement (the "<u>APA</u>") substantially in the form annexed hereto as **<u>Exhibit B</u>** with the objective of selling substantially all of the Debtor's assets to the DIP Lenders.  The salient provisions of the APA include the following:

| | |
|---|---|
| **Purchaser:** | NewCo, a Delaware corporation in formation.[2] |
| **Purchased Assets:** | Substantially all of the Debtor's assets, including the following: |
| | (i) cash and cash equivalents; |
| | (ii) accounts receivable; |
| | (iii) equipment; |
| | (iv) contracts and leases essential to Debtor's business, as listed on Schedule 2.1 to the APA; |
| | (v) outstanding stock of EPV Solar Europe Limited; |
| | (vi) permits; |
| | (vii) intellectual property; |
| | (viii) inventory; |
| | (ix) capital leases; |

---

[2]     The purchaser's identity as "NewCo" is temporary and will be changed upon selection of a corporate name by the DIP Lenders.

(x) goodwill;

(xi) causes of actions, including avoidance actions under the Bankruptcy Code; and

(xii) minority ownership interest in Solar Plus - Produção de Painéis Solares, S.A.

**Assumed Liabilities:**   The DIP Lenders have agreed to bear cure costs under any contract or lease to be assumed under the APA.

**Purchase Price:**   The Purchase Price consists of the following:

(i) the DIP Lenders' credit bid in the amount of the Debtor's total outstanding obligations under the DIP Financing Facility, and

(ii) the DIP Lenders' assumption of the Assumed Liabilities.

**Closing Date:**   The closing shall occur on the third business day following the day all conditions precedent are satisfied or waived.

**Conditions Precedent:**   The entry of an order by the Bankruptcy Court, approving the APA and the transactions it contemplates, is one of the conditions precedent to the closing of the DIP Lenders Sale Transaction.

**Termination:**   The APA will terminate if, among other reasons, the Closing Date does not occur by September 15, 2010, or, if a higher or otherwise better bid than the DIP Lenders' bid is submitted at the Second Sale Hearing.

**Miscellaneous:**   The APA does not provide for any break-up fee or expense reimbursement for the benefit of the DIP Lenders, if a higher or otherwise better bid than the DIP Lenders' bid is submitted at the Second Sale Hearing.

24.   The DIP Lenders' offer is subject to higher and better offers that may be submitted at the Second Sale Hearing. The APA does not provide the DIP Lenders with a break-up fee or expense reimbursement.

## C.   The DIP Lender Sale Transaction Is Subject To Higher And Better Offers.

25.   As previously noted, the Debtor has received no other firm offers. Nevertheless, the Debtor desires to receive the greatest value for its assets. To this end, the DIP

Lender Sale Transaction will be subject to higher and better offers (as determined by the Debtor in consultation with the DIP Lenders and the Committee and approved by the Court) submitted at the Second Sale Hearing.  As set forth below, this Motion will be served on, *inter alia*, all entities known to have expressed a *bona fide* interest in acquiring the Debtor's assets.

26.    In order for a bid submitted at the Second Sale Hearing to be considered a higher and better offer, it must:

> (i)    be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are not more burdensome or conditional to the Debtor than those contained in the APA,
>
> (ii)    not be contingent on obtaining financing or the outcome of unperformed due diligence,
>
> (iii)    be in an amount equal to at least the purchase price reflected in the APA plus an initial bid increment of $100,000.00,
>
> (iv)    not be conditioned on or request any bid protections,
>
> (v)    include a commitment to consummate the purchase of the assets within not more than five (5) business days after entry of an order approving such offer,
>
> (vii)    be accompanied by a deposit in immediately available funds equal to ten percent (10%) of the proposed purchase price, and
>
> (viii)    be accompanied by substantive proof of funding sufficient to consummate the asset sale transaction.

27.    Bidding at the Second Sale Hearing will be in increments of $250,000.00.

28.    The Debtor submits that these requirements will encourage bidders to submit offers at the Second Sale Hearing without exposing the Debtor to the whims of non-serious parties who are unable or unwilling to close a transaction.

## LEGAL AUTHORITY

**A.      The Bankruptcy Code Permits the Debtor to Sell Assets to Preserve the Value of its Estate.**

29.      Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Courts have uniformly held that approval of a proposed sale of a debtor's assets outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that sound business reasons justify the transaction. *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Chateaugay Corp.*, 973 F.2d 141, 143-145 (2d Cir. 1992) (affirming the debtors' ability to sell "an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization"); *see also Fulton State Bank v. Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate outside the ordinary course of business if he has an articulated business justification.") (citations omitted); *Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir.  1986) ("… a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re General Motors Corp.*, 407 B.R. 463, 489 (Bankr. S.D.N.Y. 2009) ("it is plain that in the Second Circuit, as elsewhere, even the entirety of a debtor's business may be sold without waiting for confirmation when there is a good business reason for doing so") (internal citations omitted); *In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) ("there has to be some articulated business justification for the use, sale or lease of property outside of the ordinary course of business") (internal citations omitted), *aff'd*, 576 F.3d 108 (2d Cir. 2009).

30.      Because the Akart Sale Transaction did not close, the Debtor is in default under the DIP Financing Facility.  The Debtor is out of cash.  Given this dire financial situation,

the Debtor has determined that a sale of substantially all of its assets as proposed in the APA is the best means for preserving and maximizing value for all creditors.  The alternative to the DIP Lenders Sale Transaction is a foreclosure by the DIP Lenders, which does not offer even the possibility that a higher and better offer will be received.  The DIP Lenders Sale Transaction is designed to encourage any other party to submit a higher and better offer and therefore is in the best interests of creditors and the estate.

31.    In the Debtor's business judgment, at least four (4) considerations demonstrate that the DIP Lenders Sale Transaction represents the highest and best offer for the manufacturing assets.  First, the DIP Lenders Sale Transaction was negotiated at arms' length. Second, while the Debtor has previously received expressions of interest from several parties none of those parties has made a firm offer to purchase the Debtor's assets.  By contrast, the DIP Lenders have submitted a firm offer (as reflected in the APA) to purchase the manufacturing assets based upon a credit bid of their secured claim.  Third, the Debtors are out of time, out of money and need to close quickly to avoid further diminution in the value of the assets.  The parties will be able to close the DIP Lenders Sale Transaction very quickly because the DIP Lenders' bid is a credit bid.  Finally, consistent with its fiduciary obligations, the Debtor has permitted and will continue to permit interested parties to conduct due diligence and submit higher and better offers at the Second Sale Hearing.

32.    The Debtor submits that the foregoing reasons provide ample business justification for the DIP Lender Sale Transaction.  Once a debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal quotations omitted).  A debtor's business judgment "should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (internal citations omitted).

33.     Additionally, courts have permitted a sale of all or substantially all of a debtor's assets outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  *See generally*, *Abbotts Dairies*, 788 F.2d 143 (3d Cir. 1986); *Lionel*, 722 F.2d at 1063; *In re Equity Funding Corp.  of America*, 492 F.2d 793, 794 (9th Cir.), cert. denied, 419 U.S. 964 (1974) ("Other circuits have recognized the power of the bankruptcy court under chapter X to authorize a sale of the debtors' property under less than emergency conditions where such sale is necessary to avoid deterioration in the value of the assets").

34.     The proposed sale of the assets pursuant to the DIP Lenders subject to better and higher offers passes the "sound business reason" test.  The sale of the Debtor's manufacturing assets represents the Debtor's best, indeed only, opportunity to maximize the value of its assets.  The value of the Debtor's manufacturing assets will decline absent a prompt sale as proposed herein due to a declining demand for them.  *See Lionel*, 722 F.2d at 1071 (holding that the most important factor for a court to consider in connection with a sale of assets is whether assets are increasing or decreasing in value).

**B.     The Assets May Be Sold Free And Clear Of Liens, Claims And Encumbrances.**

35.     The Debtor requests that the Court authorize the sale of the assets free and clear of all liens, encumbrances and interests which may be asserted against the Debtor's assets, with all such liens and claims to attach to the proceeds of the transaction with the same priority, validity, force and effect as they now have in or against the Debtor's assets.

36.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim, or interest in such property of an entity other than the estate if, among other things:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

37.    The term "any interest," as used in section 363(f), is not defined in the Bankruptcy Code.  In *Folger Adam Security, Inc. v. DeMatteis / MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000), the Third Circuit Court of Appeals specifically addressed the scope of the term "any interest." 209 F.3d at 258.  The court observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is towards "a broader interpretation which includes other obligations that may flow from ownership of the property." *Id.* at 258 (*citing* 3 COLLIER ON BANKRUPTCY 363.06[1]).

38.    As determined by the Fourth Circuit Court of Appeals in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited approvingly and extensively in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the *Folger Adam* Court stated that *Leckie* held that the debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

39.    Section 363(f) permits the Debtor to sell the assets free and clear of all liens and claims, except the liens and claims specifically assumed by the DIP Lenders or another successful bidder.  Each lien and claim that is not the result of an assumed liability satisfies at least one of the five conditions of 11 U.S.C. § 363(f).  Here, the DIP Lenders hold valid, first priority security interest in all of the Debtor's assets, and they consent to the proposed sale.  The DIP Lenders will acquire the Debtor's assets subject to the liens of The Bank of New York Mellon, as trustee and collateral agent for the EPV Solar, Inc. 1% Convertible Senior Secured PIK Notes due 2016 (the "Indenture Trustee") pursuant to the terms of the Final DIP Financing

Order.

40.     Accordingly, the Debtor requests that the assets be transferred to the DIP

Lenders or other successful bidder free and clear of all liens and claims (except for the liens

resulting from any assumed liabilities or those of the Indenture Trustee), with such liens and

claims to attach to the proceeds of the sale of the assets (if the successful bidder is a party other

than the DIP Lenders) and to be distributed in accordance with the Final DIP Financing Order.

**C.     The DIP Lenders' Credit Bid Is Appropriate Under 11 U.S.C. § 363(k) of the
        Bankruptcy Code.**

41.     Because the DIP Lenders hold valid, first priority security interests in all

of the Debtor's assets, section 363(k) of the Bankruptcy Code entitles the DIP Lenders to credit

bid up to the full value of their secured claim in order to effectuate the sale of the Debtor's

assets. *See* Final DIP Financing Order, ¶¶ U, 3, 5.

42.     Secured creditors are allowed to "credit bid" the amount of their claims in

an asset sale under section 363 of the Bankruptcy Code.  Section 363(k) of the Bankruptcy Code

provides, in relevant part, that the holder of a claim secured by property that is the subject of the

sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder

may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if

a secured creditor is undersecured, as determined in accordance with section 506(a) of the

Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its

claim and does not limit the credit bid to the claim's economic value.  *See Cohen v. KB

Mezzanine Fund II, LF (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006)

(explaining that "[i]t is well settled among district and bankruptcy courts that creditors can bid

the full face value of their secured claims under section 363(k)").

43.     By recognizing the DIP Lenders' right to credit bid, the Court's order in

the instant case will eliminate any uncertainty on the matter and help to ensure an orderly sale

process.  Accordingly, the DIP Lenders' credit bid in connection with their acquisition of the

Debtor's assets is appropriate and should be approved.

**D.     The DIP Lenders Are Good Faith Purchasers And Are Entitled To The Full
Protections Of 11 U.S.C. § 363(m).**

44.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

45.     While the Bankruptcy Code does not define "good faith," the Third Circuit

in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), has held that:

> [t]he requirement that a purchaser act in good faith…speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

*Abbots Dairies*, 788 F.2d at 147 (citations omitted).

46.     Moreover, the Second Circuit Court of Appeals has determined that a party

would have to show fraud or collusion between the buyer and the debtor-in-possession or trustee

or other bidders in order to demonstrate a lack of good faith.  *See In re Colony Hill Assocs.,* 111

F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a purchaser's good

faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or

the trustee, or an attempt to take grossly unfair advantage of other bidders.").  *See also In re*

*Gucci*, 126 F.3d 380, 390 (2d Cir. 1997).

47.     The Debtor will make an appropriate evidentiary showing at the Second

Sale Hearing that the APA is the result of a negotiation process in which all parties acted at

arms' length and in good faith, and in which all parties were represented by sophisticated

counsel.  The Debtor thus requests that this Court find that the sale of the assets as proposed

herein is in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Under the circumstances, the DIP Lenders (or another successful bidder) should be afforded the protection that section 363(m) of the Bankruptcy Code provides to a good-faith purchaser.

48.     Accordingly, the DIP Lenders are entitled to the good faith finding envisioned by section 363(m) of the Bankruptcy Code.

**E.     Finality of Order.**

49.     The Debtor requests, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that the Court expressly provide that the effectiveness of any order approving the sale of assets as proposed herein not be stayed for any period of time after the entry of such order.

50.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, *Collier* suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."   10 Lawrence P. King, COLLIER ON BANKRUPTCY, 6004.10 (15th rev. ed. 2006).  *Collier* further provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay, unless the court determines that the need to proceed sooner outweighs the interests of the objecting party.  *Id.*

51.     The Debtor hereby requests that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to seek a stay pending appeal.

## NOTICE

52.     Notice of this Motion has been given to (i) all of the Debtor's known

creditors, (ii) all of the Debtor's known equity holders, (iii) all entities known by the Debtor to have a *bona fide* interest in acquiring its assets, (iv) any party known to have or to assert a lien on any of the Debtor's assets, (v) the Office of the United States Trustee, (vi) counsel to the Committee, (vii) counsel to the DIP Lenders, (viii) the Securities and Exchange Commission, (ix) all federal, state and local regulatory authorities with jurisdiction over the Debtor, including but not limited to taxing authorities and the United States Attorney's Office for the District of New Jersey, (x) all parties who entered a notice of appearance and request for service of pleading pursuant to Bankruptcy Rule 2002.

53.    All parties who expressed an interest in the Debtor's assets and all counterparties to any contracts and leases to be assumed and assigned pursuant to the APA will be provided notice of this Motion by overnight mail or as otherwise directed by the Court.

54.    The Debtor submits that the foregoing notice is adequate and satisfies notice requirements under Sections 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

### NO PRIOR REQUEST

55.    Except as set forth in the Akart Sale Motion, no previous motion for the relief sought herein has been made to this or to any other court.

### WAIVER OF BRIEF

56.    As no novel issue of law is raised and the relevant authorities relied upon by the Debtor are set forth herein, the Debtor respectfully requests that the requirement of the filing of a brief be waived.

[Signature page to follow.]

## **CONCLUSION**

57.    For the foregoing reasons, the Debtor respectfully requests the Court grant
the relief requested in this Motion in all respects, and grant such other and further relief as is just
and proper.

Dated: August 9, 2010

Respectfully submitted,
**LOWENSTEIN SANDLER PC**

  _/s/ S. Jason Teele_____
Kenneth A. Rosen, Esq. (KR 4963)
S. Jason Teele, Esq. (SJT 7390)
Timothy R. Wheeler, Esq. (TW 3466)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

_Counsel to the Debtor and Debtor in Possession_
